IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ELIZABETH PAYNE | § | |
| | § | |
| VS. | § | NO. 3:09-CV-00595-B |
| | § | |
| FRIENDSHIP WEST BAPTIST | § | |
| CHURCH, INC. | § | |

<u>APPENDIX IN SUPPORT OF DEFENDANT FRIENDSHIP WEST
BAPTIST CHURCH'S MOTION FOR SUMMARY JUDGMENT</u>

Respectfully submitted,

John D. Nation
State Bar No. 14819700
Wyde & Nation
3131 Turtle Creek Blvd., Suite 901
Dallas, Texas 75219
214-521-9100
214-521-9130 (facsimile)

Co-Counsel for Defendant

<u>DECLARATION IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>

I, John D. Nation, hereby declare and state that:

1.1.  My name is John D. Nation. I am over 18 years of age and otherwise competent to make this affidavit. I have personal knowledge of the facts stated in this declaration. To my knowledge, all the facts stated in this declaration are true and correct.

1.2  I am a member of the Bar of this Court and a member of the firm of Wyde & Nation. I am one of the attorneys of record for Defendant Friendship West Baptist Church, Inc., who is the movant for summary judgment herein. I submit this declaration in support of Defendant's Motion for Summary Judgment.

1.3  Attached to this declaration as Exhibit 1, and incorporated herein by reference, is a true and correct copy of excerpts of the deposition taken of Plaintiff Elizabeth Payne on December 18, 2009 at the offices of Foreman, Lewis & Hutchison, 611 S. Main Street, Suite 700, Grapevine, Texas 75061. This exhibit is a true and accurate record of the questions and answers received at this deposition.

1.4  The copy of the deposition supplied to counsel is in West E-Transcript Form. Pages in this form are shorter than pages in a normal word-processing program. For ease of reading, I have converted the relevant e-transcript pages to pages in Microsoft Word and then to PDF. The original e-transcript pages (such as 0001, 0002, etc.,) appear against the left-hand margin. As required by Local Rule 56.6 (b), I have separately and sequentially numbered the pages of the appendix in the lower right-hand corner.


[No Omissions]

2

I declare under penalty of perjury that the foregoing is true and correct. I executed this declaration in Dallas, Texas on February 8, 2010.

/s/ **_John D. Nation_**
John D. Nation

EXHIBIT 1: DEPOSITION EXCERPTS OF ELIZABETH PAYNE

0001
1             IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
2                    DALLAS DIVISION
3
  ELIZABETH PAYNE              *
4                             *
     Plaintiff,              *
5                             *
  VS.                        *      CIVIL ACTION FILE NO.:
6                             *      3:09-CV-00595-B
  FRIENDSHIP WEST BAPTIST      *
7  CHURCH, INC.,              *
                             *
8     Defendant.            *
9
10        **********************************
                ORAL DEPOSITION
11              ELIZABETH PAYNE
             DECEMBER 18, 2009
12        **********************************
13
14          ANSWERS AND ORAL DEPOSITION OF ELIZABETH
15  PAYNE, a witness produced at the instance of the Defendant,
16  was taken in the above-styled and -numbered cause on the 18th
17  day of December, 2009, from 10:16 a.m. to 5:30 p.m., before
18  Brooke Barr, CSR in and for the State of Texas, reported by
19  machine shorthand, at the law office of Foreman, Lewis &
20  Hutchison, 611 South Main Street, Suite 700, Grapevine, Texas
21  75061, pursuant to the Federal Rules of Civil Procedure and
22  any provisions stated on the record or attached hereto.
23
24
25
0002
1               A P P E A R A N C E S
2  MS. SUSAN HUTCHISON
   MR. KERN LEWIS
3  MR. RAFE FOREMAN
   FOREMAN, LEWIS & HUTCHISON
4  611 South Main Street
   Suite 700
5  Grapevine, Texas  75061
   Phone:  (817)336-9005
6  Fax:  (817)336-5533
7      COUNSEL FOR THE PLAINTIFF

```
 8
       -AND-
 9
10  MS. FAITH JOHNSON
    MS. CAROL LEXING
11  FAITH JOHNSON & ASSOCIATES
    5201 N. O'Connor Blvd.
12  Suite 500
    Irving, Texas  75039
13  Phone:  (972)401-3100
    Fax:  (972)401-3105
14  E-mail:  fjassociates@att.net
15      COUNSEL FOR THE DEFENDANT
16
       -AND-
17
18  MR. JOHN D. NATION
    WYDE & NATION
19  3131 Turtle Creek
    Suite 901
20  Dallas, Texas  75205
    Phone:  (214)521-9100
21  Fax:  (214) 521-9130
    E-mail:  nationlawfirm@gmail.com
22
       CO-COUNSEL FOR DEFENDANT
23
24  Also present:  Elizabeth Moffitt, Representative of
    Friendship West Baptist Church
25
0003
 1          W I T N E S S   I N D E X
                              PAGE
 2  ELIZABETH PAYNE:
 3  EXAMINATION BY
    MS. FAITH JOHNSON .......................................4
 4
 5  Signature and Changes ...................................297
 6  Reporter's Certificate ..................................299
 7              ***
 8
 9
10          E X H I B I T S
11  NO.  DESCRIPTION                        PAGE
12  1    EEOC Dismissal and Notice of Rights Document .......296
13              ***
```

6

14
15
16
17
18
19
20
21
22
23
24
25
0004
1                    ELIZABETH PAYNE
2  Having been duly sworn, testified on her oath as follows:
3                    EXAMINATION
4  BY MS. JOHNSON:
5        Q.    For the record, this is Civil Action Number
6  3:09-CV-00595-B, styled the State of Texas versus -- I mean
7  -- I am so accustomed to styled the State of Texas, after
8  being a judge for 17 years.  This is styled Elizabeth Payne
9  versus Friendship West Baptist Church.
10             Okay.  Ms. Payne, have you ever taken an oral
11  deposition before?
12       A.    Yes, I have.
13       Q.    Okay.  And this is a deposition, oral
14  deposition of Elizabeth Payne.  She is here represented by
15  Susan E. Hutchison.  And she also has Mr. Foreman, who is
16  here.
17             And, Kern, what was your full name again?
18             MR. LEWIS:  Kern Lewis.
19       Q.    (BY MS. JOHNSON)  Kern Lewis.
20             And my name is Faith Johnson, and I represent
21  Friendship West Baptist Church.  And for the record, we also
22  have John Nation; we also have Carol Lexing, who works with
23  me, and we also have Liz Moffitt representing Friendship West
24  Baptist Church.
25             Ms. Payne, obviously -- you've indicated
0005
1  you've take an deposition before, so you kind of have a sense
2  of what it is that we are about to do.  I'll have several
3  questions for you.  If at anytime you do not understand my
4  question, please ask me to repeat or clarify.
5        A.    All right.  Thank you.
6        Q.    And, do remember, the court reporter is taking
7  down everything you are saying.  So you can't say uh-huh,

7

2        THE WITNESS:  I don't remember, to be honest
3  with you.
4        Q.    (BY MS. JOHNSON)  Okay.  Did you have any
5  training while you were working for him?
6        A.    Oh, I don't remember.
7        Q.    Do you remember if you had any computer
8  training?
9        A.    I don't remember.  I really don't remember.
10       Q.    Okay.  Do you remember if you had any software
11  training?
12       A.    I don't remember.  May I ask you to explain or
13  clarify what computer training is?
14       Q.    I think earlier we talked about that.
15       A.    Uh-huh.
16       Q.    Anything relating to the computer, whether
17  it's WordPerfect, Excel, PowerPoint.  I think we may have
18  explained that earlier.
19       A.    And then you asked me about software, so I was
20  wondering if it was something else.
21       Q.    Right.
22       A.    I can't remember.  I'm sorry.
23       Q.    Yeah, I was just rephrasing it another way.
24       A.    Okay.  I don't remember.
25       Q.    Because of that exact reason, you were asking
0077
1  about what is computer training.  So I was breaking it down
2  for you.
3        A.    Okay.  Thank you.
4        Q.    So you don't recall if you had software
5  training?
6        A.    I don't remember.
7        Q.    Excel training?
8        A.    I don't remember.
9        Q.    PowerPoint training?
10       A.    I don't remember.
11       Q.    Okay.  And that was -- you started in 1995; is
12  that correct?
13       A.    Yes, ma'am.

14      Q.    And I know you indicated that you worked for
15  little or nothing; did you ever get any raises during that
16  time?
17      A.    No.
18      Q.    Any increases?
19      A.    No.
20      Q.    Okay.  Now, let's go back to Friendship West.
21  What was your position at Friendship West?
22      A.    I was the executive assistant to the senior
23  pastor.
24      Q.    Okay.  What were your duties and
25  responsibilities?
0078
1       A.    Duties and responsibilities were to assist
2  Mr. Haynes in every aspect.
3       Q.    What do you mean by every aspect?
4       A.    Anything that he needed, whether it be work,
5  personal life.
6       Q.    I'm sorry?
7       A.    Work, personal life, anything.
8       Q.    So would you give us -- would you clarify what
9  you mean by anything:  Work, personal or otherwise?
10      A.    Whether it be taking his pants to get them
11  hemmed or finding receipts for different things to help him
12  do his expense reports.  Answering all of his calls;
13  forwarding him calls; doing his travel arrangements; doing
14  his daily schedule.
15      Q.    Uh-huh.
16      A.    I mean, everything.
17      Q.    Anything else?
18      A.    Anything that -- pertaining to him I had a
19  responsibility in.
20      Q.    Okay.  Did you have specific assignments at
21  Friendship West Baptist Church?
22      A.    Yes, I had specific assignments.
23      Q.    And what were those?
24      A.    Goodness, what were those?  You know, I don't
25  remember all of them.  I know that -- expense reports, the
0079
1  travel arrangements for Mr. Haynes.  My main focus was to
2  make sure Mr. Haynes was taken care of in every way.
3       Q.    Were you responsible for writing letters,
4  writing memos?
5       A.    Yes, ma'am.  If needed, yes, ma'am.
6       Q.    Were you responsible for typing his sermons?
7       A.    No, ma'am.

9

8      Q.    You -- who typed his sermons?
9      A.    I don't know who typed his sermons.
10     Q.    But you never typed his sermons?
11     A.    No, ma'am.
12     Q.    Did you have to type anything for him?
13     A.    Yes, ma'am.
14     Q.    What were some of the things you had to type
15  for him?
16     A.    Different correspondence for different things.
17     Q.    Okay.  Well, could you give me an example of
18  different things, like what?
19     A.    What I would need to type for him?
20     Q.    Yes.  Uh-huh.
21     A.    There were many different things.  One of them
22  was he was out of town during a time he needed to go to jury
23  duty.  So I had to type it to -- you know, to Dallas County
24  to let them know that he wouldn't be in town.
25            Correspondence to different churches
0080
1  confirming when he was going to be there, his arrival time or
2  his flight time.  How much the ticket was for reimbursement.
3  Just many different things.
4      Q.    Did you make arrangements and schedule events
5  for him?
6      A.    Yes, ma'am.
7      Q.    What kind of events?
8      A.    Any events he had.  I mean --
9      Q.    Example of what events.
10     A.    If he went to a church?
11     Q.    Any event.
12     A.    If he went to a church, I would get the travel
13  and everything, the -- you know, even the travel with the
14  cars, getting him to and from the hotel.  Getting him a car
15  if he wanted to rent a car.  I mean, he had a very busy
16  travel schedule.  So it was many, many events.  I couldn't
17  even begin to remember all of them.  He was gone weekly.
18     Q.    So what other duties and responsibilities did
19  you have at Friendship West?
20            MS. HUTCHISON:  Objection; form.
21            THE WITNESS:  There were many different
22  things.  I -- my primary job was to assist Mr. Haynes in any
23  way, in any way.
24     Q.    (BY MS. JOHNSON)  Okay.  And you -- what were
25  you paid at Friendship West?
0081
1      A.    45,000.

10

.

4      Q.   (BY MS. JOHNSON)  Okay.  You indicated that
5   Dr. Haynes was your supervisor; is that correct?
6      A.   Yes, ma'am.
7      Q.   Okay.  Did you supervise anybody when you were
8   at Friendship West January --
9      A.   No, no, no.
10      Q.   Okay.  So no one was under your supervision at
11   Friendship West January through August of 2008?
6      Q.   Did you tell Danielle Aires that you were
7   having e-mail conversations back and forth with Dr. Wright?
8      A.   Again, I don't remember how it came up.  I am
9   truly trying to remember exactly how that happened.  And I
10   cannot remember with her.
11      Q.   But wasn't Danielle One of the
12   co-workers/friends who told you not to be involved with
13   Dr. Wright?
14         MS. HUTCHISON:  Object to form.
15      Q.   (BY MS. JOHNSON)  Did she tell you that?
16      A.   Are you asking me if she said, don't be
17   involved with Dr. Wright --
18      Q.   Yes.
19      A.   -- to me?
20      Q.   Yes.
21      A.   And are you asking me if those were her words?
22      Q.   Something to that affect.
23      A.   Something to that affect.
24      Q.   Yeah.
25      A.   I don't recall her words.  I don't recall her
0183
1   exact words.  I am sorry.
2      Q.   But for some reason, she was one of the ones
3   who told you that a non-African American should not be in a
4   relationship, interracial relationship with an African
5   American?
6      A.   She -- her words were, it would not be viewed
7   upon in a positive light.
8      Q.   And she said that to you when you were at
9   Friendship West?
10      A.   She did.
11      Q.   Under what circumstances?
12      A.   Under -- well, that conversation came up when
13    -- on that circumstance -- that circumstance actually came
14   up when I was -- when we were talking about -- that
15   conversation came up when we were actually talking to another
16   individual at the church.  And I had put her on a dating site

11

17  because she wanted to meet someone, and so I wrote her
18  profile up for her.
19          I had forgotten to click on race, and
20  predominant, non-African Americans were clicking on her
21  profile.  And that is when it was -- you know, a comment was
22  made pertaining to that, pertaining to the non-African
23  American and African American relationship --
24      Q.    Okay.
25      A.    -- wouldn't be looked on favorably.
0184
1       Q.    And by whom would it be not looked on
2   favorably?
3       A.    The church, the members of the church, pastors
4   of the church.
5       Q.    That's what Danielle Aires said?
6       A.    That's what Danielle Aires said, yes.
7       Q.    And you made the same comment about Laura
8   Clack?
9       A.    Yes, ma'am.
10      Q.    Under what circumstances were -- was the
11  comment made by her?
12      A.    Are you talking about -- okay.
13      Q.    Non-African Americans being in an interracial
14  relationship.
15      A.    It had occurred during that conversation also
16  when I had put her on the dating site.
17      Q.    What about Stephanie Johnson?
18      A.    She was not in that conversation.  I don't
19  recall at the moment.
20      Q.    You mentioned that the relevant facts she had
21  in reference to the claim was non-African American in an
22  interracial relationship with an African American.
23          MS. HUTCHISON:  Object to form.
24          THE WITNESS:  I don't recall the specific
25  incident with Stephanie Johnson at this moment.
0185
1       Q.    (BY MS. JOHNSON)  Did Stephanie Johnson know
2   about your relationship with Dr. Wright?
3       A.    No, ma'am.
4           MS. HUTCHISON:  Object to form.
5       Q.    (BY MS. JOHNSON)  Did Ms. Clack know?  Did you
6   discuss your relationship with Ms. Clack, your relationship
7   with Dr. Wright with Ms. Clack?
8       A.    Yes, ma'am.
9       Q.    And you had discussed it with Ms. Aires?
10      A.    Yes, ma'am.

12

11      Q.    Had you discussed it with Stephanie Johnson?
12      A.    No, ma'am.
13      Q.    Had you discussed it with Liz Moffitt --
14      A.    Yes, ma'am.
15      Q.    -- your relationship with Jeremiah Wright?
16      A.    In what aspect?
17      Q.    This interracial relationship.
18      A.    No, ma'am.  I did not --
19      Q.    Okay.
4            MS. HUTCHISON:  Objection; form.
5            THE WITNESS:  Jeremiah Wright and I only
6  exchanged e-mails and phone calls.
7      Q.    (BY MS. JOHNSON)  What was the nature of those
8  e-mails?
9            MS. HUTCHISON:  Objection; form.
10           THE WITNESS:  Which e-mails?  There were many
11  of them.
12      Q.    (BY MS. JOHNSON)  How many e-mails went back
13  and forth?
14      A.    A lot.  More than what I can even -- a lot.
15      Q.    80?
16      A.    More.
17      Q.    More than 80?
18      A.    More than 80.
19      Q.    Do you have additional e-mails other than what
20  you supplied to us?
21      A.    No.  I do not have the additional e-mails.
22      Q.    You kept some e-mails?
23      A.    I had some e-mails.
24      Q.    And you supplied all of those e-mails to us?
25      A.    The ones I have that I kept, yeah.
0199
1      Q.    Okay.  So tell us exactly about these e-mails,
2  starting with your first e-mail.
3      A.    The first e-mail?
4      Q.    Yes.
5      A.    I don't even remember when that was.  It would
6  have been January, February, maybe March of 2008.
7      Q.    Okay.  What was the nature of the e-mail?
8      A.    I want to say the first e-mail from
9  Jeremiah Wright was, welcome onboard, welcome to Friendship
10  West.  I would assume it was in January.
11      Q.    Who made the first contact, you -- between you
12  and Jeremiah Wright, who made the first contact with the
13  other person, you or Jeremiah Wright?
14      A.    Dr. Wright.

13

15      Q.    He made the first contact to you?
16      A.    Yes.
17      Q.    Okay.  So he knew you?
18      A.    He --
19          MS. HUTCHISON:  Object to form.
20          THE WITNESS:  -- he knew of me.
21      Q.    (BY MS. JOHNSON)  He knew of you?
22      A.    Yes.
23      Q.    How did he know of you?
24          MS. HUTCHISON:  Object to form.
25          THE WITNESS:  Dr. Haynes.
0200
1       Q.    (BY MS. JOHNSON)  Dr. Haynes told him about
2   you?
3       A.    Yes, ma'am.  That is my understanding.  That
4   is hearsay.  I was not there in that conversation.
5       Q.    Under what circumstances?
6          MS. HUTCHISON:  Object to form.
7          THE WITNESS:  After my first -- after my
8   second interview, which Dr. Haynes was involved with,
9   Dr. Haynes had told me that he had contacted Dr. Wright in --
10  asking if he thought I was a good candidate or not.
11          He had a concern that -- he liked my
12  personality in the interview, and we seemed to have gotten
13  along; however, he had concerns that I wasn't black and
14  didn't know if the church or the employees would respond to
15  that well.  And I was told by Dr. Wright and Dr. Haynes, and
16  several of the employees, that Reverend Wright said, let her
17  interview with Mrs. Haynes and see how that goes.
18      Q.    (BY MS. JOHNSON)  But you did not meet
19  Dr. Wright before your interview with Friendship West?
20      A.    That is correct.
21      Q.    When did you first meet Dr. Wright?
22      A.    In April of 2008.
23      Q.    Okay.  But you had been conversing with him by
24  e-mail before --
25      A.    E-mail and phone, yes.
0201
1       Q.    And phone?
2       A.    Uh-huh.
3       Q.    So when did your relationship and your
4   communication with Dr. Wright progress to another level?
5       A.    Into what level?
6       Q.    Well, initially you-all weren't having an
7   interracial relationship, were you?
8          MS. HUTCHISON:  Object to form.

14

9          THE WITNESS:  Again, do -- are you -- our
10  e-mails became more friendly; is that what you are asking?
11       Q.    (BY MS. JOHNSON)  Well, you define your
12  relationship with Jeremiah Wright.  At the very beginning,
13  what was your relationship?
14       A.    He was very helpful to me if there were
15  questions that I had, if there were pastors I didn't know.
16          I called him at one point.  I had to go in and
17  save seats for quite a few people at the Obama rally in
18  February of 2008.  And they weren't letting me in; I didn't
19  have a business card at the time.  And I -- they weren't
20  believing that I was -- I had the title I had to seat the
21  people at the VIP entrance, that I was Dr. Haynes' assistant.
22  So I actually called Dr. Wright for assistance to get in
23  there, seeing if he knew of anyone.
24          So, I mean, he was extremely helpful to me on
25  many different levels.  So I would call him with minor
0202
1  questions.
2       Q.    So what was the nature of that relationship?
3  Was he just a friend?
4       A.    Oh, he was just a very helpful --
5          MS. HUTCHISON:  Objection --
6          Hang on.
7          Objection; form.
8          THE WITNESS:  -- he was a very helpful friend.
9       Q.    (BY MS. JOHNSON)  Okay.  That was at the
10  beginning of your relationship?
11       A.    Yes.
12       Q.    Now, the question is, did that relationship
13  change to another type of relationship?
14       A.    Yes, it did.
15       Q.    So at what point did it change to another type
16  of relationship?
17       A.    Sometime after May or June of 2008.
18       Q.    And what did the relationship change into?
19       A.    We began flirting.
20       Q.    Okay.  How did you begin flirting?
21       A.    How did I begin flirting?
22       Q.    How did you -- you said you-all began
23  flirting.  How did you two begin flirting?
24       A.    How did we begin flirting?  Dr. Wright and I
25  would send jokes and little funny things to each other that
0203
1  were -- just in general.  And I believe at one point one of
2  his questions was -- and I don't remember the time, was,

15

3  would it cause a problem if you met me somewhere.
4       Q.    And what was your response?
5       A.    I said, no.
6       Q.    Okay.  When was that?
7       A.    As I stated, I am not sure when that was.
8       Q.    It was at some point when the relationship
9  progressed to another level?
10      A.    Sometime after April of 2008.
11      Q.    Okay.  Had you met him?
6  going back and forth?
7            MS. HUTCHISON:  Objection; form.
8            THE WITNESS:  There were e-mails and phone
9  calls.
10      Q.    (BY MS. JOHNSON)  Phone calls.  Did you-all
11  ever go on a date?
12      A.    No, ma'am.
13      Q.    Did you-all ever sleep together?
14      A.    No, ma'am.
15      Q.    Did you-all ever have sex?
16      A.    No, ma'am.
17      Q.    Did you-all ever kiss?
18      A.    No, ma'am.
19      Q.    Did you-all ever hug?
20      A.    No, ma'am.
21      Q.    Did y'all ever have any kind of physical
22  contact?
23      A.    I am sorry.  When he was in April we probably
24  hugged.  I think I hugged him when I first met him, you know,
25  things of that sort.  But is that what you are asking me?
0206
1       Q.    I'm just asking any contact whatsoever.
2       A.    Probably something like that when he was here
3  in April, a hug.  I think I escorted him into some rooms
4  where I grabbed his arm.  Incidents such as that.  There may
5  have been more hugs that I just do not recall at the moment.
6       Q.    So after you met him, whose idea was it to
7  take the relationship to another level?
8            MS. HUTCHISON:  Objection; form.
9            THE WITNESS:  I can't answer what Dr. Wright's
10  ideas were.  When Dr. Wright would flirt, I did not
11  discourage it.
12      Q.    (BY MS. JOHNSON)  Did you also flirt?
13      A.    Yes, I did.
14      Q.    Okay.  And you don't know who started the
15  flirting?
16      A.    Dr. Wright started the flirting.  And I did

16

17  not discourage it.
18      Q.    And you responded?
19      A.    Yes, I did.
20      Q.    Did you respond with flirting back?
21      A.    Yes, I did.
22      Q.    Okay.  Now, you indicated that you and
23  Dr. Wright had an interracial relationship.  What do you mean
24  by that, define that?
25      A.    Define it -- I had a e-mail/phone call
0207
1  relationship with Dr. Wright.  We had plans on meeting
2  somewhere physically.  We didn't.  We had ongoing phone
3  calls, e-mails.
4      Q.    Where did y'all plan to meet?
5      A.    It was -- we hadn't bought any plane tickets
6  or anything; we had just mentioned places.
7      Q.    Where?
8      A.    At that time he was in Africa.  I think Miami
9  came up in conversation.  He invited me to Chicago at another
10  point.
11      Q.    Was he planning on paying for your fare to
12  Chicago?
13      A.    I don't think we discussed who's paying for
14  what.
15      Q.    Uh-huh.  So you-all discussed meeting up, but
16  you never met up?
17      A.    That's correct.
18      Q.    And you started discussing meeting up after
19  April when he was here?
20      A.    Yes, ma'am.
21      Q.    And you-all continued this relationship until
22  when?
23      A.    August 1st of 2008.
24      Q.    And after August 1st you ceased with the
25  relationship?
0208
1      A.    Yes, ma'am.
2      Q.    Okay.  And I'm not positive if you gave me a
3  definition of how you define the interracial relationship.
4  How did you define that?
5          MS. HUTCHISON:  Objection; form.
6          THE WITNESS:  Dr. Wright and I had a --
7  Dr. Wright and I had an inappropriate relationship based on
8  our intention and communication that we had.
9          MS. HUTCHISON:  She didn't say inappropriate,
10  she said interracial.

17

11             THE WITNESS:  Interracial relationship.
12 Define that?
13      Q.    (BY MS. JOHNSON)  Yes.  How do you define your
14 interracial relationship with him, interracial relationship
15 with Dr. Wright?
16             MS. HUTCHISON:  Object to form.
17             (Brief pause.)
18             MS. HUTCHISON:  Why is it interracial?
19             THE WITNESS:  He was of African American
20 descent; I was of Hispanic descent.
21      Q.    (BY MS. JOHNSON)  So based on this interracial
22 relationship that you are defining, tell us exactly what is
23 your claim against Friendship West Church.
24             MS. HUTCHISON:  Object to form.
25             THE WITNESS:  I was treated differently than
0209
 1 the other employees there at the church.
 2      Q.    (BY MS. JOHNSON)  Meaning?
 3      A.    Meaning, I was not ever brought in formally
 4 before termination and written up or given a probation, or
 5 given a different set of standards that I needed to fix
 6 before getting terminated like other employees were.
 7             Danielle Aires at one point made the comment
 8 when she -- when I confided in her about Dr. Wright and I
 9 that, you know, if anyone finds out, because you are not
10 black, they will let you go.
11      Q.    So you did inform Danielle Aires about your
12 relationship with Dr. Wright?
13      A.    Yes, ma'am.
14      Q.    And when did you do that?
15      A.    I don't remember the exact date.  She knew
16 about it for a while.
17      Q.    Was that before April or after April?
18      A.    It was after April.
19      Q.    Okay.  Was it in July?
20      A.    When I first confided or when --
21      Q.    Yes, when you first confided.
22      A.    I don't remember when I first confided.  It
23 was before July.
24      Q.    So you indicated that your claim against
25 Friendship West is because you were treated differently.
0210
 1 Anything else?
 2             MS. HUTCHISON:  Objection; form.
 3             THE WITNESS:  I was treated differently.
 4      Q.    (BY MS. JOHNSON)  Okay.  I know.  But I am

18

5  just simply asking, tell us exactly what is your claim other
6  than what you said, treated differently.
7           MS. HUTCHISON:  Objection; form.
8           THE WITNESS:  I was not treated like the other
9  employees at all.
10     Q.    (BY MS. JOHNSON)  Meaning?
11           MS. HUTCHISON:  Objection; form.
12           THE WITNESS:  Again, meaning like if -- I
13  believe somebody had said that I didn't meet the
14  requirements.  It was never brought to my attention that I
15  didn't meet the requirements.  It was never brought to my
16  attention that I was doing something incorrectly.
17           I was never formally asked to sign anything
18  that I did incorrectly, or agree to change my performance or
19  try to do better on my performance like other ones were.
20     Q.    (BY MS. JOHNSON)  Uh-huh.
21     A.    I was discriminated on with -- you know, with
22  an inappropriate or appropriate relationship that I had with
23  Dr. Wright.  There were numerous affairs that went on that
24  were extramarital or out of wedlock at the church, and people
25  were not fired or reprimanded in the any way.
0211
1      Q.    So your claim is how you were treated
2  differently in reference to Jeremiah Wright compared to the
3  other employees?
4           MS. HUTCHISON:  Objection; form.
5  Mischaracterization of all of the things she just testified
6  to.
7           THE WITNESS:  I have to kind of agree with
8  that one.  I was treated differently there.
9      Q.    (BY MS. JOHNSON)  Okay.
10     A.    Ever since the very beginning when Dr. Haynes
11  had to go up and -- in the employee meeting in January and
12  say, I have an assistant, we have hired an assistant; she'll
13  be starting on Monday, and she is not African American.  And
14  if anyone has a problem with that, y'all need to let me know
15  right now.  That was addressed in an employee meeting.
16     Q.    Were you in that meeting?
17     A.    No, I was not.
18     Q.    How do you know that was addressed in that
19  meeting?
20     A.    Many employees told me about it.
21     Q.    Who told you about that?
22     A.    Oh, goodness.  Dr. Haynes told me about it,
23  Danielle Aires told me about it, Laura Clack told me about
24  it, Stephanie Johnson told me about it.

19

25      Q.    Was it --
0212
1       A.    Stephanie Washington told me about it.  I
2   believe the praise and worship leader -- if I get his name
3   wrong, correct me, and I'm sorry if I do.  I believe his name
4   is Shawn Martin told me about it.
5       Q.    They told you about that before you were hired
6   or after you were hired?
7       A.    After I was hired.
22  were defining your interracial relationship as one that is a
23  romantic relationship?
24          MS. HUTCHISON:  Objection; form.
25          THE WITNESS:  I don't think I said anything
0216
1   about romantic, or I said a relationship with an African
2   American pastor.
3       Q.    (BY MS. JOHNSON)  You were comparing it to be
4   an affair or a romantic relationship, your interracial
5   relationship with Dr. Jeremiah Wright.
6          MS. HUTCHISON:  Objection; form.
7          THE WITNESS:  I was comparing it to be a
8   romantic relationship, yes, I was.
9       Q.    (BY MS. JOHNSON)  Thank you.
10          Now, were you sexually harassed at Friendship
11  West?
12          MS. HUTCHISON:  Objection; form.
13          THE WITNESS:  Was I sexually harassed?
14      Q.    (BY MS. JOHNSON)  Yeah.
15      A.    No, I wasn't sexually harassed.
16      Q.    Okay.  So you were never sexually harassed at
17  Friendship West; is that correct?
18      A.    That's correct.
19      Q.    Okay.  And when you indicated that you were
20  treated differently because of your interracial relationship,
21  which you define as a romantic relationship, you were treated
22  differently from other staff people who were not involved in
23  a relationship with a non-African -- or, excuse me, on that
24  last part -- in terms of who were not -- who were involved in
25  relationships with someone of the same race.  You are saying
0217
1   that you were treated differently because they were not fired
2   or terminated?
3          MS. HUTCHISON:  Objection; form.
4          THE WITNESS:  Were other extramarital affairs,
5   adultery --
6       Q.    (BY MS. JOHNSON)  Yes.

20

7        A.    -- were they -- anyone who conducted affairs
8  or adultery in the church, were they fired; is that --
9        Q.    Well, no.  Your -- my point is, you were
10  saying that you -- the reason why your claim is you were
11  treated differently is because those people with the
12  extramarital affairs or adultery, same race, were not
13  terminated; but you in a relationship, interracial, romantic,
14  were terminated.
15        A.    I was -- I am saying I was discriminated on
16  several different things, as far as not ever getting written
17  up, not having the conversations with HR, not ever being able
18  to sign anything like many other ones who had done many other
19  mistakes.
20            I'm saying that if that is what lead up to me
21  getting terminated was e-mails and phone conversations with a
22  pastor from a different church, there were other African
23  Americans within Friendship West who would have affairs and
24  adultery with people outside of their marriage and they were
25  not terminated, they were not reprimanded.  And it was fine
0218
1  with everyone.
2        Q.    So under Title 7, where is there an immorality
3  clause protection for Hispanics or anyone else?
4            MS. HUTCHISON:  Objection; form.
5            THE WITNESS:  Okay.  In violation of Title 7?
6        Q.    (BY MS. JOHNSON)  Yes.
7        A.    In the Civil -- and with Hispanics?
8            MS. HUTCHISON:  Objection; form.
9        Q.    (BY MS. JOHNSON)  In terms of an immorality
10  clause.
11            MS. HUTCHISON:  That is just a harassing
12  question.  Don't answer it.
13            THE WITNESS:  Okay.
14        Q.    (BY MS. JOHNSON)  Do you not plan to answer
15  that question?
16            MS. HUTCHISON:  No, she does not.
17        Q.    (BY MS. JOHNSON)  Do you not plan to answer
18  that question?
19            MS. HUTCHISON:  You can say no.
20            THE WITNESS:  No.
21        Q.    (BY MS. JOHNSON)  So is there -- so you're
22  saying that an adulterer has a protection under Title 7
23  clause?
24            MS. HUTCHISON:  No.  Objection; form.
25            THE WITNESS:  Do I say no?
0219

```
 1          MS. HUTCHISON:  Do you have any idea what she
 2   is asking you?
 3          THE WITNESS:  I don't.  I don't have an idea
 4   what she is asking.
 5      Q.    (BY MS. JOHNSON)  Are you saying that an
 6   adulterer has protection under Title 7 if they are one race
 7   and not terminated because of their adultery, and someone of
 8   another race who commits adultery is not terminated?
 9          MS. HUTCHISON:  Objection; form.
0230
 1      Q.    So it's not in the office?
 2      A.    I don't know where it is now.
 3      Q.    Did you ever show it to Dr. Haynes?
 4      A.    No.
 5      Q.    Did your ever tell him about someone sending
 6   him some card with a picture of boobs pushed up?
 7      A.    I told him of several phone calls or --
 8      Q.    I mean -- no, no.  Specifically the card.
 9      A.    The card --
10      Q.    Yeah.
11      A.    -- did I tell him about the card?  I am trying
12   to think.  I don't recall if that was -- did I tell him about
13   the card?  No, I didn't tell him about the card.
14      Q.    And he was your supervisor, right?
15      A.    He was my supervisor.
16      Q.    Okay.  Now -- so in reference to that card,
17   the lady in the picture, you don't know what she may have had
18   on at the bottom, you just -- and you can't remember what she
19   had on from the waist up?
20      A.    I don't think she had anything from the waist
21   -- I mean, but she was holding her breasts.  And I don't know
22   what she was wearing from the waist down.
23      Q.    Okay.  And you just don't remember any clothes
24   being on her at all?
25      A.    I don't remember because -- because it was at
0231
 1   the waist up.  So I don't know what she was wearing from the
 2   waist down.
 3      Q.    Okay.  Now, in your conversation with
 4   Dr. Wright, did he ever include any kind of sexual remarks or
 5   speech or anything on these e-mails back and forth?
 6      A.    Yes.
 7      Q.    Give us an example of what he said in these
 8   e-mails, sexual speech.
 9      A.    What he'd like to do.
10      Q.    And what is that?
```

22

11       A.      Sexually?
12       Q.      Yes.  What did he say in the e-mails?
13       A.      He'd like to make love to me.
14       Q.      Okay.  Anything else?
15       A.      He would describe what he wanted to do to me.
16       Q.      And what was that?
17       A.      He wanted me to sit on top of his face.
18       Q.      Sit on top of his -- what is that called?
19           MS. HUTCHISON:  Excuse me?
20       Q.      (BY MS. JOHNSON)  Is that called anything,
21   sitting on top of his face?
22       A.      I believe it is called oral sex.
23       Q.      Is it called anything else?
24           MS. HUTCHISON:  Object to form.
25           THE WITNESS:  If it is called anything else
0232
1   then oral sex, I'm -- I don't know.
2        Q.      (BY MS. JOHNSON)  Well, what is carnival, what
3   is carnival?  You -- you remember the language carnival in
4   one of the e-mails?
5        A.      Yes, I do.
6        Q.      What does that mean?
7        A.      He called it carnival.
8        Q.      Okay.  He called what carnival?
9        A.      Me sitting on his face carnival.
10       Q.      Okay.  So that was another term for sitting on
11   his face, carnival?
12       A.      That's --
13           MS. HUTCHISON:  Objection; form.
14           THE WITNESS:  -- I guess so.  I don't know.
15       Q.      (BY MS. JOHNSON)  You indicated that he called
16   it carnival?
17       A.      You indicated it and I agreed.
18       Q.      I'm -- well, I don't want to testify for you.
19   What is carnival?  I mean --
20       A.      Carnival in the Hispanic -- it's an actual
21   festival that happens in Brazil once a year in February, I
22   believe.  That is what carnival is.
23       Q.      Okay.  Dr. Wright used that term in one of the
24   e-mails; is that correct, carnival?
25       A.      Yes, he did.
0233
1        Q.      Did you understand what he was meaning when he
2   wrote that e-mail to you?
3        A.      No.  He had to explain it to me.
4        Q.      So he explained it to you?

23

5      A.    Yes, he did.

6      Q.    And what did he explain to you?

7      A.    That it was a weight-guessing game.  He would

8  like for me to sit on his face.

9      Q.    Okay.  Now, in your family court case; I may

10  have covered this, you -- you were sentenced to 190 days for

11  contempt; is that correct?

12      A.    180 days.

13      Q.    I am sorry.  And you're still serving that

16  roommate in North Richland Hills.  My ex-husband and I would

17  talk about reconciling, so I would go stay with him.  So it

18  was really on and off.

19           But really started staying in North Richland

20  Hills a lot somewhere around May, June of 2008.  But there

21  would be times that if my ex-husband would call, can you take

22  me to this, want to try to work things out, he would call and

23  I would go stay with him.  I can't give you exact dates

24  because I would be guessing.

25      Q.    So Carrollton is where your ex-husband, Mr.

0241

1  Payne, lived?

2      A.    Yes, ma'am.

3      Q.    Okay.  So you lived with him from January to

4  April or May?

5      A.    Yes.  But there were times that I would still

6  go stay with who is now my roommate in North Richland Hills.

7      Q.    And I don't want to put words in your mouth.

8  When did you live with your ex-husband in 2008?  You tell me

9  the months.

10      A.    I was there every night for probably the first

11  six, seven weeks of 2008, consistently every night.

12      Q.    Okay.  And after that, when, how often were

13  you there?

14      A.    I don't want to give you misinformation.  It

15  varied.  Just depended on how the week was going.

16      Q.    So you would continue to spend nights with him

17  up until what point in 2008?

18      A.    Up until August of 2008.

19      Q.    Okay.  So you were still spending nights with

20  him.  Were you still sexually involved with him?

21      A.    We were no longer sexually involved.  One of

22  the reasons I would stay with him, my daughter, that was

23  where she was used to being.  So when I would have her the

24  nights she enjoyed staying there.  That is what she was used

25  to.  That is where her whole room was set up.  That is where

0242

24

1   her dogs were.  So a lot of it was for her.
2        Q.     But you were staying with him off and on up
3   through August of 2008?
4        A.     Yes, yes.
5        Q.     Okay.  Now, you indicated, in terms of
6   Dr. Jeremiah Wright, that he said certain things to you?
7        A.     Yes.
8        Q.     I wanted to make certain that we got
9   everything that you recall him saying to you in a sexual
10  nature.  Anything else?
11       A.     There were -- in e-mails, phone calls, what?
12       Q.     Yes.  E-mails and phone calls.
13       A.     What he would say to me?
14       Q.     Yes.
15       A.     What he would like to do.  I mean, again, it
16  would be things along the line of what he would like to do to
17  me.
18       Q.     And tell us what those were.
19       A.     He'd like to hear the way I screamed.
20       Q.     Okay.
21       A.     He'd like for me to sit on top of him.
22       Q.     Okay.
23       A.     He'd like to take a shower with me.  Things of
24  that nature.  I am sure there's many other things; I just
25  can't remember right now.
0243
1        Q.     Anything else?
2        A.     He'd like to feel the way my lips felt.
3        Q.     Has he ever felt your lips?
4        A.     No, no.
5        Q.     But he said to you he liked the way your lips
6   felt?
7             MS. HUTCHISON:  No.  Objection; form.
8             THE WITNESS:  No, no.  He said he would like
9   to see how my lips felt.
10       Q.     (BY MS. JOHNSON)  Okay.  Anything else?
11       A.     And, you know, when he was here in April, I
12  could have kissed him and his wife on the cheeks when they
13  were leaving.  So it was, you know, something as innocent as
14  that in April.
15             A lot of other things.  Gosh, I can't -- that
16  is all of -- just simple sexual nature?
17       Q.     Yes.
18       A.     Just things along that line, repeating maybe
19  in different formats.
20       Q.     Okay.  Now, what did you say to him in terms

25

21  of sexual speech or --
22       A.    I said things very similar.
23       Q.    What did you say?
24       A.    That I would enjoy being on top of him, that I
25  would do the things with him.  I too looked forward to seeing
0244
1   him.  I said things very similar in nature to him.
2        Q.    And what were some of the other things other
3   than you would love to sit on top of him, you would love to
4   be with him, what else did you say?
5        A.    I think there is one e-mail where it described
6   me undressing him.
7        Q.    And what did it say?
8        A.    I don't recall word for word.  But I remember
9   writing it.  It was something about undressing him.
10            I would agree if he said -- made a suggestion,
11  I would agree on it.
12       Q.    What kind of suggestion?
13       A.    He said he wanted to hear me scream.  I would
14  say something back in response to, I did too.
15       Q.    Okay.  What else?
16       A.    When he made the comment about sitting on top
17  of his face, I made the remark that I thought that would be
18  pleasing as well.
19       Q.    Okay.  What else?
20       A.    Many other things very similar to that, just
21  probably just different -- in just different variations.
22       Q.    So you were also involved in sexual speech
23  toward Dr. Wright?
24       A.    Yes, ma'am.
25       Q.    And you indicated earlier that he initiated
0245
1   the sexual talk or you?
2        A.    He initiated -- we both did the flirting.  But
3   he is a very friendly, flirtatious kind of man.  But the
4   e-mail where I knew it was more than just flirting with a
5   sweet, nice man who I was playing with and joking, was the
6   e-mail where he said, would it be a problem if you met me
7   somewhere.
8        Q.    Okay.  So did he initiate the sexual talk?
9        A.    I cannot remember exactly.  But I would assume
10  so.
11       Q.    But you quickly responded back in a sexual
12  tone?
13       A.    That is correct.
14       Q.    Okay.  And all of that continued on up through

26

15  August 2008; is that correct?
16      A.    Yes, ma'am.
17      Q.    Now, in your answers -- in your answer to
18  Number 9 in the Plaintiff's Responses to Interrogatories,
19  Defendant's Interrogatories, you said that you were the only
20  write female working at Friendship West?
21      A.    White?
22      Q.    You -- well, that is what you said here, you
23  were the only white Hispanic female.
24      A.    Because that was the description that it gave.
25  Yeah, I was the only white Hispanic female.
0246
1       Q.    Yeah.
2       A.    No, there was one who worked as a janitor
3   there.
4       Q.    Okay.  Now, how were you harmed by being the
5   only white Hispanic female working at Friendship West?
6             MS. HUTCHISON:  Objection; form.
7             THE WITNESS:  I'm sorry.  How was I --
8       Q.    (BY MS. JOHNSON)  Harmed, h-a-r-m-e-d, harmed.
9       A.    Can you give me that --
10      Q.    Were you harmed in any kind of way?
11            MS. HUTCHISON:  Objection; form.
12            THE WITNESS:  Oh, harmed?
13      Q.    (BY MS. JOHNSON)  Yes.
14      A.    Harmed.
15      Q.    Yes.
16      A.    I was treated differently.
17      Q.    I mean, but how were you harmed by being the
18  only white Hispanic female working at Friendship West, how --
19            MS. HUTCHISON:  Objection; form.
20      Q.    (BY MS. JOHNSON)  -- were you harmed?
21      A.    Again, are you saying that in
22  discrimination-wise?
23      Q.    Well, just -- I mean, how were you -- when you
24  think about harmed you think about being hurt.  How were you
25  hurt by being the only white Hispanic female --
0247
1       A.    I was treated --
2             MS. HUTCHISON:  Hang on.  Let her finish her
3   question and I've got to object to it, okay?
4       Q.    (BY MS. JOHNSON)  So how were you harmed, how
5   were you injured, how were you hurt by being the only white
6   Hispanic female working at Friendship West?
7             MS. HUTCHISON:  Objection; form.
8             THE WITNESS:  I was treated differently than

27

9   the other employees.
10       Q.    (BY MS. JOHNSON)  Also in Question 9 you
11   indicated that the defendant discovered e-mails and other
12   information suggesting that you were involved in an
13   interracial relationship.  Who discovered those e-mails?
14       A.    I don't know.
15       Q.    When were those e-mails discovered?
16       A.    I don't know the exact time when those e-mails
17   were discovered.
18       Q.    How were they discovered?
19       A.    I don't know how they were discovered.
20       Q.    Are you saying management discovered them?
21       A.    I don't know who discovered them.
22       Q.    So you don't even know who discovered them?
23       A.    No, ma'am.
24       Q.    Also in your response to Question Number 9 you
25   indicated that co-workers and supervisors expressed to you
0248
1   that African Americans should not be involved in
2   relationships with people who are not African American.
3       A.    That is correct.
4       Q.    Okay.  Who said that?
5       A.    Oh, many of them.
6       Q.    Who?
7       A.    I'll give you an instance.  Dr. Reverend
8   Marcus King.  I had a friend who was Hispanic, however, she
9   looked completely of Anglo Saxon descent.  Her last name was
10   Nunez.  And I said something about, she is single; she is
11   cute, you know.  He was a single pastor there.  And he made
12   the remark on, Girl, what do you want to do, get me killed.
13   I'd get shot if I was seen with her.
14       Q.    And this was a co-worker or a supervisor?
15       A.    This was a co-worker.
16       Q.    And what was his name?
17       A.    Marcus King, Marcus D. King.
18       Q.    And who else?
19       A.    When I did the profile for Laura Clack, she
20   made the remark, there is no way I'd go out -- you have got
21   to put black only.  Put that in big betters, put black only.
22   When I -- honestly, when I did her little profile, that
23   didn't even enter my mind to put anything on the race.  I
24   didn't think that would be an issue.
25           And she made the similar remark, you know,
0249
1   there is no one I would date anyone but black, girl.  Put on
2   there black only in bold letters.  You know, of course, I

28

3   didn't and it was more -- but it was a known fact.
4             When I did confide in Danielle Aires and Laura
5   Clark and even Stephanie Washington about Reverend Wright,
6   their exact words were, if you get found out we are throwing
7   you under the bus.
8        Q.    Who was that now?
9        A.    Laura Clack, Danielle Aires and Stephanie
10  Washington.
11       Q.    And who else expressed an opinion about
12  African Americans should not be involved in a relationship
13  with non-African Americans?
14       A.    Ricky Hill.
15       Q.    Ricky Hill?
16       A.    Reverend Ricky Hill.
17       Q.    Who else?
18       A.    I'm sure there is others.  Right now I cannot
19  remember specific incidents.
20       Q.    But those are the only names you can remember
21  right now?
22       A.    Those are the ones right now that made
23  specific remarks to me in front of me or to me.
24       Q.    And they made those remarks at the church?
25       A.    At the church.
0250
1        Q.    During working hours?
2        A.    During working hours.
3        Q.    And throughout your employment from January to
4   August?
5        A.    And -- going back to that question before when
6   you said during working hours, there were times they weren't
7   during working hours.  Working hours at a church is very
8   different than an 8:00 to 5:00 job anywhere else.  It could
9   have been on a Wednesday night, you know, right before church
10  started; it could have been on a Sunday or even on a
11  Saturday.  It could have -- so during working hours, I don't
12  want to be strapped to 8:00 to 5:00, Monday through Friday.
13       Q.    So it happened Monday through Friday, and it
14  also happened in the evening?
15       A.    It could have been anytime during the
16  seven-day span, depending on what we were doing.
17       Q.    Okay.  So the question is, did it ever happen
18  Monday through Friday, 9:00 to 5:00?
19       A.    I don't remember.  It could have been any
20  various times.  Those weren't our just -- you know, those
21  just weren't my hours that we worked, that I worked.
22       Q.    Okay.  Did they -- did any of those comments

29

23  take place after 5 o'clock?
24      A.    I don't remember.
25      Q.    Did any of those conversations take place on
0251
1  Saturday?
2      A.    I don't remember.
3      Q.    Did any of those conversations take place on
4  Sunday?
5      A.    I don't remember.
6      Q.    You don't -- several -- you talked to several
7  people, or several people talked to you?
8      A.    Right.  I don't remember the exact times and
9  dates they happened.
10      Q.    And you don't remember at all even if they
11  were Monday through Friday during work time?
12          MS. HUTCHISON:  Objection; form.
13          THE WITNESS:  I don't remember exactly the --
14  the exact times those conversations happened.
15      Q.    (BY MS. JOHNSON)  Well, what were you doing
16  when some of these conversations were going on?
17      A.    The conversation with Reverend King was in his
18  office.  The conversation with Laura Clack and Ricky Hill
19  were in their offices.
20      Q.    Okay.
21      A.    I don't remember what day or time that it
22  happened, what time -- I don't remember if it was a --
23      Q.    Would that suggest that it was during working
24  hours?
25      A.    It was during working hours.
0252
1      Q.    Okay.
2      A.    But, I mean, if you are going to close me into
3  Monday through Friday from 8:00 to 5:00, I just didn't want
4  to --
5      Q.    Yeah.  Well, that was one of my questions,
6  whether or not it was during working hours that those
7  conversations were taking place.  So you are saying yes, --
8      A.    I don't remember what times they were or what
9  days.
10      Q.    Okay.  You don't remember the times or the
11  days, but you do remember some of the conversations were
12  during working hours?
13      A.    Some of the conversations were during working
14  hours, yes.
15      Q.    Now, those e-mails that were going back and
16  forth between you and Jeremiah Wright, were those e-mails

30

17  taking place during working hours?
18      A.    Some of them were.
19      Q.    Okay.  Were they taking place on the church
20  computer?
21      A.    No, not on the church computer.
22      Q.    Meaning, did you use the church computer to
23  send those e-mails?
24      A.    Not the church computer.
25      Q.    Okay.  So you -- which computer did you use?
0253
1      A.    I was on my Blackberry.
2      Q.    And your Blackberry was -- belonged to the
3  church or you?
4      A.    The church.
5      Q.    Okay.  So were all of the e-mails on the
6  Blackberry between you and Dr. Jeremiah Wright?
7      A.    Not all of them, no.
8      Q.    Where were some of the other e-mails from?
9      A.    From a computer that I used at home.
10      Q.    Okay.  Was that the laptop that belonged to
11  the church?
12      A.    No.
13      Q.    It was your own personal laptop?
14      A.    Computer.
15      Q.    Computer?
16      A.    Yes.
17      Q.    Okay.  So the e-mails back and forth -- and
18  I'm talking about the e-mails where you-all were talking
19  sexual speech and language to one another back and forth.
20      A.    Uh-huh.
21      Q.    It happened on your personal computer at home,
22  which was a desktop?
23          MS. HUTCHISON:  Objection; form.
24          THE WITNESS:  Are you asking if all of them
25  happened there?
0254
1      Q.    (BY MS. JOHNSON)  No, some of them happened --
2      A.    Some of them, yes.
3      Q.    -- on your desktop, which was your personal
4  computer?
5      A.    Yes, ma'am.
6      Q.    And is that the one that either had one of the
7  three of the e-mail addresses that you had?
8      A.    Yes, ma'am.
9      Q.    And the others happened on your Blackberry
10  that belonged to the church?

31

11       A.    Yes, ma'am.

12       Q.    And you never used the desktop at the church

13   to converse by e-mail --

14       A.    If I did it was rare.  And I don't remember

15   the specific time.  I may have.  I don't want to -- I'm

16   guessing.

17       Q.    Okay.  And you are saying you may have used

18   the church --

19       A.    I may have --

20       Q.    -- desktop?

21       A.    -- I may have.  But it was not the majority of

22   the time.

23       Q.    Okay.  And you never used the laptop from the

24   church?

25       A.    I didn't use the laptop to e-mail

0255

1    Reverend Wright.  Is that what you are asking?

2        Q.    Right.  Yes.

3        A.    No, I did not.  No.

4        Q.    Okay.

5        A.    The laptop that belonged to the church I did

6    not use to e-mail Reverend Jeremiah Wright.

7        Q.    And I'm specifically talking about the sexual

8    speech and language --

9        A.    Yes, I understand.

10       Q.    -- back and forth.

11       A.    Yes, ma'am.

12       Q.    I want to make certain we were clear on that.

13       A.    Yes, ma'am.

14       Q.    So you never used the church's desktop at the

15   church to converse with Dr. Wright in reference to the sexual

16   language and speech?

17       A.    No, ma'am.  I didn't say that.  I said if I

18   did it was seldom.  That was not where I used the majority.

19       Q.    What did you use during the majority of the

20   time?

21       A.    The Blackberry.

22       Q.    The Blackberry.  And that Blackberry belonged

23   to the church?

24       A.    Yes, ma'am.

25       Q.    And you e-mailed him through your Blackberry

0256

1    during working hours?

2        A.    Yes, ma'am.  I did.

3        Q.    Okay.  Were you-all communicating almost every

4    day after April 2008 through August 2008?

5       A.    We did not communicate every day.  There would
6   be times that we would and there would be times that we would
7   not.
8       Q.    Okay.  Was it uncommon for you to speak to him
9   almost every day?
10          MS. HUTCHISON:  Objection; form.
11          THE WITNESS:  Sometimes it would happen every
12  day, sometimes it wouldn't.  It varied.
13      Q.    (BY MS. JOHNSON)  Okay.  But when you-all were
14  communicating, you were using sexual language or speech on
15  the Blackberry to him throughout the week from time to time?
16      A.    Yes, ma'am.
17      Q.    Using your Blackberry?
18      A.    Yes, ma'am.
19      Q.    And at work, at Friendship West Baptist
20  Church, your place of work?
21      A.    Yes, ma'am.
22      Q.    Okay.  And you indicated in your
23  interrogatories also that you observed other employees who
24  had similar relationships.  What do you mean by similar
25  relationships?
0257
1       A.    Of sexual nature.
2       Q.    Explain to me what -- similar relationship.
3       A.    Other employees had relationships with each
4   other or outside of their marriage of sexual context.
5       Q.    What were the nature of those relationships?
6       A.    As far as I knew, those were sexual
7   intercourse relationships.
8       Q.    Okay.  Now, your relationship with
9   Dr. Jeremiah Wright wasn't similar in that nature; is that
10  correct?
11      A.    As far as the sexual intercourse?
12      Q.    Yes.
13      A.    That's correct.
14      Q.    Okay.  So you observed other employees who had
15  sexual intercourse outside of marriage?
16          MS. HUTCHISON:  Objection; form.
17          THE WITNESS:  Okay.  Can you ask that question
18  again?
19      Q.    (BY MS. JOHNSON)  You indicated there were
20  similar people -- there were other employees who had similar
21  relationships; is that correct?
22          MS. HUTCHISON:  Objection; form.
23      Q.    (BY MS. JOHNSON)  You indicated that?
24          MS. HUTCHISON:  Objection; form.

33

25           THE WITNESS:  Yes, ma'am.
0258
1       Q.    (BY MS. JOHNSON)  Okay.  And I asked you to
2   describe those similar relationships.
3       A.    Yes, ma'am.
4       Q.    Okay.  And you were beginning to do that; is
5   that correct?
6           MS. HUTCHISON:  Objection; form.
7           THE WITNESS:  I believe so.
8       Q.    (BY MS. JOHNSON)  You said that, as an
9   example, they had sexual intercourse with one another?
10      A.    Yes, ma'am.
11      Q.    Okay.  You did not have sexual intercourse
12   with Jeremiah Wright?
13      A.    That is correct.
14      Q.    Okay.  So to that extent, your relationship
15   with Jeremiah Wright was not similar to the relationship with
16   the people you are talking about who had the sexual
17   relationship; is that correct?
18           MS. HUTCHISON:  Objection; form.
19           THE WITNESS:  Can you describe to me what your
20   terms of a sexual relationship is, because maybe I am not
21   understanding?
22      Q.    (BY MS. JOHNSON)  Well, sexual intercourse.  I
23   think you may have used that term.  You used the term, other
24   people had sexual intercourse with one another, did you not?
25      A.    I thought your -- the question was, and please
0259
1   correct me if I am wrong -- I was trying to -- I guess my
2   comparison was of sexual nature with each other.  And I just
3   used the sexual intercourse.
4       Q.    And I am just simply trying to break it down.
5       A.    All right.
6       Q.    You -- you are defining similar relationship.
7   And you started saying that other people had similar
8   relationships in that they had sexual intercourse with one
9   another.  I'm -- is that not correct?
10      A.    That is correct.
11      Q.    Okay.  However, you did not have sexual
12   intercourse with Dr. Wright?
13      A.    That is correct.
14      Q.    Okay.  So that is one example.  How else did
15   the other people, other employees have a similar
16   relationship, similar sexual relationship as yours?
17      A.    Dr. Haynes had -- with pictures that we
18   described earlier with the, Baby, you look good.

34

19      Q.    Okay.  Did you ever have a picture of yourself
20  with Dr. Jeremiah Wright either half naked or almost naked or
21  anything like that?
22      A.    Did I have a picture of Dr. Wright?
23      Q.    Yes.
24      A.    Naked?
25      Q.    Yes.
0260
1      A.    No, ma'am.
2      Q.    Yes.  Okay.  And did management know about any
3  of these people who were having affairs?
4          MS. HUTCHISON:  Objection; form.
5          THE WITNESS:  My supervisor, who was
6  Dr. Haynes, was having these sexual affairs.  And I'm --
7  correct me if -- I mean, I would assume he was aware of his
8  e-mails and affairs he was having.
9      Q.    (BY MS. JOHNSON)  Was he having e-mails going
10  back and forth with these women?
11          MS. HUTCHISON:  Objection; form.
12          THE WITNESS:  Was he having e-mails going back
13  and forth?
14      Q.    (BY MS. JOHNSON)  Yes.
15      A.    Yes.
16      Q.    Okay.  You never witnessed any kind of sexual
17  relationship with Dr. Haynes and these women?
18          MS. HUTCHISON:  Objection; form.
19          THE WITNESS:  I mean, are you saying was I
20  there when they had sex?  No, I wasn't there when they had
21  sex.
22      Q.    (BY MS. JOHNSON)  Okay.
23      A.    But when you are getting these letters of
24  someone who is showing their breasts with, I would like to
25  have showers with you; I would like to have oral, you know,
0261
1  sex with you, that's -- would probably be along the lines of
2  having an inappropriate relationship with someone outside of
3  your marriage.
4      Q.    Okay.  But they were expressing what they
5  wanted.
6          MS. HUTCHISON:  Objection; form.
7          THE WITNESS:  They were -- right.
8      Q.    (BY MS. JOHNSON)  Okay.  But you never saw
9  Dr. Haynes have any sex with anybody?
10      A.    When Dr. Haynes hands me over $2,000 in cash
11  and asks me to take it down to Western Union and wire it to
12  an individual for travel arrangements, I -- and this is the

35

13  same person who was sending the card, I would think it was an
14  affair.
15      Q.    Okay.  But you never saw any sexual
16  relationship going on.
17          MS. HUTCHISON:  Objection; form.
18          THE WITNESS:  I witnessed communication of an
19  inappropriate sexual relationship between Dr. Haynes and
20  women.  Was I there when they had sexual intercourse, I was
21  not present when they had sexual intercourse.
22      Q.    (BY MS. JOHNSON)  Okay.  Now, other than
23  Dr. Haynes, who else in management knew about anyone having
24  affairs?
25          MS. HUTCHISON:  Objection; form.
0262
1          THE WITNESS:  Ricky Hill knew.
2      Q.    (BY MS. JOHNSON)  Ricky Hill knew that who was
3  having an affair?
4          MS. HUTCHISON:  Objection; form.
5          THE WITNESS:  Either himself and Dr. Haynes.
6      Q.    (BY MS. JOHNSON)  Okay.  Who else knew that
7  other people were having an affair?
8          MS. HUTCHISON:  Objection; form.
9          THE WITNESS:  Who else knew?  Many of the
10  employees.  It was Dr. -- I mean, Marcus King, Laura Clack --
11      Q.    (BY MS. JOHNSON)  Okay.  Let's take them one
12  at a time.  Dr. --
13      A.    I'm sorry.  Marcus King.  I don't know if he
14  had his doctorate --
15      Q.    Okay.  Marcus King knew that people were
16  having an affair.  Who did he know about?
17          MS. HUTCHISON:  Objection; form.
18          THE WITNESS:  He himself knew.
19      Q.    (BY MS. JOHNSON)  Knew what?
20      A.    He was having sexual relations with the person
21  that worked in my position before me.
22      Q.    And Ms. Clack knew of these affairs?
23          MS. HUTCHISON:  Objection; form.
24          THE WITNESS:  Did Ms. Clack know of these
25  affairs?
0263
1      Q.    (BY MS. JOHNSON)  Right.  Did she know of
2  them?
3      A.    Yes.
4      Q.    Who did she know was having an affair?
5      A.    Ms. Clack informed me of Reverend King and
6  Monique Monroe, who had my position before me, having a

36

7  sexual affair.  She was well aware of Dr. Haynes and
8  different women.  She informed me.  Her boss, who had had
9  extra affairs.
10      Q.     Uh-huh.
11      A.     Another pastor.  I forget his first name.
12  Pastor Fitzgerald and his current wife, before they were
13  married and while he held a pastoral position, the church
14  actually allowed her to go on a trip where they had
15  extramarital sexual affairs.
16      Q.     But who knew about that, is my question?
17             MS. HUTCHISON:  Objection; form.
18             THE WITNESS:  Laura Clack.  I thought we were
19  still on Laura Clack.
20      Q.     (BY MS. JOHNSON)  And she is in management?
21      A.     No.  She's the assistant to Ricky Hill.
22      Q.     Okay.  But is she in management?
23      A.     No.
24      Q.     Okay.  Who else in management knew about these
25  affairs?
0264
1              MS. HUTCHISON:  Objection; form.
2              THE WITNESS:  I can only assume that Vita Holt
3  and Ricky Hill, who were in management, would also know of
4  these affairs.
5       Q.     (BY MS. JOHNSON)  Okay.  But you are just
6  assuming and you don't know?
7       A.     I don't know first-hand.
8       Q.     Anyone else in management?
9       A.     Dr. Haynes.
10      Q.     Well, you mentioned Dr. Haynes already.
11  Anyone else other than Dr. Haynes, Pastor Ricky, I think you
12  said, Hill?
13      A.     Vita Holt.
14             MS. HUTCHISON:  Objection; form.
15      Q.     (BY MS. JOHNSON)  Are you saying Vita Holt
16  knew about these affairs?
17      A.     I would assume.  I don't know first-hand.  I
18  had never discussed it with her.
19      Q.     Anyone else?
20             MS. HUTCHISON:  Objection; form.
21             THE WITNESS:  I went to Liz Moffitt and told
22  her that I realized that Lisa Harrod, the woman who was
23  showing her breasts in the card, was the same woman I was
24  wiring money to.  And I wanted to know how to handle the
25  situation.
0265

37

1     Q.   (BY MS. JOHNSON) Okay.  So you went to
2  Liz Moffitt.  You don't know if she knew about any of the
3  affairs at the church?
4        MS. HUTCHISON: Objection; form.
5        THE WITNESS: She was aware of another couple
6  who had a child outside of wedlock that both worked there.
7     Q.   (BY MS. JOHNSON) Who was that?
8     A.   Jack Acona, I believe is his last name; if I
9  say it incorrectly, I'm sorry, and Tia Bottom.
10     Q.   And who knew about that, Liz Moffitt?
11     A.   Yes.
12     Q.   How did she know about that?
13        MS. HUTCHISON: Objection; form.
14        THE WITNESS: They're still employed there.
15     Q.   (BY MS. JOHNSON) I mean, but you said she
16  knew about it.  Why do you say she knew about it?
17     A.   Because it was common knowledge.  Everyone
18  knew.
19     Q.   Okay.  But did Liz Moffitt tell you she knew
20  about that?
21     A.   No, she did not tell me about that -- everyone
22  -- it was just common knowledge.  Everyone knew that they had
23  a child.  They still worked there.  When they met they were
24  there, they had a sexual affair and they had a child
25  together.
0266
1     Q.   And they both were married?
2     A.   No, they were not married.  They were single.
3     Q.   Oh, okay.  So they weren't having an
4  adulterous affair?
5        MS. HUTCHISON: Objection; form.
6        THE WITNESS: They were having sexual
7  relations outside of marriage.
8     Q.   (BY MS. JOHNSON) Okay.  But neither one of
9  them were married while having that sexual affair?
10     A.   I don't believe either one of them were
11  married.
12     Q.   You also indicated in your interrogatories
13  that your responsibility included working and travel --
14  and/or traveling with Jeremiah Wright?
15        MS. HUTCHISON: No.  Objection; form.
16        THE WITNESS: No, I did not travel with
17  Dr. Jeremiah Wright.  That was not part of my job.
18     Q.   (BY MS. JOHNSON) Did you have interaction
19  with Jeremiah Wright?
20     A.   I had interaction with Jeremiah Wright.

21      Q.    And that was only based on the e-mails and the
22  telephone?
23      A.    That is correct.
24      Q.    And you did -- did you ever make travel
25  arrangements for Jeremiah Wright?
0267
1      A.    I assisted in his travel arrangements when he
2  came here for -- for the speaking engagement April of 2008.
3      Q.    Okay.  Were you ever by Jeremiah Wright's side
14     Q.    (BY MS. JOHNSON)  Back on the record in this
15  civil action.
16           Ms. Payne, you indicated that you had a
17  supervisor; is that correct, at Friendship West?
18     A.    At Friendship West, yes.
19     Q.    And who was that supervisor?
20     A.    Dr. Haynes.
21     Q.    Did you have any other supervisor?
22     A.    I mean, there were -- not that I directly
23  reported to, no.
24     Q.    Okay.  So Dr. Haynes was the only one who
25  could fire you?
0280
1           MR. LEWIS:  Objection; form.
2           THE WITNESS:  I have no clue.  I don't know.
3      Q.    (BY MS. JOHNSON)  Who hired you?
4      A.    Who did I interview with or who --
5      Q.    Who offered you the position?
6      A.    Dr. Haynes.
7      Q.    Okay.  And was it your understanding that he
8  was the only one who could fire you?
9      A.    I don't think that was my understanding, no.
10  I don't think so.
11     Q.    But he was your only supervisor?
12          MR. LEWIS:  Objection; form.
13          THE WITNESS:  Yes.  I believe so.
14     Q.    (BY MS. JOHNSON)  Who else would have been
15  your supervisor?
16     A.    Who I reported to every day, in that capacity?
17     Q.    Yes.  Uh-huh.
18     A.    Dr. Haynes.
19     Q.    Okay.  Now, you indicated that there were
20  other affairs going on, adulterous affairs going on in the
21  office at Friendship West Baptist Church?
22     A.    Yes, ma'am.
23     Q.    And you indicated -- you have already stated
24  who knew about those affairs?

39

25  A. Yes, ma'am.

0281

1  Q. Dr. Hill, Liz Moffitt.  I think you said --
2 did you indicate Ms. Clack knew?
3   A. Uh-huh.
4  Q. And you indicated that -- you said Tonya Neil
5 didn't know, right?
6     MR. LEWIS:  Objection; form.
7  Q. (BY MS. JOHNSON)  Did Ms. Tonya Neil know
8 about the affairs?
9     MR. LEWIS:  Objection; form.
10  Q. (BY MS. JOHNSON)  At the church?
11   A. I am sure she did.
12  Q. Did Dr. Haynes ever know about the affairs,
13 adulterous affairs at the church.
14     MR. LEWIS:  Objection; form.
15     THE WITNESS:  I would assume he did.
16  Q. (BY MS. JOHNSON)  In your presence, did he say
17 anything to you about the affairs at the church?
18   A. No.
19  Q. Okay.  And you obviously talked to people at
20 the church; is that correct, about some of these affairs?
21   A. Yes, ma'am.
22  Q. Okay.  And when you talked to co-workers or
23 other people at the church about these adulterous affairs,
24 was Dr. Haynes ever present?
25   A. No.

0282

1  Q. I asked earlier about your e-mails back and
2 forth to Dr. Jeremiah Wright when you were talking about
3 sexual -- when you were using sexual language and sexual
4 speech.  And I asked when did those e-mails come to the
5 attention of management.  Do you remember me asking that
6 question?
7   A. I do.
8  Q. Okay.  Do you remember what your answer was?
9   A. I said I didn't recall, that I didn't know.
10  Q. Okay.  Did Dr. Haynes ever know about your
11 e-mails between Dr. Jeremiah Wright and you when you were
12 talking about sexual matters?
13     MR. LEWIS:  Objection; form.
14     THE WITNESS:  I believe so.
15  Q. (BY MS. JOHNSON)  How so?
16   A. I don't know how he found out about them.
17  Q. But you don't know when he found out about
18 them?

40

19      A.    I assume at the very end of July, either the
20  -- one of the last days of July, the month of July.
21      Q.    Did he tell you he found your e-mails on your
22  Blackberry?
23      A.    No, he did not.
24      Q.    Okay.  Did anyone else tell you that
25  Dr. Haynes, Freddie Haynes found your e-mails?
0283
1      A.    No.  No one told me that, no.
2      Q.    Okay.  So you just assumed he knew about your
3  e-mails?
4      A.    I heard a phone conversation he was having
5  with someone.
6      Q.    When?
7      A.    A couple of days or the day before August 1st.
8  I don't remember exactly when.
9      Q.    What did he say in that conversation?
10      A.    I heard him say something to the effect -- you
11  know what, I would be guessing and speculating, so.
12      Q.    So you don't remember anything he said about
13  those e-mails?
14      A.    That's correct.
15      Q.    Okay.  We were tendered certain copies of
16  e-mails.
17      A.    All right.
18      Q.    And I am assuming you had given to your
19  attorney?
20      A.    Uh-huh.
21      Q.    And in -- it appears that all of the e-mails
22  -- it appears to be incomplete.  Are these all the e-mails
23  you have regarding the conversation between you and
24  Dr. Jeremiah Wright?
25      A.    Can I -- may I see them?
0284
1      Q.    Yes.  Here.
2      A.    Thank you.
3      Q.    Starting here.
4      A.    Are you asking me are these all the ones that
5  I have?
6      Q.    Yes.
7      A.    I believe so.
8      Q.    And they appeared to be incomplete.  I want to
9  give you an example of what I'm talking about.
10            This is Plaintiff's Number 2 that was marked
11  in the Plaintiff's Responses and Objections to Defense
12  Request for Production.  You wrote to -- it appeared on July

41

13   the 29th, 2008 at 11:39 a.m. to revw400@attglobal.net.  And
14   you said, did you get my e-mail from this morning?  I sent it
15   around 6:30.  It was very descriptive.
16          A.    Uh-huh.
17          Q.    I thought I would have heard from you by now.
18          A.    Okay.
19          Q.    Where is that e-mail you're making a reference
20   to?
21          A.    I don't know.  I didn't keep all the e-mails.
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19
20          I, ELIZABETH PAYNE, have read the foregoing
21   deposition and hereby affix my signature that same is true
22   and correct, except as noted above:
23          _____
                    ELIZABETH PAYNE
24
25
0298
1   THE STATE OF _____)
2   COUNTY OF _____)
3
4          Before me, _____, on this
5   day personally appeared ELIZABETH PAYNE, known to me or
6   proved to me on the oath of _____ or through
7   _____ (description of identity card
8   or other document) to be the person whose name is
9   subscribed to the foregoing instrument and acknowledged to
10  me that he/she executed the same for the purpose and
11  consideration therein expressed.
12
           Given under my hand and seal of office on this
13
    _____ day of _____, _____.

42

14
15                _____
                  NOTARY PUBLIC IN AND FOR
16                  THE STATE OF _____
                  My Commission Expires: _____
17
18
19
20
21
22
23
24
25
0299
1  STATE OF TEXAS      )
2  COUNTY OF DALLAS    )
3
4          I, Brooke N. Barr, Certified Shorthand
5  Reporter, duly commissioned and qualified in and for the
6  State of Texas, do hereby certify that there came before me
7  on the 18th day of December, 2009, at the law office of
8  Foreman, Lewis & Hutchison, 611 South Main Street, Suite 700,
9  Grapevine, Texas 75061, the following named person, to wit:
10  ELIZABETH PAYNE, who was duly sworn to testify the truth, the
11  whole truth, and nothing but the truth of knowledge touching
12  and concerning the matters in controversy in this cause; and
13  that she was thereupon examined upon her oath and her
14  examination reduced to typewriting under my supervision; that
15  the deposition is a true record of the testimony given by the
16  witness, that review by the witness was not requested on the
17  record, and signature of the witness is to be signed before
18  any notary public.
19          I further certify that I am neither attorney
20  nor counsel for nor related to any of the parties to the
21  action in which this deposition is taken, and further that I
22  am not a relative or employee of any attorney or counsel
23  employed by the parties hereto, or financially interested in
24  this action.
25
0300
1          Given under my hand on this the _____ day
2  of _____, 2009.
3
4
5          _____

43

BROOKE N. BARR, CSR NO. 6521
6        CSR Expiration Date:  12/31/11
KX & ASSOCIATES
7        Firm Registration #478
1881 Sylvan Avenue
8        Suite 105
Dallas, Texas 75208
9        (214)520-6868
(214)630-9200 (Fax)