IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ELIZABETH PAYNE,<br>　Plaintiff | §<br>§<br>§ | |
| v. | § | CIVIL ACTION NO. 3-09CV0595-B |
| | § | |
| FRIENDSHIP WEST BAPTIST CHURCH,<br>INC.,<br>　Defendant | §<br>§<br>§<br>§ | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**

TO THE HONORABLE JUDGE OF THIS COURT:

COMES NOW, Plaintiff Elizabeth Payne, and files this Response to Defendant's Motion for Summary Judgment, in support of which would show the Court as follows:

**I.
OBJECTION TO UNSUPPORTED STATEMENTS IN DEFENDANT'S BRIEF**

Defendant offers no summary judgment evidence relating to the basis for its termination of Ms. Payne. Defendant simply offers an unsupported statement on p. 8 of Defendant's brief that "Plaintiff was in fact terminated due to incompetence in the discharge of her employment duties." Plaintiff objects to this statement as it is unsupported by appropriate evidence and asks that such statement be stricken from consideration.

**II.
ARGUMENT**

Plaintiff has established a prima facie case of discrimination by showing that 1. she is in a protected class; 2. she was qualified for her position; 3. she was fired; and 4.

she was replaced by someone outside her class OR she was treated less favorably than someone outside her class.  Thus, a presumption arose that Plaintiff was discriminated against by Defendant.  Defendant could overcome that presumption by offering a legitimate, non-discriminatory reason for termination.  However, Defendant has chosen to not articulate any reason for termination in its motion.  As a result, Defendant has not overcome the presumption and its motion fails.

Alternatively, should the Court find that the presumption is overcome, the evidence, taken as a whole: (1) creates a fact issue as to whether each of the church's stated reasons was not the actual motivation for the action and (2) creates a reasonable inference that race was a determinative factor in the adverse employment action. Under a sufficiency of the evidence standard, the church is not entitled to summary judgment because they cannot show that the evidence, as a whole, would not permit a factfinder to infer that the true reason for the adverse employment decision was discriminatory.

The evidence establishes that the prevailing attitude at the church was not race neutral and favored African-Americans, the church hires almost all African-Americans and the only Hispanics hired prior to Ms. Payne were on the cleaning crew, the reasons given for termination keep changing and are conflicting, the reasons given for termination are not legitimate and cannot be supported, the church did not follow its own policies and procedures in dealing with Ms. Payne, and she was treated differently than a similarly situated employee.  Any of those reasons will defeat summary judgment.  All of them together overwhelms the church's motion.

## III.
## SUMMARY JUDGMENT FACTS

Attached in Appendix:

   A. Statement of Position of Friendship West to the EEOC

   B. Email from Plaintiff requesting reason for termination

   C. Excerpts from the deposition of Liz Moffitt

   D. Excerpts from the deposition of Frederick Haynes

   E. Excerpts from the deposition of Veta Holt

   F. Excerpts from the deposition of Tonya Neal

   G. Emails between Plaintiff and Jeremiah Wright

   H. Affidavit of Elizabeth Payne

   A.    THE CHURCH

Friendship West Baptist Church has about 12,000 members. Appx 114/10—12. Reverend Frederick Haynes has been the senior pastor at Friendship West Baptist Church for 26 years. Appx 111/12—19. Rev. Haynes is the ultimate decision maker for the affairs of the church. Appx 112/8—11. He participates with the trustees in setting policies Appx 113/20—25. The decisions to hire and fire are ultimately made by him. Appx 114/5—8.

The church employs a number of ministers and various employees. Danielle Ayers is the minister of social justice Appx 117/7—19. Tonya Neal is director of media/communications and Veta Holt is the chief administrator. Appx 117/7—118/10. Elizabeth Payne was hired as Rev. Haynes' administrative assistant in January 2008.

She was fired in a meeting with Vetal Holt and Liz Moffitt in August 2008. Elizabeth Payne is Hispanic. Appx 236

B.    SHEER NUMBERS

The church has about 60 employees, 20 part time and 40 full time. None of them are Caucasian. The only Hispanics are the cleaning crew. They are all at least partially of African-American descent. Appx 195/24—197/5

Other than the cleaning ladies, there are no employees at the church that are not African-American at least in part. Appx 56/6—19. Plaintiff is the last person employed there of a different race. Appx 56/20—23.

C.    PREVALENT ATTITUDE

Friendship West is predominantly an African American church Appx 115/13—16; Appx 135/20—1. One of their organizations is BLACC: Brothers Leading and Loving the African-American Church and Community. Appx 136/11—13. According to Rev. Haynes, the African-American Church has a "certain cultural dynamic." Appx 136/17—22. There are traditions of the church that are in line with the black church tradition. Appx 134/8—14.

Rev. Haynes' ministry has a focus that is designed to address the burdens and discriminatory blocks that have hindered the advancement of blacks. Appx 139/20—126/1. That is done by affirming blacks in a way that is not race neutral. Appx 140/2—141/4.

Rev. Haynes also serves as Executive Advisor of the Empowerment Experiment. Appx 144/14—145/2; Appx 142/13—23. That is an organization dedicated to commit black individuals to shop only at black operated and owned establishments for an entire

year to educate the community on the need to support black owned businesses. Appx 142/5—12. He endorses the concept and had the founder of the organization speak at the church  (Appx 143/15—19) where he encouraged his congregation to pray for such action. Rev. Haynes believes that because of the history of discrimination against blacks in this nation, it is not discrimination to support blacks over other races, thus treating them differently.  Appx 146/25—150/6 .

Q:  Is it your testimony that having programs or policies at the church which seek to affirm blacks is not discriminatory even if it involves excluding other races like the Empowerment Experiment?  A:  Again, based on the history of this country, no.  Appx 151/25—152/9.

When Rev. Haynes considered hiring Ms. Payne, he was concerned about "an assimilation process" because "this would have been the first time that I had a non-African-American in my office that close."   Appx 153/22—154/9.  It was  a "new" situation because he was going to hire a non-African-American. Appx 155/8—18.  It was so new and unusual to hire a non-African-American, that Haynes announced in a staff meeting that he was going to hire a non-African-American and sought counsel from his other ministers as well as his mentor, Jeremiah Wright, about the wisdom of hiring a non-African-American. Appx 156/13—158/4

Veta Holt, the Chief Administrative Officer of the church also testified that supporting a business solely based upon the race of its owners is not discriminatory. Appx 198/9—24.  However, Liz Moffitt, the Human Resources Manager for the church believes that it would be discriminatory to make a decision to engage in business with somebody only because of their race.  Appx 59/13—18.    She further testified that it

violated the law to encourage a discriminatory attitude in the workplace just as much as to treat someone that way. Appx 59/19—23. If you encourage a discriminatory attitude in the workplace, that's going to affect how people interact with someone of that race. Appx 59/24/- 60/4.

When asked her opinion as to why the church employs all African-Americans other than the cleaning crews, Ms. Moffitt she does not have an opinion. Appx 95/7—12. Those who run and manage the church have not even been curious as to why the church employs all African Americans. Appx 218/20—24.

D.   HUMAN RESOURCES

The job of Liz Moffitt, the Human Resources Manager, includes recommendations for hiring and firing (Appx 10/8—18) as well as employee relations, new employee orientations, recruiting, staffing, training. Appx 11/14—12/4. Her job includes enforcement of policies and procedures in the handbook and to make sure they are applied across the board. Appx 49/4—25. However, she says that it was not part of her job to form an opinion as to whether Plaintiff's termination was legitimate. Appx 80/12—16.

Ms. Moffitt understands that there are signs or flags of discrimination to look for. Appx 50/9—23. Those might include the number of employees being overwhelmingly of one race (statistical information—Appx 51/10—22), or whether the reasons given for conduct toward an employee are legitimate or not (Appx 52/17—24), or a prevalent attitude in the workplace toward a particular class of people (Appx 52/25—53/4) or whether the employer follows its own policies and procedures (Appx 53/5—10) or

whether or not an employee is treated differently than the way the employer treats other employees (Appx 53/11—16).

Ms. Moffitt has never been given the task at the church to find out whether discrimination has occurred apart from sexual harassment.  Appx 54/14—19; Appx 55/13—56/5. She has provided sexual harassment training but she has never provided training related to race discrimination or harassment.  Appx 98/7—11.  Ms. Moffitt reports to Reverends Haynes, Hill and Holt  Id.

Ms. Moffitt has provided training on giving employee performance reviews, including providing such training to Haynes in 2007.  Appx 13/13—14/5.  The training emphasized the importance of providing information to employees about their performance on an ongoing basis.  Appx 15/3—8.  It is important to tell employees how they are or are not meeting expectations and give them a chance to improve.  Appx 15/9—22.

Ms. Moffitt had the church obtain an electronic performance management system, which is an electronic system where managers can make notations concerning the employee's performance if there are issues that need to be corrected or addressed.  Appx 16/23—17/21.   She agrees that if they expect an employee to change, it's fair to let them know about it and that is the reason for the electronic performance management system.  Appx 17/22—18/6.  In conjunction with this process, she gave the supervisors deadlines for performance reviews to be completed.  Appx 19/16—19/25.  Haynes has never done a performance review of any assistant.  Appx 20/6—11.  She has never asked him why he hasn't provided the performance reviews.  Appx 21/3—5.

E.     PROGRESSIVE DISCIPLINE

The church has a progressive discipline policy. Appx 36/23—37/1; Appx 35/7—11. Progressive discipline starts with an oral conversation. If the issue doesn't get any better after a period of time, then it moves to a written warning. And then if it doesn't get any better after that, they are moved to a "final" warning and then termination. Appx 37/2—13. A written warning is a way to notify an employee that the church is ramping up the discipline. Appx 38/20—39/6.

Suspension is part of progressive discipline and it is designed to give an employee and opportunity to think about what they've done, decide if they want to keep working there and agree to whatever terms relate to returning. Appx 35/12—20. If employee that is counseled about an issue responds appropriately, it tells her that the employee responses well to counseling and training. Appx 68/2—10.

F. REASONS FOR PLAINTIFF'S TERMINATION

1. REASONS CHANGE CONSTANTLY

The following lists the reasons given by Rev. Haynes, Liz Moffitt, Veta Holt and that the church provided to the EEOC for Ms. Payne's termination:

a. Haynes: 1. Misspelling and grammatical errors on a document that he submitted to Harvard, 2. misspelling on appointment folder, 3. calendar entry with misspelling, 4. not checking in on Sundays, 5. not answering her cell phone, 6. being absent on Mondays, 7. not attending leadership meetings, 8. using his name to get personal things done, 9. speaking to the media. Appx 159/14—160/23.

b. Moffitt: 1. giving statements to the media; 2. Errors in her work; 3. Personality conflicts with the staff. Those are the <u>only</u> reasons. Appx 48/4—18.

During her deposition, Ms. Moffitt confirms that the three things she listed are the only reasons for Ms. Payne's termination. After a break, conferring with her attorney and questions from her attorney, Ms. Moffitt adds that Ms. Payne not coming to work on Sundays and allegedly missing work on Mondays were reasons for termination. Appx 99/12—16. However, she doesn't even know if Ms. Payne missed any Mondays and there is nothing that shows that. Appx 102/16—103/7. She goes on to say that Sundays were a "work day." Appx 100/22—24. They also try to throw in that Ms. Payne allegedly missed staff meetings, but Moffitt says she doesn't know of any staff meetings that Ms. Payne missed. Appx 101/1—7.

    c.   Statement to EEOC: 1. "lack of performance and poor attitude," 2. misspellings and grammatical errors; 3. reassigning her own assignments to other personnel; 4. lack of knowledge of Power Point; 5. dealing with personal problems on church time; 6. receiving a sum of money from the church to assist with child support; expanding her responsibilities; 7. "several instances" of scheduling conflicts; 8. incorrectly made travel arrangements; 9. office disputes with co-employees; 10. a hostile, defensive attitude; 11. a failure to attend church services; 12. a failure to attend Saturday meetings; 13. often late to work; 14. could not be found at her assigned work space; and 15. misspellings and grammatical errors in the Harvard project.

    d.   Holt: Haynes told her he wanted to fire Ms. Payne because there were engagements on his calendar that he did not make "and her work." Appx 194/8—11.

  2.  REASONS ARE PRETEXTUAL

a. Appt. Folder: No documentation that there was a problem regarding the appt folders (Appx 162/1—4). Rev. Haynes says the problem continued even after Moffit talked to

Ms. Payne. Appx 161/14—17, but he can't say how many times or recount any of the names or instances. Appx 163/2—21. Ms. Moffitt says that Ms. Payne misspelled someone's name on a folder one time that she is aware of (Appx 65/6—14). Moffitt testified that she is not aware of any errors on folders after she talked to Ms. Payne. Appx 66/13—15.

b.  Calendar:  Rev. Haynes can't give any specific instance of any problem on his calendar. Appx 164/24—165/14. It was allegedly a continuing problem until the day Ms. Payne left. Id. Rev. Haynes can't even give one example. Appx 166/18—19. Rev. Haynes states there was on his calendar an appointment that he did not approve (Appx 70/3—6). It was one appointment one time. Appx 97/5—9 (compare to EEOC statement that there were "several instances of scheduling conflicts").

c.  Sunday Workday:  Rev. Haynes says that twice Ms. Payne didn't check in on Sunday. Appx 166/20—167/22.  Yet working on Sunday (or even "checking in") is not listed on either the job description (Appx 169/13—17) or on the orientation checklist (Appx 168/8—169/12), which in fact reflect that the job is for Monday through Friday, 8 am to 5 pm. Appx 168/4—7.

d.  Answering Cell Phone:  Her alleged failure to answer her cell phone was a continuing problem. Appx 170/4—15. Yet there is nothing to document it, not even an email or reminder. Appx 170/16—20. Rev. Haynes says he discussed it with Moffitt (Appx 170/21—171/1), but she does not mention it or list it as a problem either when she was asked by Ms. Payne's counsel or after she added new reasons for termination when her lawyer asked. Appx 48/4—18; Appx 99/12—16

e. <u>Monday Absences</u>:   There is no documentation that Plaintiff was absent on any Monday. Appx 171/19—172/14.  Rev. Haynes states that "it became a habit."  Appx 173/22—25, but Ms. Payne was never written up for it or counseled about it.

f. <u>Leadership Meetings</u>:   Not attending leadership meetings "a few times."   Appx 174/18—175/4.  Ms. Payne was never warned about it or counseled about it.  Appx 175/5—21.  Such attendance is also not in the job description and not on the orientation checklist.  Appx 176/5—8. Missing staff meetings was not one of the reasons Rev. Haynes gave Rev. Holt her for Ms. Payne's termination.  Appx 200/19—201/3

g. <u>Poor Attitude</u>:  Even though the church represented to the EEOC that this was a reason for termination, Rev. Haynes testified in his deposition that it was not a reason for termination.   Appx 176/22—177/2.   Ms. Moffitt testified that she is not aware of anything that would show that if someone had sat down with her, Ms. Payne would not have fixed an issue.   Appx 104/16—22.   Ms. Payne was never insubordinate or disrespectful or refused to mend her ways.  Appx 106/25—107/3.

h. <u>Media</u>:  Regarding the media situation, Rev. Haynes believes that Ms. Payne spoke once to the media early on in her employment at a time when Jeremiah Wright was coming to speak.  Rev. Haynes doesn't know what she said.  Appx 177/21—22.  He doesn't even know when or if she was allegedly informed not to speak to the media. Appx 177/23—178/1.  Ms. Moffitt confirms that Ms. Payne was quoted once in the paper but she doesn't recall what it was.  Appx 68/17—23.  Before Ms. Payne was quoted in the media, nobody told her not to do that. Appx 69/10—17.  Rev. Holt confirms that the quote from Ms. Payne in the Star Telegram about Wright that they are using as a basis for termination was "He's a great man."  That's it. Appx 202/10—15.  Rev. Holt has no idea

if Ms. Payne ever had any instruction not to talk to the media before the quote in the paper came out. Appx 203/2—16. There is nothing documented reflecting that Ms. Payne was ever told before the quote came out that she was not allowed to talk to the media and there is nothing documented that reflects that this was a problem at the time. Appx 204/22—23.

i. <u>Harvard Project</u>: Ms. Payne worked on a project that involved coordinating information from various sources to put it all together into a booklet for Rev. Haynes to provide to Harvard. Appx 215/15—18. She was to obtain the information from Rev. Haynes, other ministers, Tonya Neal, Human Resources and other sources and the Communications Department would then design the booklet and print the material. Appx 215/15—18; Appx 216/23—217/12. The Director of Communications was Tonya Neal. Id. If something is going to be printed to be distributed, it is handled by the print department under her supervision. Appx 213/7—10. It was her employee, Jack Akana, that used a software program called InDesign to put the information into a booklet. Appx 219/12—19; Appx 220/2—10. He used software that allowed him to design and create the layout and the booklet. Appx 220/13—22. Rev. Haynes says he had a problem with the Harvard project in its design, grammar and spelling, and Ms. Payne is completely and solely responsible for that. Rev. Haynes typed his own submission of material. Appx 119/17—21. The misspellings were not in the sections he typed, but in other sections. Appx 120/15—24 (compare to his later testimony that he was responsible for a misspelling in his material when it was pointed out in his deposition. Appx 133/11—22). Rev. Haynes has no knowledge of who proofed the document. Appx 121/9—122/13. With respect to each section of the report, Rev. Haynes doesn't know who typed much of

it, who designed the layout, who proofed it and/or who printed it. Appx 123/9—125/9; Appx 126/3—129/25. He doesn't know the extent of anyone else's involvement with the document. Appx 132/5—11.

Moffitt acknowledges that it is possible that Ms. Payne was not the one that misspelled the words on the Harvard report as nobody asked or checked. Appx 70/20—71/3; 71/24—72/2. She says that even if it was Tonya Neal's department's responsibility to design, proofread and print the report, it would still be legitimate to reprimand Ms. Payne for misspellings. Appx 73/21—74/2. Moffitt doesn't even know under what circumstances Tonya Neal would be responsible for proofreading documents that her department designs and prints. Appx 74/17—21. She concedes that she would need to know that to determine if Ms. Payne was being treated unequally, but is not aware of anyone checking into that. Appx 74/17—75/10.

Compare Rev. Haynes' response when it is pointed out that Tonya Neal put information on the church's website that is an outright lie. For two years, the website of which Tonya Neal was in charge lied about Rev. Haynes having received a doctorate from Oxford. Appx 183/23—185/25. Rev. Haynes did not receive a doctorate from Oxford and the website was eventually corrected after 2007, but nobody was disciplined for that. Appx 186/1—187/3. Rev. Haynes contends that he was not aware that the website reflected that he had a doctorate from Oxford, which he acknowledges is not true. Id. He contends that Tonya Neal was responsible for the misinformation published to the world, but there was no discipline for such misinformation. Id.

h. <u>Conflicts with Staff</u>: Rev. Holt testified that situations with other employees were <u>not</u> related to Ms. Payne's termination. Appx 207/.1—19. Liz Moffitt said that personality

conflicts and interpersonal issues were not unexpected occurrences. Appx 28/15—19. They are things that can happen frequently in the workplace and she is trained to deal with them. Appx 28/20—25. Ms. Moffitt says there were four people with whom Ms. Payne had conflicts that were a basis for termination: Dee Moten, Rev. Parker, Tonya Neal and Cornell Towns. Appx 76/3—9. She doesn't know what the situation was with Mr. Towns. Appx 76/13—15. With Tonya Neal, the conflict was over getting the Harvard report to a fedex box Appx 81/5—23. HR was going to mediate between the two and Ms. Payne agreed but Tonya Neal refused. Appx 83/1—13. Tonya Neal indicated everything was fine. Appx 83/14—19. In fact, Neal testified herself that her relationship at work with Ms. Payne was fine. Appx 214/3—5. Ms. Moffitt also testifies that as to any conflict between Ms. Payne and Ms. Neal that might have existed, "they were both at fault." Appx 84/19—85/5.

The "incident" with Rev. Parker was that Ms. Payne wanted to join the church but didn't want to walk in front of the congregation. Appx 86/5—11. Ms. Moffitt was asked "[s]o was there something that [Ms. Payne] did wrong?" and she stated "I don't know, I don't think so." Appx 86/22—87/6.

Regarding Dee Moten, Moffitt says she has "no opinion" as to whether Ms. Payne was doing something wrong or provoking Moten. She can only say "I don't know." Appx 88/1—10.

Further, these alleged incidents related to attempts at "mediation sessions" directed by HR between employees. Moffitt says an employer should not hold it against the employee that they want to have a mediation session. Appx 89/2—4. In fact, it is a positive sign that they want to improve. Appx 89/5—25.

G.     VIOLATION OF CHURCH'S OWN POLICIES AND PROCEDURES

    1.     NO DOCUMENTED BASIS FOR TERMINATION

Veta Holt, the Chief Administrative Officer that terminated Ms. Haynes, was trained to document reasons for termination, but she has not seen any documentation of the reasons for Plaintiff's termination. Appx 209/7—23. At time of termination, she did not ask if there were any documented reasons justifying termination. Appx 210/7—12.

Ms. Moffitt acknowledges that in responding to employee issues, it's important to have documentation that reflects what really happened. Appx 22/6—12. Ms. Moffitt's training in Human Resources taught her that if she does an investigation into an issue at work, documentation is an important part of that. Appx 27/6—11.

She is not aware of anyone who has checked the performance management system to see if it contains any information about Ms. Payne. (so they responded to the EEOC and this lawsuit without doing so). Appx 23/5—12. Their performance management system was there to document good and bad performance. Appx 24/13—20. A big part of performance system was to get employees to improve and change. Appx 25/3—10. Performance reviews were in writing and given to employees and required sufficient detail to allow employees notice of behaviors that were good and bad. Appx 26/7—22.

When they terminated her, Ms. Holt and Ms. Moffitt refused to provide a reason for termination. Appx 206/5—8. Even after Ms. Payne sent a written request (Appx 7) in accordance with the Texas Labor Code, the church illegally refused to provide a reason for termination.

    2.     FAILURE TO FOLLOW COMPANY POLICIES/PROCEDURES

In every other instance where an employee was terminated for performance reasons, the church followed its progressive discipline policy—all with African-American employees. Other than Ms. Payne, the church has never fired someone without giving them a written warning for performance issues. Appx 68/11—16.

Renee Shepherd fired in 2009. Appx 29/11—30/23. There was documentation on a performance evaluation that Renee had notifying her of performance problems. Appx 31/11—25. She was also suspended for two days for performance issues and notified of such in a letter. Appx 32/7—33/21. Subsequently, she went back to work and then was reported again for performance issues. Appx 34/6—17. She had at least three meetings with HR and Rev. Parker about performance and interpersonal issues. Appx 61/12—23 . She had an oral warning, then a written warning and a suspension, a number of meetings and additional training. Appx 62/9—21.

Kassandra Foard, print technician (Appx 41/15—19), received a written warning and then a "final" before termination. Appx 42/20—43/3. Charlotte Rhone, administrative assistant (Appx 41/20—24) received a verbal, then a written warning, then a final written, all for performance issues. Appx 44/3—14. Vernon Robinson, Director of Audio Visual, received verbal and written warnings prior to termination. (Appx 41/10—14)

The only African-American employees who were terminated without progressive discipline were those whose termination was not related to work performance. Mark Edwards and Stephanie Washington fired for inappropriate relationship. Appx 45/6—22. Edward Mirango was fired for stealing another employee's keys, making a copy and

showing up at her house. Appx 46/10—13. Kittie Taylor was fire fore stealing Rev. Haynes' shoes and giving them to her husband. Appx 46/14—47/24.

Ms. Payne was fired without following the progressive discipline and without so much as a written warning. Appx 68/11—16. Even the Chief Administrative Officer is not aware of any steps taken by anyone to talk to Ms. Payne to correct any behavior before termination. Appx 201/17—21.

3. SIMILARLY SITUATED EMPLOYEE

The church takes the position that there was no similarly situated employee with which to compare treatment. However, the church completely fails to mention Charlotte Rhone, the administrative assistant to Danielle Ayers. Appx 41/20—24. Ayers is the Minister of Social Justice. Appx 117/7—19. The job that Ms. Payne had was identical to the job that Ms. Rhone had. Appendix 236. With Ms. Rhone, the church followed its progressive discipline policy and Ms. Rhone received a verbal warning, then a written warning, then a final written warning before being terminated, all for performance issues. Appx 44/3—14.

H. CHURCH DELIBERATELY IGNORES SIGNS OF DISCRIMINATION

Ms. Moffitt is trained how to spot signs of discrimination and that is part of her job. Appx 50/9—23; Appx 51/10—22; Appx 52/17—2; Appx 52/25—53/4; Appx 53/5—10; Appx 53/11—16. She did not do any investigation as to whether there was a negative attitude based on race. Appx 56/24—57/5. She did not do an investigation as to whether the church followed its own policies and procedures with respect to the termination. Appx 57/6—10. She did not compare the way Ms. Payne was treated with the way other employees were treated. Appx 57/11—15. She did not investigate whether

the reasons offered to fire Ms. Payne were legitimate. Appx 57/18—21. She is not aware of anyone who investigated any of these things. Appx 57/22—58/1.

I. MS. PAYNE WAS REPLACED BY AN EMPLOYEE NOT IN HER PROTECTED CLASS

Plaintiff's replacement is bi-racial: half African-American. F212/2—10.

J. MS. PAYNE'S COMMUNICATIONS WITH REVERAND JEREMIAH WRIGHT

Reverend Wright is a mentor to Reverend Haynes and Haynes feels that they are like adopted son to adopted father. Appx 137/18—138/1. During her employment, Ms. Payne had occasion to come into contact with Wright and they began exchanging emails. Those emails are included in the Appendix 214-227. The church representatives have testified that the emails/communications were not a factor in Ms. Payne's termination (Appx 205/9—12) and any alleged violation of the Christian Standard of Living had nothing to do with P's termination. Appx 96/15—24. They claim that they did not hear about their relationship until after Ms. Payne was terminated. Appx 179/2—5.

Reverend Haynes has never asked Wright if it was true about the emails. Appx 179/2—180/7. He has never read the emails that have been produced. Appx 180/9—25. Rev. Haynes still maintains a good relationship with Wright and still invites him to speak at the church. Appx 181/14—19. Rev. Haynes does not hold the emails against Rev. Wright. Appx 182/11—16.

K. REVEREND HAYNES' INAPPROPRIATE RELATIONSHIPS

During Ms. Payne's employment, while opening mail for Rev. Haynes, Ms. Payne came across a card to Haynes from Lisa Harrod with suggestive content and a sexually suggestive photo. Moffitt admits that Payne brought it to her and that it was sexually

suggestive. Appx 91/16—21. Even though it would be significant to her as an HR issue if Haynes was having an affair (Appx 92/13—21), she did nothing to find out if he was. (Appx 93/12—19).

Rev. Haynes acknowledges that he knows Lisa Harrod, she lives in Miami Appx 187/1—188/13. Haynes states that he is Harrod's "spiritual mentor." Appx 189/3—20. They are also linked on Facebook as friends. Appx 190/10—13. Haynes saw Harrod in Miami in 2008 and they had lunch. Appx 191/11—16. He has never asked her if she did, indeed, send an inappropriate, sexually oriented photo of herself to him. Appx 188/20—189/21.

L.   QUALIFIED FOR THE JOB

Ms. Payne met all of the qualifications for the position. Appx 236 She had approximately fourteen years experience in work that was either as administrative assistant or similar. Appx 236 She had experience fielding phone calls, making travel arrangements, creating correspondence, customer service, public relations, providing reports, reconciling reports, placing employees in various positions as a headhunter, arranging special events, including addressing all necessary details. She was familiar with the church hierarchy and organization. Appx 236. She worked for Bacardi Imports, Tichner Media System (now Univision), Whitley Penn & Associates, Fort Worth Independent School District, Fort Worth Museum of Science and History and McSearch company. Appx 236. She was never fired from any prior job. Appx 236. They all provided experience in the same type of responsibilities as the church administrative assistant position. Ms. Payne learned to be a good multi-tasker and a team player. Appx

236. She learned to address problems in the workplace and deal with crises that occurred. Appx 236.

The Plaintiff has established that there are at least material fact issues with respect to discrimination by the Defendant and the Defendant's motion should be denied as a matter of law.

Respectfully submitted,

s/Susan E. Hutchison
Susan E. Hutchison
State Bar No. 10354100

S. Rafe Foreman
State Bar No. 07255200
Kern A. Lewis
State Bar No. 12295320

FOREMAN, LEWIS & HUTCHISON, P.C.
611 S. Main Street, Suite 700
Grapevine, Texas 76051
(817) 336-5533
FAX: (817) 336-9005

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

This is to certify that on this 4th day of March, 2010, a true and correct copy of the above and foregoing document was served on the following attorney of record via the court's electronic service:

Faith Simmons Johnson
Faith Johnson & Associates, LLP
5201 N. O'Connor Blvd., Ste. 500
Irving, Texas  75039

John D. Nixon
Wyde & Nation
3131 Turtle Creek, Ste. 901
Dallas, Texas  75219

s/Susan E. Hutchison
Susan E. Hutchison