

**FAITH JOHNSON**
*Attorney and Counselor at Law*
faith@amlawteam.com

October 13, 2008

U.S. Equal Employment Opportunity Commission
Attn.: Ms. Peggy J. Kirkwood
Dallas District Office
3rd Floor
Dallas, Texas 75202
**Sent via facsimile transmission: (214) 253-2720**

    Re:    **EEOC Charge No. 450-2008-04697**
             **Claimant: Elizabeth Payne**
             **Employer: Friendship West Baptist Church**

## Statement of Position

Dear Ms. Kirkwood:

    We represent Friendship West Baptist Church ("Church" or "Employer") and are writing in response to the above-referenced Charge of Discrimination. The Church's Statement of Position is as follows:

    **A.**    **Elizabeth Payne was terminated for poor performance.**

        1. The employee was terminated on or about Friday, August 1, 2008. She was terminated for lack of performance and poor attitude.

        2. The employee was hired on or about January 07, 2008 as the Executive Assistant to Senior Pastor Haynes. Rev. Haynes is a well-known minister of the Christian Gospel both locally as well as nationally and is in great demand as a speaker for other churches as well as at other venues. As Executive Assistant, Mrs. Payne was responsible to coordinate Rev. Haynes' travel schedule, advise him of requested speaking engagements, prepare written materials for his presentations, as well as engage in other typical administrative office functions. Because of Rev. Haynes' reputation, it is important that all of these activities be undertaken with great care and attention to detail. A true and

correct copy of the job vacancy with description of expected qualifications and duties is attached hereto as Exhibit "1".

3. On numerous occasions, Mrs. Payne made mistakes in performing her duties. She routinely prepared and distributed written materials that had misspellings or grammatical errors. These mistakes reflected poorly upon the Pastor's and Church's reputation. Other Church administrative leaders also came to learn that Mrs. Payne was taking job assignments for which she was personally responsible and assigning them to other Church personnel. She would divide up these sub-assignments between several employees so that each employee thought they were helping her in some limited fashion, when in fact, these other employees were completing the entire assignment, she was doing nothing, but would assemble the other employees' work and act as if she had performed her duties. Mrs. Payne had told Church hiring personnel that she knew how to operate Power Point and other standard office software, but it soon became obvious that she did not.

4. Mrs. Payne spent large amounts of time during Church work hours dealing with her personal problems, usually legal matters that were related to her child visitation, custody, and support disputes. In March 2008, Mrs. Payne advised Church staff that there was a warrant for her arrest for past-due child support, that she could not make the necessary payments, and that her arrest was imminent. The Church staff paid her the sum of $7,535.00 as an advance on salary to allow her to make the child support payment and avoid going to jail.

5. Rather than perform her assigned duties as Executive Assistant, Mrs. Payne began to seek to enlarge or redirect her responsibilities. She directed Church staff to send media inquiries to her attention, rather than to the Church's Director of Communications, and in some instances instructed media to call her on her private cell number. She began to accept speaking engagements on behalf of Rev. Haynes when she had been instructed to simply get the information about the proposed speaking engagement and then allow Rev. Haynes to determine if it fit within his schedule. In several instances, she scheduled Rev. Haynes to speak at times when he had conflicting events, leading to his great embarrassment. When travelling, Rev. Haynes further experienced a number of incorrectly made travel arrangements that Mrs. Haynes had been responsible for.

6. Mrs. Payne got into office disputes with a variety of Church staff. Liz Moffitt, the Church's H.R. Director had to intervene in these disputes and came to the opinion that each of them were initiated by Mrs. Payne's hostile, defensive attitude and unwillingness to conform herself to the supportive, collegial type of conduct expected of employees at a Christian church.

7. In addition to her other administrative duties, Mrs. Payne was told prior to being hired that she was expected to attend a monthly Saturday morning Pastors and Leaders in Sharing meeting, to attend weekly church services, and to check in with Rev. Haynes in-between services to see if he had any problems or issues for which he needed her assistance. She came to one of the Saturday morning meetings, was never seen by Church staff at services, and never came to Rev. Haynes in-between services.

8. Mrs. Payne was often late to work or could not be found at her assigned work space during the Church's work hours.

Appx 2

Plaintiff 136

9. Mrs. Payne was counseled on a recurring basis regarding her many deficiencies. She regularly apologized to Rev. Haynes for the poor quality of her written materials and promised to do better, but never did. Mrs. Payne was apparently unfamiliar with spell-checker functions found in most word processing software.

10. Rev. Haynes had the honor of speaking before an audience at Harvard University and depended upon Mrs. Haynes to draft certain written materials and make sure they were submitted to the university prior to his arrival. When he got to Harvard, he was horrified to see a number of misspellings and grammatical errors on the written presentation and was further horrified to learn that the deficient materials had already been distributed. The Church's other staff had to work on an emergency basis to correct the mistakes, get the materials sent to Harvard and attempt to retrieve and destroy copies of the prior version sent by Mrs. Payne.

B. **There was no discrimination.**

11. Mrs. Payne claims that she was discriminated against based upon race (white), sex (female), and national origin (Hispanic). More specifically, she claims that she was terminated for having an "interracial relationship with an African-American male, who was pastor at another church". She claims to have observed other African-American employees who were engaged in "affairs and romantic relationships" with other African-Americans who were not terminated.

12. As a Christian employer, the Church requires its employees to abide by a Christian Code of Conduct. Any married employee who is known to be involved in an improper relationship with another person is subject to discipline including termination. Had the Church known that Mrs. Payne, a married woman, was having an affair with another person, she would have been subject to discipline including termination. The race of either the employee or the other person would be irrelevant, only the improper relationship. Please see attached hereto as Exhibit "2" a true and correct copy of the Church's employee handbook, in which the Church's Christian Code of Conduct is described on page 5.

13. On information and belief, Mrs. Payne sold her story or picture to the New York Post and in that published story, she claims to have had an affair with Rev. Jeremiah Wright, the pastor most recently known for his affiliation with Presidential Candidate Barrack Obama. She further claims that the affair began because she had some responsibility to work and/or travel with him on behalf of the Church. This statement is a blatant lie. As described above, she had no responsibility to travel with or work with anyone outside of the Church. The Church does not believe that Mrs. Payne has had any kind of relationship with Rev. Wright. Once her sensational allegations were published in the New York Post, local investigative reporters descended upon the Church and were prepared to allow Mrs. Payne to elaborate on her allegations on television. However, upon further questioning, the story began to unravel and, on information and belief, she has admitted to one or more of these local reporters that there was no affair.

14. The Church did not know that the employee was involved in an affair, but if it had, she would have most likely been terminated for failure to follow Christian living standards. The Church does not know of any other employee who is involved in an affair, same race or interracial, but assumes that this allegation is in keeping with Mrs. Payne's desire to not tell the truth in order to gain some kind of advantage or benefit.

The Church has done nothing wrong. It will not consider any remedial or agreed action and stands by the termination.

Ms. Kirkwood, please let us know if any further response or information is required. Thank you for your attention to this matter.

Sincerely:
**Anthony & Middlebrook, P.C.**

*[signature: Faith Johnson]*

Faith Johnson
For the Firm

FSJ/se
cc: Client

Friendship West Baptist Church
Under general supervision of the Senior Pastor, will perform, coordinate and oversee technical and office administrative duties, including the provision of varied and complex office duties; may supervise clerical and other support staff, and perform other duties as assigned. Position requires extensive travel arrangement experience.

Equivalent to completion of two years of college-level coursework in business or a field related to the work and three years of office administrative, or an equivalent combination of education and experience sufficient to successfully perform the essential duties of the job.

Must possess mobility to work in a standard office setting and to use standard office equipment, including a computer, strength to lift and carry materials weighing up to 10 pounds; vision to read printed materials and a computer screen; and hearing and speech to communicate in person and over the telephone.

**OTHER SKILLS AND ABILITIES**

- The successful candidate must fully support the philosophy of FWBC and its leadership team.
- The ability to work efficiently and effectively in team situations is critical, as well as the ability to work independently.
- Must possess solid time management skills and organizational abilities. The ability to coordinate several activities at once and to quickly analyze and resolve specific problems is important.

**OTHER QUALIFICATIONS**

- Analyzing and resolving office administrative and procedural problems;
- Performing basic research and preparing reports and recommendations;
- Organizing own work, coordinating projects, setting priorities, meeting deadlines and following up on assignments with a minimum of direction;
- Using initiative and independent judgment within established policy and procedural guidelines;
- Providing complex office administrative support in the areas of procurement, budgeting, report reparation and staff communication; and Communicating effectively with co-workers, superiors, the general public, representatives of public and private organizations and others sufficient to exchange or convey information.

Plaintiff 139

## CHRISTIAN STANDARDS OF LIVING

It shall be Friendship West Baptist Church's policy to employ those capable of meeting high standards of character, education and occupational qualifications, congenial with fellow employees and capable of occupational growth and who have made a commitment to Jesus Christ and consistent with our Statement of Faith.

The commitment of Friendship West Baptist Church to conduct business lawfully and ethically is fundamental to our very existence as a ministry. It is critically important that all employees meet the highest standard of legal and ethical conduct; nothing less than these standards will be acceptable. Therefore, each employee has an obligation to operate with honesty and propriety.

Friendship West Baptist Church's commitment to ethical behavior is supported by our strict code of conduct as follows:

1. Comply with all laws and regulations
2. Deal honestly with donors, vendors, and consultants
3. Use ministry resources properly
4. Devote your full working time and efforts to ministry interest
5. Reflect the highest standard of ethical conduct at all times when dealing with fellow staff, and each and every person you come in contact with.

The conduct of employees reflects directly upon the Church. All employees are expected to maintain a consistent attitude of friendliness, teachability, and a love and concern for others. **Critical or negative attitudes, gossip, and conduct not consistent with Christian standards cannot be tolerated, and are grounds for discipline up to and including termination of employment.** Employees are expected to be courteous and helpful to the public, to members of the Church and those doing business with the Church. It is imperative that all employees conduct themselves in a manner that reflects favorably upon the Church. **Should an employee's conduct, whether on or off the premises, be criminal, dishonest, immoral in nature or unBiblical, or detrimental to the best interest of the Church, then it may subject the employee to discipline or dismissal depending upon the nature and extent of the infraction.**

Plaintiff 140