1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF TEXAS
2                    DALLAS DIVISION

3    ELIZABETH PAYNE,            )
                                 )
4         Plaintiff,             )
                                 )
5    VS.                         )  CIVIL ACTION NO. 3-09CV0595-B
                                 )
6    FRIENDSHIP WEST BAPTIST)
     CHURCH, INC.,               )
7                                )
          Defendant.             )

8

9    ************************************************

10          ORAL AND VIDEOTAPED DEPOSITION OF

11                 ELIZABETH MOFFITT

12                 JANUARY 6, 2010

13   ************************************************

14

15        ORAL DEPOSITION OF ELIZABETH MOFFITT, produced

16   as a witness at the instance of the Plaintiff, and

17   duly sworn, was taken in the above-styled and

18   numbered cause on the 6th day of January, 2010, at

19   9:39 a.m. to 2:25 p.m., before Laurie Purdy, CSR, in

20   and for the State of Texas, reported by machine

21   shorthand, at the offices of Faith Johnson &

22   Associates, L.L.P., 5201 North O'Connor Boulevard,

23   Suite 500, in the City of Irving, County of Dallas,

24   State of Texas, pursuant to the Federal Rules of

25   Civil Procedure.

COPY

```
 1        Q.    What does that stand for?
 2        A.    Society for Human Resources Management.
 3        Q.    Are there any other organizations that you
 4   belong to?
 5        A.    Yes.  There's a national church
 6   organization, and I don't -- the acronyms are NACA.
 7        Q.    Do you know what that stands for?
 8        A.    No.
 9        Q.    Any other organizations that you belong to?
10        A.    Not that I can remember.
11        Q.    Okay.  Your sister-in-law, in 2006, told
12   you, what, that Friendship-West was looking for HR
13   services or --
14              MS. JOHNSON:  Object to hearsay.
15        A.    I don't know how it came about.
16        Q.    (By Ms. Hutchison)  Did you contact
17   somebody at the church?
18        A.    They contacted me.
19        Q.    Who contacted you?
20        A.    Reverend Rickey Hill.
21        Q.    And what did he tell you that they needed?
22              MS. JOHNSON:  Object to hearsay.
23        A.    Something along the lines of someone to
24   handle human resources matters.
25        Q.    (By Ms. Hutchison)  Okay.  And at that time
```

```
 1          Q.   With respect to the services that you have
 2    provided for Friendship-West since 2006, have you had
 3    any supervisory capacity there?
 4          A.   No.
 5          Q.   Do you have the ability to hire or fire
 6    anyone?
 7          A.   No.
 8          Q.   But it was part of your job to make
 9    recommendations concerning hiring and firing?
10          A.   Yes.
11          Q.   Did you report to anyone?
12          A.   Yes.
13          Q.   Who did you report to?
14          A.   Pastor Haynes, Reverend Hill and Veta Holt.
15          Q.   And has it been that way since the time
16    that you were retained?
17          A.   Veta Holt joined the staff later, but,
18    yeah.
19          Q.   So it was initially that you reported to
20    Reverend Haynes and Reverend Hill, and then after
21    Veta Holt joined the staff you also reported to her?
22          A.   Yes.
23          Q.   Is there any regular reporting
24    requirement?  In other words, do you have regular
25    meetings with them or --
```

```
 1        A.   No.

 2        Q.   So it's just -- what is it that prompts you

 3   to make any reports to any of them?

 4        A.   Any matters that I deal with I report to

 5   them.

 6        Q.   And how do you do that?

 7        A.   Phone calls, meetings.

 8        Q.   But there's not a regularly scheduled

 9   meeting for reporting?

10        A.   No.

11        Q.   And there's no regularly scheduled written

12   report that you're required to submit?

13        A.   No.

14        Q.   What did they -- who was    that told y

15   what your job would be there?

16        A.   Reverend Hill.

17             MS. JOHNSON:  Object to relevancy.

18        Q.   (By Ms. Hutchison)  I'm sorry?

19        A.   Reverend Hill.

20        Q.   And what did Reverend Hill tell you that

21   your job would be?

22        A.   I don't know all of the details, but to

23   handle human resources matters.

24        Q.   And what was your understanding of what

25   that would encompass for Friendship-West?
```

1    A.    Anything relating to human resources.

2    Q.    And what would that include?

3    A.    Employee relations, new employee

4    orientations, recruiting, staffing, training.

5    Q.    Do you think that pretty much covers it?

6    A.    There may be some things I left out --

7    Q.    Okay.

8    A.    -- but not on purpose.

9    Q.    Okay.  Well, if something comes to you

10    during the deposition, just let me know and say

11    that's part of my job, too.

12    A.    Okay.  Thank you.

13    Q.    When you say "training," what does that

14    involve?

15    A.    I -- sometimes based on some of the

16    employee relations issues that we have, I make

17    recommendations on training that should happen.

18    Q.    Can you give me an example?

19    A.    Yes.  We do sexual harassment training at

20    least every couple of years.  We may -- we've done

21    performance review training.

22    Q.    Can you think of any other kind of training

23    that you've recommended?

24    A.    I know there's plenty.  I've done some

25    myself.  Customer service.  That's all I can remember

```
 1  right now.

 2       Q.   Okay.  And with respect to customer

 3  service, are you talking about like for

 4  parishioners -- services provided for parishioners

 5  or --

 6       A.   Parishioners or each other as staff, to

 7  receive incoming calls, to return phone calls, that

 8  type of service.

 9       Q.   And who have you provided the customer

10  service type of training for?

11            MS. JOHNSON:  Object to relevancy.

12       A.   I can't think of anybody.

13       Q.   (By Ms. Hutchison)  Okay.  The performance

14  review training, are you talking about training

15  supervisors    how to do performance reviews?

16       A.   Yes.

17       Q.   And can you think of any supervisors that

18  you trained in that regard?

19            MS. JOHNSON:  Object    relevancy.

20       A.   Yes.

21       Q.   (By Ms. Hutchison)  And who would that be?

22       A.   All of the associate pastors.

23            MS. JOHNSON:  Object to relevancy.

24       A.   Reverend Hill, Veta Holt, all of the

25  directors and supervisors.
```

```
 1          Q.    (By Ms. Hutchison)   What about
 2    Pastor Haynes?
 3                    MS. JOHNSON:   Object to relevancy.
 4          A.    I would say yes.
 5          Q.    (By Ms. Hutchison)   And was this training
 6    provided in a classroom format?
 7          A.    Yes.
 8                    MS. JOHNSON:   Object to relevancy and
 9    form.
10          Q.    (By Ms. Hutchison)   And do you remember
11    where that took place?
12                    MS. JOHNSON:   Object to relevancy and
13    form.
14          A.    At Friendship-West Baptist Church.
15          Q.    (By Ms. Hutchison)   All right.   And when
16    did that happen?
17                    MS. JOHNSON:   Object to relevancy and
18    form.
19          A.    Sometime in 2007 and again in 2009.
20          Q.    (By Ms. Hutchison)   With respect to the
21    training in 2007, was it geared towards why you do
22    performance reviews and the purpose of performance
23    reviews and how they should be conducted, that kind
24    of thing?
25          A.    Yes.
```

```
 1                    MS. JOHNSON:  Object to relevancy and
 2   form.
 3              (By Ms. Hutchison)  And did it include the
 4   importance of providing information to employees
 5   about their performance on an ongoing basis?
 6                    MS. JOHNSON:  Object    relevancy and
 7   form.
 8        A.    Probably.
 9        Q.    (By Ms. Hutchison)  You would agree with me
10   that employees often don't know how they're doing
11   unless you let them know how you think they're doing?
12                    MS. JOHNSON:  Object to relevancy and
13   form.
14        A.       my opinion, yes
15        Q.    (By Ms. Hutchison)     other words, that's
16   the whole reason for doing a performance review, is
17   to te   someone this is what you can do to improve,
18   this is what you need to change, this is what you're
19   doing great on, that kind of thing?
20                    MS. JOHNSON:  Object to relevancy and
21   form.
22        A.    Yes, that's a part of
23        Q.    (By Ms. Hutchison)  What are the other, I
24   guess, purposes or goals of performance reviews?
25                    MS. JOHNSON:  Object to relevancy and
```

```
 1   form.

 2         A.    Other than what you stated?

 3         Q.    (By Ms. Hutchison)   Yes.

 4         A.    To determine merit increases.   That's it.

 5   That's all I can think of right now.

 6         Q.    Okay.   To have some sort of objective basis

 7   for giving someone a raise?

 8               MS. JOHNSON:   Object to relevancy and

 9   form.

10         A.    Yes.

11         Q.    (By Ms. Hutchison)   And that way it's not

12   just, you know, randomly decided, I like this person

13   better so they get a raise; it's based upon how

14   they're doing as an employee?

15               MS. JOHNSON:   Object to relevancy and

16   form.

17         A.    Correct.

18         Q.    (By Ms. Hutchison)   And why did you believe

19   that it was important to train them on performance

20   review issues?

21               MS. JOHNSON:   Object to relevancy and

22   form.

23         A.    We had -- the church had just purchased

24   new performance management system.

25         Q.    (By Ms. Hutchison)   I've actually never
```

```
 1   heard of that before.  What's a performance

 2   performance management system?

 3        A.    It's a system -- it's an electronic system

 4   where we were able to add all of the employees in the

 5   system.  The managers had access to their staff, and

 6   they could -- they could actually use the electronic

 7   system to make notations regarding their employee's

 8   performance.

 9        Q.    Was that something that you had recommended

10   that they purchase?

11        A.    Yes.

12        Q.    Because that is   way for the supervisors

13   t  provide ongoing feedback to the employees?

14                  MS. JOHNSON:  Object to form.

15        A.    Yes.

16        Q.    (By Ms. Hutchison)  And    there was a

17   problem with somebody's performance that they needed

18     fix,    gave the employees a chance to know about

19   it and fix it?

20                  MS. JOHNSON:  Object to form.

21        A.    Possibly.

22        Q.    (By Ms. Hutchison)  And do you believe as

23   somebody who is trained in human resources issues

24   that that's a fair thing to do?  If you expect an

25   employee to change, it's fair to let them know that?
```

```
 1                    MS. JOHNSON:  Object to form.

 2          A.         opinion, yes.

 3          Q.    (By Ms. Hutchison)  And that's one of   e

 4    reaso    that you encouraged the church to get this

 5    system and that they got it?

 6          A.    Yes.

 7                    MS. JOHNSON:  Object to form.

 8          Q.    (By Ms. Hutchison)  Now, the -- did the

 9    employees have access to the electronic system?

10                    MS. JOHNSON:  Object to relevancy and

11    form.

12          Q.    (By Ms. Hutchison)  Let me rephrase that.

13    Did the employees have access to the information put

14    on there by the supervisors?

15                    MS. JOHNSON:  Object to relevancy and

16    form.

17          A.    No, they did not have the electronic

18    access.

19          Q.    (By Ms. Hutchison)  How do the employees

20    get the information that the supervisors put on there

21    about their performance?

22          A.    When they have a meeting.

23          Q.    And does the system determine when that

24    meeting takes place?

25                    MS. JOHNSON:  Object to relevancy and
```

```
 1   form.
 2        A.   No.
 3        Q.   (By Ms. Hutchison)  Okay.  How is the
 4   meeting scheduled?
 5              MS. JOHNSON:  Object to relevancy and
 6   form.
 7        A.   The manager schedules it.
 8        Q.   (By Ms. Hutchison)  And does the
 9   information -- either the training information that
10   you gave or the information on the performance
11   management system tell the manager on what occasions
12   they should schedule a meeting?
13        A.   No.
14              MS. JOHNSON:  Object to relevancy and
15   form.
16        Q.   (By Ms. Hutchison)  So did you provide them
17   any  nformation or training on when    would be
18   appropriate to schedule a meeting with their employee
19    discuss any performance issues?
20              MS. JOHNSON:  Object to relevancy and
21   form.
22        A.   I gave them deadlines.
23        Q.   (By Ms. Hutchison)  What kind of deadlines?
24        A.   Deadlines that all performance reviews
25   would be due to be completed.
```

```
 1        Q.    (By Ms. Hutchison)  Did everyone comply

 2   with the deadlines?

 3              MS. JOHNSON:  Object to relevancy and

 4   form.

 5        A.    Probably not.

 6        Q.    (By Ms. Hutchison)  Has Pastor Haynes ever

 7   provided a performance review of any of his

 8   assistants to you?

 9              MS. JOHNSON:  Object to relevancy and

10   form.

11        A.    No.

12        Q.    (By Ms. Hutchison)  So obviously he did not

13   comply with the deadline?

14              MS. JOHNSON:  Object to relevancy and

15   form.

16        A.    I don't know that he had an assistant

17   during the time that we were doing performance

18   reviews.

19        Q.    (By Ms. Hutchison)  Well, the system was

20   initially in place in 2007, correct?

21        A.    I don't know.

22        Q.    Well, you said that your -- that you had a

23   meeting -- a training meeting regarding performance

24   reviews once in 2007 and once in 2009, correct?

25        A.    Yes.
```

```
 1   form; hearsay.
 2        A.   No.
 3        Q.   (By Ms. Hutchison)   Have you ever asked     m
 4   why he hasn't provided the performance reviews?
 5        A.
 6                  MS. JOHNSON:   Object to relevancy and
 7   form.
 8        Q.   (By Ms. Hutchison)   Now, does the
 9   performance management system address what to do
10   if -- well, strike that.   Strike that question.   Let
11   me go back for a minute.
12                  The performance evaluations, how
13   frequently are they supposed to be done?
14        A.   At least once a year.
15        Q.   Now, there could be issues with somebody's
16   performance that needed to be addressed sooner than
17   waiting a full year, right?
18                  MS. JOHNSON:   Object to form.
19        A.   Say that again.
20        Q.   (By Ms. Hutchison)   Yeah.   Maybe that was
21   not a good question.   Let's say someone starts to
22   work in January, and then their performance would be
23   due the following January, right?   It would be after
24   a year?
25        A.   Possibly.
```

```
 1                    MS. JOHNSON:   Object to form.

 2        A.    Yes.

 3        Q.    (By Ms. Hutchison)   That's part of what you

 4   deal with in human resources, correct?

 5        A.    Yes.

 6        Q.    And so you understand that in responding

 7   employ   issues, frequently it's important for you

 8   have documentation that reflects what really happened

 9   or wha   s going on?

10                    MS. JOHNSON:   Object to relevancy and

11   form.

12        A.    Yes.

13        Q.    (By Ms. Hutchison)   Particularly if you are

14   going to need to respond to a charge, for instance,

15   to the Equal Employment Opportunity Commission,

16   right?

17                    MS. JOHNSON:   Object to relevancy and

18   form.

19        A.    Yes.

20        Q.    (By Ms. Hutchison)   And you understand that

21   employees who are terminated frequently go and try to

22   obtain unemployment benefits, right?

23        A.    Yes.

24        Q.    And that process involves making an

25   application to the Texas Workforce Commission by the
```

1      Q.   Is there anything on the performance

2  management system reflecting that anyone made any

3  notations concerning her performance?

4      A.   I don't know.

5      Q.   Are you aware of anyone who has gone and

6  checked the performance management system   see if

7  it contains any of that information?

8      A.   No.

9          MS. JOHNSON:  Object to form.

10     Q.   (By Ms. Hutchison)  You have not done so

11 yourself?

12     A.   No.

13     Q.   The performance management system, that's

14 a -- is that a software program?

15     A.   Yes.

16     Q.   And do you know the name of the software?

17     A.   It started out the name was Vurv, V-u-r-v,

18 then it changed because the company got bought out.

19 And I can't remember who bought it.

20     Q.   Okay.  But when the church purchased it, it

21 was Vurv?

22     A.   Yeah, I believe it was Vurv, yeah.

23     Q.   And is that a system that is available to

24 all of the supervisors at the church?  In other

25 words -- in other words, can they log onto their

1   computer and access the system?

2                     MS. JOHNSON:   Object to relevancy and

3   form.

4        A.   Yes.

5        Q.   (By Ms. Hutchison)   Does the word "Taleo"

6   ring any bells with you?

7        A.   Yes.

8        Q.   Is Taleo who bought out Vurv?

9        A.   Yes.

10                    MS. HUTCHISON:   And that's T-a-l-e-o.

11       A.   Uh-huh.

12                    THE REPORTER:   Thank you.

13       Q.   (By Ms. Hutchison)   And what was it about

14   Vurv and later Taleo that made you recommend it to

15   the church?

16                    MS. JOHNSON:   Object to relevancy and

17   form.

18       A.   I just felt that it was a good system to

19   document -- use to document performance, good or

20   bad.

21       Q.   (By Ms. Hutchison)   And why would you want

22   to document good performance?

23                    MS. JOHNSON:   Object to relevancy and

24   form.

25       A.   Because good performance -- it's important

```
 1   form.
 2        A.   Yes.
 3        Q.   (By Ms. Hutchison)  And that was both good
 4   and bad, right?  I mean, in other words, if you want
 5   them    do things better, you tell them what's good,
 6   and if    want them to stop doing things you don'
 7   like, you tell them what's bad, right?
 8                  MS. JOHNSON:  Object to relevancy and
 9   form.
10        A.    Yes.
11        Q.   (By Ms. Hutchison)  And that was a big part
12   of the purpose of the performance management system?
13                  MS. JOHNSON:  Object to relevancy and
14   form.
15        A.   Yes.
16        Q.   (By Ms. Hutchison)  Do you do any
17   performance reviews on any of the employees?
18        A.   No.
19                  MS. JOHNSON:  Object to relevancy.
20        Q.   (By Ms. Hutchison)  Do you review them or
21   sign off on them in any way?
22                  MS. JOHNSON:  Object to relevancy.
23        A.   Yes.
24        Q.   (By Ms. Hutchison)  And what's the purpose
25   of that?
```

1    Q.    (By Ms. Hutchison)   And it was important to

2    have detail to support the position that he took

3    about the employee, correct?

4              MS. JOHNSON:   Object to relevancy and

5    form.

6        A.    Yes.

7        Q.    (By Ms. Hutchison)   And did you want that

8    detail documented in the performance review itself?

9              MS. JOHNSON:   Object to relevancy.

10       A.    Yes.

11       Q.    (By Ms. Hutchison)   And were you going to

12   give the performance review to the employee to allow

13   them   modify their behavior based on the comments?

14             MS. JOHNSON:   Object to relevancy and

15   form.

16       A.    No.   The supervisor gave   back to the

17   employee and went over that section, any changes.

18       Q.    (By Ms. Hutchison)   Okay.   But you wanted

19   them to put the detail in there so that when the

20   employee got it, they would know specifically what

21   they were doing right or wrong?

22       A.    Correct.

23             MS. JOHNSON:   Object to relevancy and

24   form.

25       Q.    (By Ms. Hutchison)   Do you remember who the

```
 1   pattern.

 2        Q.    (By Ms. Hutchison)   Well, why wouldn't you

 3   just rely on your memory?

 4                MS. JOHNSON:   Object to relevancy.

 5        A.    Because I can't remember everything.

 6        Q.    (By Ms. Hutchison)   Were you trained that

 7         do an investigation into an issue at work,

 8   that documentation is an important part of it?

 9                MS. JOHNSON:   Object to relevancy and

10   form.

11        A.    Yes.

12        Q.    (By Ms. Hutchison)   Has anyone at the

13   church ever asked you to provide training on any

14   other policy or procedure other than sexual

15   harassment or performance evaluations?

16                MS. JOHNSON:   Object to relevancy and

17   form.

18        A.    Team building.

19        Q.    (By Ms. Hutchison)   Did you provide the

20   training on team building?

21                MS. JOHNSON:   Object to relevancy and

22   form.

23        A.    No.

24        Q.    (By Ms. Hutchison)   Who asked you to do

25   that?
```

```
 1                    MS. JOHNSON:  Object to relevancy.

 2        A.   He had the staff engage in some team

 3   activities where they had to repeat some type of arm

 4   movement, where they had to teach each other how to

 5   perform in unison.  He also did a PowerPoint

 6   presentation.

 7        Q.   (By Ms. Hutchison)  Part of your services

 8   that you provide includes dealing with employee

 9   relations issues, correct?

10        A.   Correct.

11        Q.   What types of employee relations issues

12   have you dealt with at the church?

13        A.   Personality conflicts, employee --

14   interpersonal issues.

15        Q.   Personality conflicts or interpersonal

16   issues are not unexpected occurrences at the

17   workplace, are they?

18                    MS. JOHNSON:  Object to form.

19        A.   In my opinion, no.

20        Q.   (By Ms. Hutchison)  And in the -- in the

21   education and training you've received in human

22   resources, those are not only things that happen

23   frequently in the workforce, but part of why you were

24   trained to deal with them, correct?

25        A.   Correct.
```

```
 1                    MS. JOHNSON:  Object to relevancy and
 2    form.
 3         A.    We specified with Renee what the
 4    expectations -- the services that she needed to
 5    provide to Reverend Parker.
 6         Q.    (By Ms. Hutchison)  What was Renee's
 7    response?
 8                    MS. JOHNSON:  Object to relevancy and
 9    form and hearsay.
10         A.    She was agreeable.
11         Q.    (By Ms. Hutchison)  She didn't make any
12    comments other than she was agreeable?
13         A.    No.  They talked --
14                    MS. JOHNSON:  Object to relevancy and
15    form and hearsay.
16         A.    They talked about -- Renee talked about the
17    fact that Reverend Brianna wasn't as clear as she
18    would like for her to be, so they came to an
19    agreement that Renee would ask more questions if she
20    didn't understand something.
21         Q.    (By Ms. Hutchison)  Is Renee still employed
22    there?
23                    MS. JOHNSON:  Object to relevancy and
24    form.
25         A.    No, she's not.
```

```
 1          Q.    (By Ms. Hutchison)  Did she get fired or

 2    did she quit?

 3                MS. JOHNSON:  Object to relevancy and

 4    form.

 5          A.    She got fired.

 6          Q.    (By Ms. Hutchison)  Who fired her?

 7                MS. JOHNSON:  Object to relevancy and

 8    form.

 9          A.    Her bosses.

10          Q.    (By Ms. Hutchison)  Who would be?

11          A.    Reverend Brianna, Reverend White and

12    Reverend Batson.

13                THE REPORTER:  Say that last name

14    again.

15                THE WITNESS:  Batson, B-a-t-s-o-n.

16          Q.    (By Ms. Hutchison)  And do you remember

17    when she was fired?

18                MS. JOHNSON:  Object to relevancy and

19    form.

20          A.    Either the end of November or the beginning

21    of December.

22          Q.    (By Ms. Hutchison)  Of 2009?

23          A.    Yes.

24                MS. JOHNSON:  Object to relevancy and

25    form.
```

```
 1          Q.    (By Ms. Hutchison)   And what was the reason

 2   for her termination?

 3                 MS. JOHNSON:   Object to relevancy.

 4          A.    Poor performance.

 5          Q.    (By Ms. Hutchison)   What was Renee's job

 6   title?

 7          A.    Administrative --

 8                 MS. JOHNSON:   Object to relevancy and

 9   form.

10          A.    Administrative assistant.

11          Q.    (By Ms. Hutchison)   Did Renee receive a

12   performance evaluation?

13                 MS. JOHNSON:   Object to relevancy and

14   form.

15          A.    Yes.

16          Q.    (By Ms. Hutchison)   Do you know when she

17   received a performance evaluation?

18                 MS. JOHNSON:   Object to relevancy and

19   form.

20          A.    No.

21          Q.    (By Ms. Hutchison)   But with her there is

22   documentation of performance issues that she had?

23                 MS. JOHNSON:   Object to relevancy and

24   form.

25          A.    Yes.
```

1      Q.    (By Ms. Hutchison)   And in the performance

2  evaluation, does it reflect that there are criticisms

3  of her performance?

4                MS. JOHNSON:  Object to relevancy and

5  form.

6      A.    I don't know.

7      Q.    (By Ms. Hutchison)      there any other

8  documentation of any issues with Renee Shepherd's

9  performance other than in the performance evaluation?

10               MS. JOHNSON:  Object to relevancy and

11  form.

12     A.    Yes.

13     Q.    (By Ms. Hutchison)   And where is that

14  documentation?

15     A.    Personnel file.

16     Q.    What is in her personnel file?

17               MS. JOHNSON:  Object to relevancy and

18  form.

19     A.    Do you want me to list everything --

20     Q.    (By Ms. Hutchison)   Yeah.

21     A.    -- or just general?

22     Q.    Anything that reflects issues related to

23  her performance or information related to her

24  performance.

25     A.    I know there's documentation that supports

```
 1    a suspension that she received.

 2         Q.   Okay.  What kind of documentation is that?

 3              MS. JOHNSON:  Object to relevancy and

 4    form.

 5         A.   A letter.  I can't remember if she signed

 6    it or not.

 7         Q.   (By Ms. Hutchison)  And the letter outlines

 8    for her why she's being suspended?

 9         A.   Yes.

10              MS. JOHNSON:  Object to relevancy.

11         Q.   (By Ms. Hutchison)  And was she suspended

12    for a certain period of time and then allowed to

13    return to work?

14              MS. JOHNSON:  Object to relevancy and

15    form.

16         A.   Yes.

17         Q.   (By Ms. Hutchison)  Do you remember how

18    long she was suspended?

19              MS. JOHNSON:  Object to relevancy and

20    form.

21         A.   Two days.

22         Q.   (By Ms. Hutchison)  And was the suspension

23    for performance issues?

24              MS. JOHNSON:  Object to relevancy and

25    form.
```

1    before Reverend Brianna came to you about her or

2    after?

3                    MS. JOHNSON:  Object to relevancy and

4    form.

5        A.    Before.

6        Q.    (By Ms. Hutchison)  So she was reprimanded

7    for the counseling issues, suspended for two days,

8    came back to work, and then after that was when

9    Reverend Brianna Parker came to you about her?

10                   MS. JOHNSON:  Object to relevancy and

11   form.

12       A.    Correct.

13       Q.    (By Ms. Hutchison)  But she wasn't

14   terminated when Reverend Parker came to you.  You had

15   meeting where they worked it out and she went back

16   to work?

17       A.    Correct.

18                   MS. JOHNSON:  Object to relevancy and

19   form and hearsay.

20       Q.    (By Ms. Hutchison)  Do you remember how

21   long after that it was that she was terminated?

22                   MS. JOHNSON:  Object to relevancy and

23   form.

24       A.    No.

25       Q.    (By Ms. Hutchison)  Do you remember

1   anything else in her personnel file that documented

2   anything related to her performance other than the

3   suspension letter?

4               MS. JOHNSON:  Object to relevancy and

5   form.

6       A.   No, I don't remember.

7       Q.   (By Ms. Hutchison)  Now, is suspension a

8   part of the progressive discipline program?

9               MS. JOHNSON:  Object to relevancy and

10  form.

11      A.   Yes.

12      Q.   (By Ms. Hutchison)  And what is it that the

13  suspension is designed to do?

14              MS. JOHNSON:  Object to relevancy and

15  form.

16      A.   It gives an employee an opportunity to just

17  think about what they've done, determine whether they

18  want to continue their employment, and agree to

19  whatever terms they were given as relates to their

20  job.

21      Q.   (By Ms. Hutchison)  And why would you do

22  that instead of just fire somebody?

23              MS. JOHNSON:  Object to relevancy and

24  form.

25      A.   I don't know.

```
 1          Q.    (By Ms. Hutchison)  Well, as the human
 2   resources expert for the church, what was your
 3   opinion as to why she was suspended instead of fired?
 4                    MS. JOHNSON:  Object to relevancy and
 5   form.
 6          A.    It was not my recommendation.
 7          Q.    (By Ms. Hutchison)  Did you recommend that
 8   she be fired?
 9                    MS. JOHNSON:  Object to relevancy and
10   form.
11          A.    No.
12          Q.    (By Ms. Hutchison)  And I'm just asking you
13   what was your understanding of why she was suspended
14   instead of fired.
15                    MS. JOHNSON:  Object to relevancy and
16   form.
17          A.    I don't know.
18          Q.    (By Ms. Hutchison)  You didn't form an
19   opinion in that regard?
20          A.    No.
21                    MS. JOHNSON:  Object to relevancy and
22   form.
23          Q.    (By Ms. Hutchison)  The church has a
24   progressive discipline policy, correct?
25                    MS. JOHNSON:  Object to relevancy.
```

```
 1          A.      Correct.

 2          Q.      (By Ms. Hutchison)   Describe if you will

 3   what progressive discipline means.

 4                  MS. JOHNSON:   Object to relevancy and

 5   form.

 6          A.      Progressive discipline, in my opinion,

 7   means that it starts with maybe an oral conversation

 8   about an issue.   In the event the issue doesn't get

 9   any better after a period of time, then it moves to

10   maybe a written warning.   And then if it doesn't --

11   if their performance does not get better after that,

12   then they are moved to maybe a final or a

13   termination.

14          Q.      (By Ms. Hutchison)   What's a final?

15                  MS. JOHNSON:   Object to relevancy and

16   form.

17          A.      Final warning.   This is the last

18   opportunity I'm going to give you to fix this issue.

19   If you don't, you could be -- you could be

20   terminated.

21          Q.      (By Ms. Hutchison)   Is it a policy of the

22   church or a policy of yours in HR to keep any

23   documentation concerning oral conversations or any

24   written warnings in the personnel file?

25                  MS. JOHNSON:   Object to relevancy and
```

1  that information such as a written warning in their

2  personnel file?

3             MS. JOHNSON:  Object to relevancy and

4  form.

5      A.   To show a pattern.

6      Q.   (By Ms. Hutchison)  What is the purpose of

7  having a progressive discipline policy instead of if

8  somebody does something wrong, you just fire them

9  right away?

10             MS. JOHNSON:  Object to relevancy and

11  form.

12      A.   It depends on the severity of the

13  situation.

14      Q.   (By Ms. Hutchison)  I understand.  I'm

15  asking you why have a progressive discipline policy?

16             MS. JOHNSON:  Object to relevancy and

17  form.

18      A.   To help employees improve their

19  performance.

20      Q.   (By Ms. Hutchison)  What is the purpose of

21  giving an employee a written warning?  Why put it in

22  writing?

23             MS. JOHNSON:  Object to relevancy and

24  form.

25      A.   It's a more serious form of discipline.

1       Q.    (By Ms. Hutchison)  So that is a way to let

2   an employee know basically we're ramping up the

3   discipline?

4                   MS. JOHNSON:  Object to relevancy and

5   form.

6       A.    Correct.

7       Q.    (By Ms. Hutchison)  And then when you talk

8   about a final, that's something that says, you know,

9   we're very serious about this; you've already been

10  warned about it.  If you don't fix it, then you're

11  likely to lose your job?

12                  MS. JOHNSON:  Object to relevancy and

13  form.

14      A.    Correct.

15      Q.    (By Ms. Hutchison)  Have you had to provide

16  or anyone, to your knowledge, at the church had to

17  provide a written warning to any employees?

18                  MS. JOHNSON:  Object to relevancy and

19  form.

20      A.    Yes.

21      Q.    (By Ms. Hutchison)  And, to your knowledge,

22  who has received written warnings?

23                  MS. JOHNSON:  Object to relevancy and

24  form.

25      A.    Vernon Robinson, Kassandra Foard, Charlotte

```
 1   Rhone, R-h-o-n-e, Renee Shepherd.  That's all I can
 2   remember right now.
 3        Q.   (By Ms. Hutchison)  What was Vernon
 4   Robinson's written warning for?
 5                    MS. JOHNSON:  Object to relevancy and
 6   form.
 7        A.   I don't remember.
 8        Q.   (By Ms. Hutchison)  Do you remember if it
 9   was performance related?
10        A.   I don't.
11                    MS. JOHNSON:  Object to relevancy and
12   form.
13        Q.   (By Ms. Hutchison)  What about Kassandra
14   Foard, what was her warning for?
15                    MS. JOHNSON:  Object to relevancy and
16   form.
17        A.   Performance.
18        Q.   (By Ms. Hutchison)  Do you recall what
19   aspect of performance?
20                    MS. JOHNSON:  Object to relevancy and
21   form.
22        A.   She had -- she had deadlines that she had
23   to meet every week, and there was several times that
24   she didn't meet those.
25        Q.   (By Ms. Hutchison)  And Charlotte Rhone, do
```

1    you recall what her warning was for?

2                    MS. JOHNSON:  Object to relevancy and

3    form.

4        A.   Not doing her work well.

5        Q.   (By Ms. Hutchison)  And Renee Shepherd,

6    what was her warning for?

7                    MS. JOHNSON:  Object to relevancy and

8    form.

9        A.   Counseling members.

10       Q.   (By Ms. Hutchison)  What was Vernon

11   Robinson's job at the time he got the warning?

12                   MS. JOHNSON:  Object to relevancy and

13   form.

14       A.   I think he was a director of audio-visual.

15       Q.   (By Ms. Hutchison)  And what about

16   Kassandra Foard?

17                   MS. JOHNSON:  Object to relevancy and

18   form.

19       A.   Print technician.

20       Q.   (By Ms. Hutchison)  What about Charlotte

21   Rhone?

22                   MS. JOHNSON:  Object to relevancy and

23   form.

24       A.   Administrative assistant.

25       Q.   (By Ms. Hutchison)  Who was Ms. Rhone an

LAURIE PURDY REPORTING SERVICE, INC.
PHONE/FAX    817-461-1716

Appx 41

```
 1        A.    Yes.

 2        Q.    For performance?

 3        A.    Yes.

 4              MS. JOHNSON:  Object to relevancy and

 5   form.

 6        Q.   (By Ms. Hutchison)  And then Charlotte

 7   Rhone, she was terminated?

 8              MS. JOHNSON:  Object to relevancy and

 9   form.

10        A.    Yes.

11        Q.   (By Ms. Hutchison)  For performance?

12        A.    Yes.

13              MS. JOHNSON:  Object to relevancy and

14   form.

15        Q.   (By Ms. Hutchison)  Did any of them receive

16   suspensions other than Renee Shepherd?

17              MS. JOHNSON:  Object to relevancy and

18   form.

19        A.    Not that I'm aware of.

20        Q.   (By Ms. Hutchison)  Did any of them receive

21   a final?

22              MS. JOHNSON:  Object to relevancy and

23   form.

24        A.    Kassandra Foard.

25        Q.   (By Ms. Hutchison)  Was it in writing?
```

1          MS. JOHNSON:   Object to relevancy and

2     form.

3          A.    Yes.

4          Q.    (By Ms. Hutchison)   Do you know who wrote

5     it?

6               MS. JOHNSON:   Object to relevancy and

7     form.

8          A.    Danielle Ayers.

9          Q.    (By Ms. Hutchison)   Do you remember what it

10    said?

11              MS. JOHNSON:   Object to relevancy and

12    form and hearsay.

13         A.    No.

14         Q.    (By Ms. Hutchison)   So with respect to

15    Kassandra Foard -- maybe I had my notes wrong.   Is

16    Kassandra Foard the one that received a final from

17    Danielle Ayers?

18              MS. JOHNSON:   Object to relevancy and

19    form.

20         A.    No.

21         Q.    (By Ms. Hutchison)   Oh, Charlotte Rhone.

22         A.    It was Charlotte.

23              MS. JOHNSON:   Object to relevancy and

24    form.

25         Q.    (By Ms. Hutchison)   I wrote that down

1    wrong.  I'm sorry.

2        A.    That's okay.

3        Q.    So with respect to Charlotte Rhone, she

4    received a verbal at least one verbal warning from

5    Danielle Ayers and a written warning from Danielle

6    Ayers and a final written?

7        A.    Yes.

8                  MS. JOHNSON:  Object to relevancy and

9    form.

10       Q.    (By Ms. Hutchison)  And those were all for

11   performance-related issues?

12                 MS. JOHNSON:  Object to relevancy and

13   form.

14       A.    Yes.

15       Q.    (By Ms. Hutchison)  Did you agree with her

16   termination?

17                 MS. JOHNSON:  Object to relevancy and

18   form.

19       A.    Yes.

20       Q.    (By Ms. Hutchison)  Do you remember when

21   Charlotte Rhone was terminated?

22                 MS. JOHNSON:  Object to relevancy and

23   form.

24       A.    No.

25       Q.    (By Ms. Hutchison)  Are you aware of anyone

```
 1    being fired that did not receive a written warning of

 2    some kind before their termination?

 3                    MS. JOHNSON:  Object to relevancy and

 4    form.

 5         A.   Yes.

 6         Q.   (By Ms. Hutchison)  And who is that?

 7         A.   Reverend Mark Edwards.

 8         Q.   And he's the one that stole the keys and

 9    went to the lady's home and her daughter was home?

10         A.   No.

11                    MS. JOHNSON:  Object to relevancy and

12    form.

13         Q.   (By Ms. Hutchison)  What did he do to get

14    fired?

15                    MS. JOHNSON:  Object to relevancy and

16    form.

17         A.   Who?  Reverend Edward?

18         Q.   (By Ms. Hutchison)  Yes.

19         A.   Inappropriate relationship with his

20    assistant.

21         Q.   And who was his assistant?

22         A.   Stephanie Washington.

23                    MS. JOHNSON:  Object to relevancy.

24         Q.   (By Ms. Hutchison)  And they both got

25    fired?
```

```
1          Q.    (By Ms. Hutchison)   Edward Mirango?

2          A.    Uh-huh.

3          Q.    And what did he do?

4          A.    He was the one that --

5                MS. JOHNSON:  Object to relevancy.

6          A.    -- stole the keys.

7          Q.    (By Ms. Hutchison)   Okay.  I just had the

8    names wrong on that.

9          A.    That's okay.

10         Q.    So Mr. Mirango was the one that took the

11   keys and made a copy and then went to the lady's

12   house?

13         A.    Correct.

14         Q.    All right.  So other than Reverend Edwards

15   and Stephanie Washington, Ed Mirango and Elizabeth

16   Payne, was anyone else fired without a written

17   warning?

18                MS. JOHNSON:  Object to relevancy and

19   form.

20         A.    Kittie Taylor.

21         Q.    (By Ms. Hutchison)   Kitty like K-i-t-t-y?

22         A.    I think it's

23         Q.    Kittie Taylor?

24         A.    Uh-huh.

25         Q.    And why was she fired?
```

```
 1                    MS. JOHNSON:   Object to relevancy and

 2    form.

 3         A.    Theft.

 4         Q.    (By Ms. Hutchison)   What did she steal?

 5                    MS. JOHNSON:   Object to relevancy.

 6         A.    She stole items out of Pastor Haynes'

 7    closet

 8         Q.    (By Ms. Hutchison)   Closet like at work?

 9         A.    At the church, uh-huh.

10         Q.    Did she confess to it?

11                    MS. JOHNSON:   Object to relevancy and

12    form; hearsay.

13         A.    She told another employee.

14         Q.    (By Ms. Hutchison)   What did she take?

15                    MS. JOHNSON:   Object to relevancy and

16    form.

17         A.    Shoes.

18         Q.    (By Ms. Hutchison)   She took Pastor Haynes'

19    shoes?

20                    MS. JOHNSON:   Object to relevancy.

21         A.    Yes.

22         Q.    (By Ms. Hutchison)   Did she say why?

23                    MS. JOHNSON:   Object to hearsay.

24         A.    She gave them to her husband.

25         Q.    (By Ms. Hutchison)   Okay.  Is there anyone
```

 1   else who was fired without a written warning?

 2              MS. JOHNSON:   Object to relevancy.

 3        A.   I can't think of anyone else.

 4        Q.   (By Ms. Hutchison)   List every reason why

 5   Elizabeth Payne was fired.

 6        A.   Giving statements to the media.

 7        Q.   Okay.

 8        A.   Errors in her work.

 9        Q.   Okay.

10        A.   Personality conflicts with the staff.

11        Q.   Anything else?

12        A.   Not that I can recall.

13        Q.   So to the best of your recollection, as you

14   sit there, the reasons for Elizabeth Payne's

15   termination are giving statements to the media,

16   errors in her work and personality conflicts with the

17   staff; is that correct?

18        A.   That's correct.

19        Q.   When you reviewed the policies and

20   procedures with Reverend Hill that went into the

21   employee handbook, did you review any policies

22   related to discrimination in the workplace?

23        A.   Sexual harassment policy.

24        Q.   Any others?

25        A.   Their employment -- employment policy that

1   says that they don't discriminate.

2          Q.    Okay.   Anything else?

3          A.    That's all I can remember.

4          Q.    As part of your job as human resources

5   consultant, does that encompass enforcement of the

6   policies and procedures that are in the handbook?

7                MS. JOHNSON:   Object to relevancy.

8          A.    Yes.

9          Q.    (By Ms. Hutchison)   And it's part of your

10  job in human resources to make sure that the policies

11  and procedures are applied across the board, correct?

12               MS. JOHNSON:   Object to relevancy and

13  form.

14         A.    I make recommendations.

15         Q.    (By Ms. Hutchison)   But that's part of what

16  you police in your role in human resources?

17               MS. JOHNSON:   Object to relevancy and

18  form.

19         A.    Correct.

20         Q.    (By Ms. Hutchison)   I mean, that's part of

21  the basis for human resources is to address

22  employment policies and how they're applied, correct?

23               MS. JOHNSON:   Object to relevancy and

24  form.

25         A.    Correct.

1    Q.   And part of your role in human resources is

2  to also make sure that other people in the workforce

3  are not doing that?

4    A.   Correct.

5    Q.   And that decisions that are being made

6  about employees are not being made on the basis of

7  their protected class?

8    A.   Correct.

9    Q.   And you are     part of your role in human

10  resources is basically to be, I guess, a watchdog for

11  that kind of thing?

12    A.   Correct.

13    Q.   And so I'm sure you understand that when

14  people discriminate, they don't usually tell you

15  they're discriminating, right?

16            MS. JOHNSON:  Object to form.

17    A.   Say that again.

18    Q.   (By Ms. Hutchison)  Yeah.  Did they train

19  you in human resources that frequently you have to

20  look for signs or flags of discrimination?

21            MS. JOHNSON:  Object to relevancy and

22  form.

23    A.   Yes.

24    Q.   (By Ms. Hutchison)  Because -- I'll just

25  give you an example.  Let's say an employer decides

```
 1   to get rid of the older workers because they're, for
 2   whatever reason, you know, slowing down the process,
 3   and they decide to get rid of the older workers.
 4   They don't generally call them in and say, you're
 5   old; we're firing you.  They usually find some other
 6   reason to get rid of them.  And you've got to look
 7   for the flags, correct?
 8                MS. JOHNSON:  Object to form.
 9        A.   Correct.
10        Q.   (By Ms. Hutchison)  And so the flags that
11   you look for include -- some of it is statistical.
12   Have you learned that there are statistical flags for
13   discrimination?
14                MS. JOHNSON:  Object to form.
15        A.   Yes.
16        Q.   (By Ms. Hutchison)  And, for example, if
17   you have an employer that has a workforce that is
18   100 percent white when there are other races that are
19   qualified for those positions and have applied, then
20   that might be a flag for discrimination, correct?
21                MS. JOHNSON:  Object to form.
22        A.   It could be, correct.
23        Q.   (By Ms. Hutchison)  And you -- the law
24   would require that employer or at least human
25   resources issue to be investigated to determine the
```

1  reason that there is not a mixed race workforce,

2  correct?

3                    MS. JOHNSON:  Object to form.

4      A.   Say that again.

5      Q.   (By Ms. Hutchison)  Yes.

6      A.   Sorry.

7      Q.   Someone would need to look into it and find

8  out the reason that there's not a mixed race

9  workforce?

10                   MS. JOHNSON:  Object to form.

11     A.   Not necessarily.

12     Q.   (By Ms. Hutchison)  Well, don't -- in order

13 to find out if there's discrimination, don't you have

14 to investigate it?

15                   MS. JOHNSON:  Object to form.

16     A.   Yes.

17     Q.   (By Ms. Hutchison)  And some of the other

18 flags that exist for determining whether or not

19 discrimination is occurring in the workplace would

20 include whether the reasons given for a specific act

21 toward an employee are legitimate or not --

22                   MS. JOHNSON:  Object to form.

23     Q.   (By Ms. Hutchison)  -- right?

24     A.   Correct.

25     Q.   And it might also include an attitude -- a

```
 1    prevalent attitude in the workplace toward that
 2    particular class of people, correct?
 3                    MS. JOHNSON:  Object to form.
 4         A.    It could, yes.
 5         Q.    (By Ms. Hutchison)  And another flag might
 6    also be, for example, whether or not the employer
 7    follows their own policies and procedures in
 8    interacting with the employee, correct?
 9                    MS. JOHNSON:  Object to form.
10         A.    Correct.
11         Q.    (By Ms. Hutchison)  And another flag might
12    be for discrimination is whether or not that employee
13    is treated differently than the way the employer
14    treated other employees, correct?
15                    MS. JOHNSON:  Object to form.
16         A.    Correct.
17                    MS. JOHNSON:  Do you want to take a
18    break?  We've been going about a couple of hours.  Is
19    this a good spot for you?  If not, we can --
20                    MS. HUTCHISON:  Let's go a little bit
21    longer and then we can take a break.
22                    MS. JOHNSON:  I just didn't know if
23    her hands were getting tired.
24         Q.    (By Ms. Hutchison)  Now, with respect to
25    these flags of discrimination, those are things that
```

1  it's part of your responsibility to investigate,

2  correct?

3      A.    Correct.

4      Q.    But the employer also has a responsibility

5  under the law to be sure that it's not

6  discriminating, correct?

7      A.    Correct.

8              MS. JOHNSON:  Object to form.

9      Q.    (By Ms. Hutchison)  And a responsibility to

10 investigate any flags or signs of discrimination to

11 see if it's occurring, correct?

12             MS. JOHNSON:  Object to form.

13     A.    Correct.

14     Q.    (By Ms. Hutchison)  Have you ever been

15 given the task at Friendship-West to investigate

16 whether or not discrimination has occurred?

17             MS. JOHNSON:  Object to form and also

18 relevancy.

19     A.    No.

20     Q.    (By Ms. Hutchison)  With respect to any of

21 the actions against any of the employees, including

22 the discipline, the terminations, hiring or firing,

23 has anyone ever asked you to determine whether or not

24 discrimination took place?

25             MS. JOHNSON:  Object to relevancy and

```
 1  form.

 2        A.    Any form?

 3        Q.    (By Ms. Hutchison)   Yes.

 4              MS. JOHNSON:   Object to relevancy and

 5  form.

 6        A.    Quite possibly.

 7        Q.    (By Ms. Hutchison)   And when would that

 8  have been?

 9              MS. JOHNSON:   Object to relevancy and

10  form.

11        A.    Any reference that I would have made

12  earlier about claims of discrimination.

13        Q.    (By Ms. Hutchison)   Maybe I'm not

14  understanding.   Are you saying --

15        A.    Maybe I don't understand.

16        Q.    -- that you've ever investigated any form

17  of discrimination at Friendship-West?

18              MS. JOHNSON:   Object to relevancy and

19  form.

20        A.    The sexual harassment claim that I got

21  anonymously.

22        Q.    (By Ms. Hutchison)   Okay.

23        A.    I don't remember that I've investigated any

24  others.

25        Q.    Okay.   And has anyone ever asked you to
```

1    investigate any other form of discrimination at

2    Friendship-West?

3                    MS. JOHNSON:  Object to relevancy and

4    form.

5          A.    Not that I can recall.

6          Q.    (By Ms. Hutchison)  Does Friendship-West

7    currently employ any employees that don't -- that are

8    not at least partially African-American?

9          A.    That are not partially African-American?

10         Q.    Yes.

11         A.    I believe so.

12         Q.    And who would those be?

13         A.    Maria Lupe.  I think that's it.

14         Q.    And those are the cleaning ladies?

15         A.    Yes.

16         Q.    Other than the cleaning ladies, does

17   Friendship-West employ any employees that are not at

18   least partially African-American?

19         A.    I don't think so.

20         Q.    Is Elizabeth Payne the last employee that

21   you're aware of that was employed there that was of a

22   different race altogether?

23         A.    I believe so.

24         Q.    Now, with respect to her termination, did

25   you do any investigation into whether or not there

1    was an attitude in the workplace that was negative

2    about her being employed there --

3         A.    No.

4         Q.      based on her race?

5         A.    No.

6         Q.    Did you do any investigation as to whether

7    or not the church followed its own policies and

8    procedures in her termination?

9              MS. JOHNSON:  Object to form.

10        A.    No.

11        Q.    (By Ms. Hutchison)  Did you do any

12   investigation or comparison as to the way she was

13   treated versus the way other employees were treated

14      their termination?

15        A.    No.

16              MS. JOHNSON:  Object to relevancy and

17   form.

18        (     (By Ms. Hutchison)  Did you do any

19   investigation to independently determine whether or

20   not the reasons offered to fire her were legitimate?

21        A.    No.

22        Q.    Are you aware of anyone else who did any

23   kind of an investigation to determine those things?

24              MS. JOHNSON:  Object to relevancy and

25   form.

1         A.    No.

2         Q.    (By Ms. Hutchison)   Were you involved in

3    providing any information to the EEOC in response to

4    Ms. Davila's claim -- or I called her

5    Ms. Davila -- Elizabeth Payne's claim?

6               MS. JOHNSON:   Object to relevancy and

7    form.

8         A.    Possibly.

9         Q.    (By Ms. Hutchison)   Was there somebody else

10   that was in charge of responding to the EEOC charge?

11              MS. JOHNSON:   Object to relevancy and

12   form and hearsay.

13        A.    I don't know.   Probably the legal team.

14        Q.    (By Ms. Hutchison)   Okay.   Other than -- I

15   want to exclude lawyers because then we get into the

16   whole attorney-client communication thing.   That's

17   all privileged.   But I was just wondering if there

18   was anyone at the church who was involved in

19   providing the information or gathering the

20   information for the EEOC.

21        A.    Probably Veta Holt.

22              MS. JOHNSON:   Object to relevancy.

23        A.    Probably Veta Holt.

24        Q.    (By Ms. Hutchison)   Did anyone at the

25   church other than the lawyers meet with you to obtain

1    situation where your race would be a bona fide

2    occupational qualification?

3                    MS. JOHNSON:  Object to relevancy and

4    form.

5        A.    No.

6        Q.    (By Ms. Hutchison)  Okay.  And I'm asking

7    you about -- I mean, you believe that

8    anti-discrimination laws apply outside the workplace

9    as well, don't you?

10                   MS. JOHNSON:  Object to relevancy and

11   form.

12       A.    Yes.

13       Q.    (By Ms. Hutchison)  Okay.  And how is it

14   not discriminatory to make a decision to engage in

15   business with somebody only because of their race?

16                   MS. JOHNSON:  Object to relevancy and

17   form.

18       A.    Okay.  Yes, it would be.  Sorry.

19       Q.    (By Ms. Hutchison)  And it violates the law

20   to encourage a discriminatory attitude in the

21   workplace just as much as it does to treat somebody

22   that way, doesn't it?

23       A.    Yes.

24       Q.    And certainly if you encourage a

25   discriminatory attitude in the workplace, that's

1  going to affect how people interact with someone of

2  that race, isn't it?

3           MS. JOHNSON:  Object to form.

4      A.   Correct.

5      Q.   (By Ms. Hutchison)  For example, if an

6  African-American worked in a work environment that

7  was -- where everyone else there was white and they

8  encouraged an attitude that was pro white, that would

9  affect the way the white people treated the

10 African-American, wouldn't it?

11           MS. JOHNSON:  Object to form.

12     A.   I don't know.  I can't speak to that.

13     Q.   (By Ms. Hutchison)  But isn't that

14 something that you address in human resources, is

15 attitudes in the workplace?

16           MS. JOHNSON:  Object to form.

17     A.   Yes.

18     Q.   (By Ms. Hutchison)  And that is something

19 that our laws are designed to eliminate is

20 discriminatory attitudes in the workplace, right?

21           MS. JOHNSON:  Object to form.

22     A.   Quite possibly.  I know the law is designed

23 to eliminate discriminatory actions, so if it becomes

24 an action, then, yes.

25     Q.   (By Ms. Hutchison)  Well, don't actions

```
 1   question.  How many meetings did you have with Renee
 2   Shepherd and Reverend Parker?
 3                  MS. JOHNSON:  Object to relevancy and
 4   form.
 5        A.   At least three.
 6        Q.   (By Ms. Hutchison)  And were they all
 7   trying to resolve their differences?
 8                  MS. JOHNSON:  Object to relevancy and
 9   form.
10        A.   No.  Some of them were regarding her
11   performance, her work performance, Renee's.
12        Q.   (By Ms. Hutchison)  So the meetings that
13   you had with Renee and Reverend Parker were --
14   revolved around Renee's work performance issues and
15   their interpersonal issues?
16        A.   Yes.
17                  MS. JOHNSON:  Object to relevancy and
18   form.
19        Q.   (By Ms. Hutchison)  And you had at least
20   three meetings between the three of you?
21                  MS. JOHNSON:  Object to relevancy and
22   form.
23        A.   Right.
24        Q.   (By Ms. Hutchison)  And about how far apart
25   were those meetings?
```

1          MS. JOHNSON:  Object to relevancy.

2     A.    Was he terminated after the last meeting?

3     Q.    (By Ms. Hutchison)  No.  The written

4  warning, was that given to her after the last

5  meeting?

6          MS. JOHNSON:  Object to relevancy and

7  form.

8     A.    Yes.

9     Q.    (By Ms. Hutchison)  So in terms of the

10  sequence of events, it was a suspension followed by a

11  series of meetings followed by a written warning

12  followed by termination?

13          MS. JOHNSON:  Object to relevancy and

14  form.

15     A.    Training, suspension.  She also had an oral

16  and then written.

17     Q.    (By Ms. Hutchison)  A verbal warning or

18  counseling?

19     A.    Uh-huh.

20     Q.    Yes?

21     A.    Yes.

22     Q.    And do you remember the period of time for

23  the entire process, like whether it all occurred over

24  a year or a period of months?

25          MS. JOHNSON:  Object to relevancy and

```
1    that we did in a staff meeting that she was probably

2    a part of, but I can't be specific.  I remember

3    talking with her about the errors that she was making

4    on Pastor Haynes' calendar and the interview folders

5    that she would set up for him.

6         Q.   Would you consider that training?

7         A.   I would consider it, yeah, training, yes.

8         Q.   Okay.  Is that the only training you're

9    aware of that Elizabeth Payne received was what you

10   gave to her concerning errors on Pastor Haynes'

11   calendar and the interview folders?

12        A.   No.  I also talked with her about her role

13   as it relates to dealing with the media.

14        Q.   Okay.  And you consider that to be

15   training?

16        A.   Yes.

17        Q.   Okay.  Is there any other training that you

18   gave her?

19        A.   I can't recall.

20        Q.   So the only training you're aware of anyone

21   giving Elizabeth Payne at the church was what you're

22   calling training when you talked to her about errors

23   she was making on Haynes' -- Pastor Haynes' calendar,

24   something about the interview folders, and talking

25   with her about her role with the media; is that
```

1   correct?

2        A.   As far as I can remember, yeah.

3        Q.   At what point in her employment did you

4   have these discussions with her?

5        A.   The first discussion was not long after she

6   had been there.

7        Q.   Like -- what does that mean?

8        A.   Within the first couple of months, at

9   least.

10       Q.   Okay.

11       A.   And Pastor Haynes informed me that she had

12  just been making a lot of errors on his calendar,

13  because she had access to his calendar and she was --

14  one of her responsibilities were adding things to his

15  calendar.

16       Q.   What errors are you specifically referring

17  to?

18       A.   I don't have specifics.

19       Q.   Well, what do you mean by errors on his

20  calendar?

21       A.   Misspelled words.

22       Q.   Were there any errors other than misspelled

23  words?

24       A.   Not that I know of.

25       Q.   So when you said that you trained her on

129

1  and talking with her about her performance.

2      Q.   On the interview folders, what was the

3  training that you gave her about that?

4      A.   I talked to her at the same time about both

5  of those instances.

6      Q.   So the training for the folders consisted

7  of make sure you spell people's names correctly?

8      A.   I made her aware that she had made an error

9  and to be careful in the future.

10      Q.   I'm just asking you about the training.

11  The training was you misspelled somebody's name;

12  Pastor Haynes called them the wrong name; be careful

13  in the future; is that correct?

14      A.   Yes.

15      Q.   The training that you gave her about her

16  role with the media was don't talk to the media?

17      A.   No.

18      Q.   What was it?

19      A.   She called -- Liz called me and told me

20  that Veta -- Veta Holt had told her that she was not

21  to be quoted in the media and she was not to talk to

22  media.  Liz called me, and I said, That is not part

23  of your responsibilities; that is Tonya Neal and

24  Tonya is the director of communications.

25      Q.   Okay.  And that's the sum total of the

1    training?

2        A.    Yeah.

3        Q.    Okay.   And did Elizabeth Payne object to

4    that?

5        A.    No.

6        Q.    Did she resist that in any way?

7        A.    Not that I can recall.

8        Q.    Was she ever quoted in the media again?

9        A.    Not that I can recall.

10       Q.    Are you aware of any conversation she had

11   with any reporters after that before her termination?

12       A.    No.

13       Q.    Are you aware of any errors on interview

14   folders that occurred after your training of her?

15       A.    No.

16       Q.    Are you aware of any misspelled words on

17   Reverend Haynes' calendar after your training of her?

18       A.    No.

19       Q.    So as far as you know, after you counseled

20   her and provided her training, she corrected the

21   problems?

22       A.    No.

23       Q.    Okay.   Well, you're not aware of any other

24   errors on his calendar?

25       A.    No, no more on his calendar, no.

131

1    Q.   And you're not aware of any -- of any more

2  issues with the folders?

3    A.   No.

4    Q.   And you're not aware of any more issues

5  with the media?

6    A.   No.

7    Q.   So in terms of the issues that you

8  addressed with her and gave her training on, there

9  weren't any more problems with those, were there?

10    A.   No, not that I'm aware of.

11    Q.   And what does that tell you about an

12  employee when you counsel them about something, train

13  them on that issue, and then they fix it?

14            MS. JOHNSON:   Object to relevancy and

15  also form.

16    A.   I didn't train her on anything else as it

17  relates to that, and I didn't have any other

18  discussions with her.  But there was a lot of errors

19  in her work that she put together for Pastor Haynes'

20  speech at Harvard University.

21            MS. HUTCHISON:   I object to the

22  responsiveness of the answer.

23    Q.   (By Ms. Hutchison)   If you have an

24  employee -- let's not make it about Elizabeth Payne.

25  Let's make it about just an employee in general.

1      A.    Okay.

2      Q.    If you have an employee in general that you

3 counsel about an issue and then they fix it and they

4 never have another issue about the thing you

5 counseled them about and trained them about, doesn't

6 that tell you that that employee responds well to

7 counseling and training?

8              MS. JOHNSON:  Object to relevancy and

9 form.

10      A.    Yes.

11      Q.    (By Ms. Hutchison)  Other than Elizabeth

12 Payne, has the church, to your knowledge, ever fired

13 somebody without giving them a written warning for a

14 performance issue?

15              MS. JOHNSON:  Object to relevancy.

16      A.    Not that I can recall.

17      Q.    (By Ms. Hutchison)  With respect to

18 Elizabeth Payne's statements to the media, are you

19 aware of anything she ever said to the media about

20 the church other than one time being quoted?

21      A.    No.

22      Q.    And what was that one quote?

23      A.    I don't know.

24      Q.    Did you read it?

25      A.    Probably.

```
 1        Q.   Do you remember the gist of it?

 2        A.   No.

 3        Q.   Was it negative?

 4        A.   I don't know.

 5        Q.   The problem that the church had about her

 6   statement that she was quoted on wasn't the content

 7   of it; it was simply the fact of it; is that true?

 8              MS. JOHNSON:   Object to form.

 9        A.   Correct.

10        Q.   (By Ms. Hutchison)  Prior to the time that

11   Elizabeth Payne was quoted in the media, was she ever

12   trained or instructed not to give a quote to the

13   media?

14        A.   I don't know.

15        Q.   Are you aware of any time anyone instructed

16   her not to do that or told her not to give quotes?

17        A.   No.

18        Q.   Now, when you say errors in her work, I

19   want to talk about what specifically you're referring

20   to.  Okay?

21        A.   (Witness nods head.)

22        Q.   So if you will list, please, what you mean

23   when you say errors in her work.

24        A.   Misspelled words.

25        Q.   Anything else?
```

```
1        A.    Adding appointments without Pastor Haynes'
2   approval.
3        Q.    Okay.   Anything else that constituted
4   errors in her work other than misspelled words and
5   adding appointments without his approval?
6        A.    Not that I can recall.
7        Q.    Are you aware of any particular words that
8   were misspelled by her?
9        A.    No.
10        Q.    Do you know if they were misspelled
11   anywhere other than on his calendar and in the
12   Harvard report?
13        A.    I don't know.
14        Q.    Are you aware of any misspelled words other
15   than on his calendar or in the Harvard report?
16        A.    Not that I can recall.
17        Q.    In the Harvard report, do you know which
18   words were misspelled?
19        A.    No.
20        Q.    With respect to the Harvard report, did
21   she -- did Elizabeth Payne actually write any of
22   that?
23        A.    I don't know.
24        Q.    So it's possible that she isn't the one who
25   misspelled the words?
```

LAURIE PURDY REPORTING SERVICE, INC.
PHONE/FAX    817-461-1716

```
 1                    MS. JOHNSON:  Object to form and

 2   relevancy.

 3       A.    It's possible.

 4       Q.   (By Ms. Hutchison)  It's possible that

 5   other people misspelled the words --

 6                    MS. JOHNSON:  Object to form.

 7       Q.   (By Ms. Hutchison)   -- and put it into the

 8   report?

 9                    MS. JOHNSON:  Object to form.

10       A.   Her responsibility was to proof it.

11                    MS. HUTCHISON:  I object to the

12   responsiveness of the answer.

13       Q.   (By Ms. Hutchison)  It's possible that

14   other people actually misspelled the words that were

15   in the report; is that true?

16                    MS. JOHNSON:  Object to form.

17       A.   Yes.

18       Q.   (By Ms. Hutchison)  Was anyone else who

19   provided misspelled words for the report reprimanded

20   in any way?

21                    MS. JOHNSON:  Object to relevancy and

22   form.

23       A.   I don't know.

24       Q.   (By Ms. Hutchison)  Are you aware of anyone

25   taking any action to find out who it was that
```

1    actually misspelled the words?

2         A.    No.

3         Q.    Now, the Harvard report was given to the

4    communications department to print, correct?

5         A.    I don't know.

6         Q.    Wouldn't that be an important thing to

7    know?

8                    MS. JOHNSON:  Object to relevancy and

9    form.

10        A.    No.

11        Q.    (By Ms. Hutchison)  I mean, isn't it -- if

12   you give something to the communications department

13   and they actually design the layout on their own

14   software and print the booklet, don't they have an

15   obligation to proofread it in that process?

16                   MS. JOHNSON:  Object to relevancy and

17   form.

18        A.    I have no opinion on that.

19        Q.    (By Ms. Hutchison)  Are you aware of anyone

20   doing anything to find out what the communication

21   department's obligations were with respect to

22   proofing and printing the Harvard report?

23                   MS. JOHNSON:  Object to relevancy and

24   form.

25        A.    Veta Holt.

```
 1   form.

 2        A.   Repeat that.

 3        Q.   (By Ms. Hutchison)  Yeah.  If Tonya Neal's

 4   department had an obligation to proofread that report

 5   in the process of them designing and in printing it,

 6   then wouldn't that be something you should consider

 7   before Elizabeth Payne is reprimanded for it?

 8             MS. JOHNSON:  Object to relevancy and

 9   form.

10        A.   I didn't say that they had a responsibility

11   to proof it.

12        Q.   (By Ms. Hutchison)  And I didn't say you

13   did.

14        A.   Okay.

15        Q.   I'm asking you to -- if they did have an

16   obligation, wouldn't that be a factor in whether or

17   not Elizabeth Payne should be reprimanded for it?

18        A.   No.

19             MS. JOHNSON:  Object to relevancy and

20   form.

21        Q.   (By Ms. Hutchison)  So if it was someone

22   else's responsibility to design, proofread and print

23   a piece of material, it would still be okay to

24   reprimand Elizabeth Payne for any misspellings in it?

25             MS. JOHNSON:  Object to relevancy and
```

```
 1    form.

 2           A.    Yes.

 3           Q.    (By Ms. Hutchison)   And even though you

 4    don't reprimand the person whose responsibility it

 5    was; is that true?

 6                 MS. JOHNSON:   Object to form.

 7           A.    The person that was responsible for it was

 8    reprimanded.

 9           Q.    (By Ms. Hutchison)   I'm asking you if Tonya

10    Neal's department was responsible for proofreading

11    it, she should have been reprimanded, too, shouldn't

12    she?

13                 MS. JOHNSON:   Object to relevancy and

14    form.

15           A.    If she was responsible for proofreading it,

16    yes.

17           Q.    (By Ms. Hutchison)   Okay.  Now, under what

18    circumstances is Tonya Neal responsible for

19    proofreading documents that her department designs,

20    creates and prints?

21           A.    I don't know.

22                 MS. JOHNSON:   Object to relevancy and

23    form.

24           Q.    (By Ms. Hutchison)   Isn't that something

25    that you would need to know to figure out whether or
```

1    not Elizabeth Payne was being treated differently?

2                  MS. JOHNSON:  Object to relevancy and

3    form.

4       A.   Yes.

5       Q.   (By Ms. Hutchison)  Are you aware of anyone

6    making that determination, in other words, finding

7    out whether she was being treated differently?

8                  MS. JOHNSON:  Object to relevancy and

9    form.

10      A.   No.

11      Q.   (By Ms. Hutchison)  Is there anything, to

12   your knowledge, that provides that -- well, strike

13   that.

14              Is there a written job description for

15   Tonya Neal's position?

16      A.   Yes.

17      Q.   Who created the job description?

18                 MS. JOHNSON:  Object to relevancy and

19   form.

20      A.   I did.

21      Q.   (By Ms. Hutchison)  You did?

22      A.   No, I didn't -- yes, I did.  Yes, I did.

23      Q.   And does it provide that she has an

24   obligation to basically be the director of the

25   communications department?

```
 1  form.

 2       A.   I don't know.

 3       Q.   (By Ms. Hutchison)  When you talk about the

 4  conflicts with staff, you listed four people.  And

 5  we're talking about Elizabeth Payne's conflict with

 6  staff.  You listed four people:  Dee Moten, Reverend

 7  Brianna Parker, Tonya Neal and Cornell Towns,

 8  correct?

 9       A.   Correct.

10       Q.   Let's start with Mr. Towns.  He is the

11  director of maintenance?

12       A.   Yes.

13       Q.   What was the situation between Elizabeth

14  Payne and Cornell Towns?

15       A.   I wasn't involved in that, so I don't know.

16       Q.   Well, you listed that as one of the reasons

17  for termination, right?

18       A.   Yes.

19       Q.   Aren't you one of the people that was

20  involved in approving or recommending her

21  termination?

22       A.   No.

23       Q.   You never recommended Elizabeth Payne's

24  termination?

25       A.   No.
```

```
 1        Q.   You didn't approve her termination?

 2        A.   I didn't have to.

 3        Q.   My question is, you didn't approve her

 4   termination?

 5        A.   I don't know.

 6        Q.   Did you offer an opinion about her

 7   termination?

 8        A.   No.

 9        Q.   Were you in the room when she was

10   terminated?

11        A.   Yes.

12        Q.   For what purpose?

13        A.   The purposes that I gave you earlier.  We

14   didn't give her a purpose.

15        Q.   Oh, I know you didn't give her a reason for

16   firing her, but what was the reason that you were in

17   the room when she was fired?

18        A.   As a witness.

19        Q.   As a witness to what?

20        A.   Her termination.

21        Q.   Why would there need to be a witness to her

22   termination?

23             MS. JOHNSON:  Object to relevancy and

24   form.

25        A.   We didn't need it.  I was just there.
```

```
 1        Q.   (By Ms. Hutchison)  Because -- who was it

 2   who made the decision not to tell her why she was

 3   being fired?

 4                MS. JOHNSON:  Object to relevancy and

 5   form.

 6        A.   I don't recall.

 7        Q.   (By Ms. Hutchison)  Did you support not

 8   telling her why she was being fired?

 9                MS. JOHNSON:  Object to relevancy and

10   form.

11        A.   I don't recall.

12        Q.   (By Ms. Hutchison)  Do you believe it's

13   wise not to tell somebody why they're being fired?

14                MS. JOHNSON:  Object to relevancy and

15   form.

16        A.   I don't have an opinion.

17        Q.   (By Ms. Hutchison)  You understand that

18   employees who are being fired may need to go get

19   unemployment compensation, correct?

20                MS. JOHNSON:  Object to relevancy and

21   form.

22        A.   Yes.

23        Q.   (By Ms. Hutchison)  And in order to do that

24   they need to tell the TWC why they were fired,

25   correct?
```

1          A.    Correct.

2                    MS. JOHNSON:   Object to relevancy and

3     form.

4          Q.   (By Ms. Hutchison)   Do you know of any way

5     for an employee to go to the TWC and tell them why

6     they were fired if you won't tell them why they were

7     fired?

8                    MS. JOHNSON:   Object to relevancy and

9     form.

10          A.    I don't know.   I don't have an opinion.

11          Q.   (By Ms. Hutchison)   Well, what was your

12     understanding of the reason that you weren't telling

13     her why she was being fired?

14                    MS. JOHNSON:   Object to relevancy and

15     form.

16          A.    I didn't ask.

17          Q.   (By Ms. Hutchison)   Okay.   And so you

18     didn't have any understanding of the reason why you

19     weren't telling her?

20                    MS. JOHNSON:   Object to relevancy and

21     form.

22          A.    No.

23          Q.   (By Ms. Hutchison)   And you don't think it

24     was part of your job in human resources to know what

25     the reason was for not informing her of her

1   termination?

2       A.   No.

3               MS. JOHNSON:   Object to relevancy and

4   form.

5       Q.   (By Ms. Hutchison)   And you didn't think it

6   was part of your job in human resources to form an

7   opinion as to whether her termination was legitimate

8   or not?

9               MS. JOHNSON:   Object to relevancy and

10  form.

11      A.   Say that again.

12      Q.   (By Ms. Hutchison)   Was it part of your job

13  in human resources to form an opinion as to whether

14  Elizabeth Payne's termination was legitimate or not

15  legitimate?

16      A.   No.

17              MS. JOHNSON:   Object to relevancy and

18  form.

19      Q.   (By Ms. Hutchison)   And you've never formed

20  an opinion in that regard?

21              MS. JOHNSON:   Object to relevancy and

22  form.

23      A.   No.

24      Q.   (By Ms. Hutchison)   And you don't have an

25  understanding of the details behind the alleged

1    conflict with Cornell Towns?

2        A.    No.

3                MS. JOHNSON:   Object to relevancy and

4    form.

5        Q.   (By Ms. Hutchison)   Do you have an opinion

6    of the details behind the alleged conflict with Tonya

7    Neal?

8                MS. JOHNSON:   Object to relevancy and

9    form.

10       A.    All I know is what Liz told me, what Veta

11   told me, and that's it.

12       Q.   (By Ms. Hutchison)   And what did Veta tell

13   you?

14       A.    That there was --

15                MS. JOHNSON:   Object to hearsay.

16                THE WITNESS:   Thank you.

17       A.    That there was a problem with Liz and Tonya

18   as it relates to the FedEx, trying to find a FedEx

19   location to get the Harvard booklets to Pastor Haynes

20   in a timely manner.   She sent me an e-mail telling me

21   to mediate the situation with Liz and Tonya because

22   they were going to continue to have to work with one

23   another.

24       Q.   (By Ms. Hutchison)   Okay.   So was -- this

25   conflict between Elizabeth Payne and Tonya, where was

1    this time-wise in relation to the other issues?

2        A.    What other issues?

3        Q.    Well, the statement to the media, the

4    errors in her work and the conflicts with the other

5    staff members.  You know what, maybe it will help me

6    to figure out -- let me go through and see if there's

7    any way to do like a time line.

8              The statement to the media, do you

9    remember when that took place?

10       A.    No.

11       Q.    Do you remember if it was early on in her

12   employment?

13       A.    No.

14       Q.    Do you remember if it was before the other

15   things that you've listed as reasons for termination?

16       A.    No.

17       Q.    The errors on Dr. Haynes's calendar that

18   you trained her about, do you remember where those

19   took place on the time line?

20       A.    It was within the first few months of her

21   employment.

22       Q.    The issue with the Harvard report, do you

23   remember where that was in the time line?

24       A.    July.

25       Q.    Do you remember when she was hired?

```
1        A.    Veta reminded Liz in an e-mail that she had
2   also had an issue with Cornell.  Liz made the comment
3   that she was aware of it and that they apologized and
4   was working better now.  And Veta's whole point was
5   to -- for me to schedule a meeting between Liz and
6   Tonya so that they could work out their differences.
7        Q.    And did you do that?
8        A.    No.  Tonya refused.
9        Q.    Did Liz refuse?
10        A.    No.  Tonya was actually out of town, and
11   she said she'd check on it when she got back.  I
12   followed up with her, and she said, Well, we're doing
13   fine now.
14        Q.    So basically Tonya indicated we don't
15   really have a problem or anything we need to work
16   out?
17        A.    Anymore, yeah.
18        Q.    Was that okay with you?
19        A.    Yes.
20        Q.    So were you still going to hold Elizabeth
21   Payne responsible for a conflict with Tonya Neal
22   after Tonya Neal tells you they don't have a problem
23   anymore?
24        A.    Yes.
25        Q.    And yet you didn't do anything to get
```

1   Elizabeth's side of the story or Tonya's side of the

2   story?

3        A.   Elizabeth put her side of the story in the

4   e-mail and she also called me.

5        Q.   She put it in an e-mail to you?

6        A.   She copied me on the e-mail that she sent

7   back to Veta.

8        Q.   And what did it say as to what her side of

9   the story was?

10        A.   I don't remember.  Not without looking at

11   it, I just don't remember.  I just remember she

12   called me to tell me about -- something about FedEx

13   and that they couldn't get the -- there was an issue

14   with getting the packet to FedEx or a certain FedEx.

15   I don't know.

16        Q.   And why was it -- why was it Elizabeth

17   Payne's fault?

18        A.   The project was Liz's to begin with.

19        Q.   No, the conflict between her and Tonya

20   Neal, why was that Elizabeth Payne's fault?

21        A.   Oh, I didn't say that it was Elizabeth

22   Payne's fault.

23        Q.   Didn't you just tell me that one of her

24   reasons for termination was conflict with staff?

25        A.   Yeah.

1          Q.   And wasn't one of those staff members Tonya

2    Neal?

3          A.   Yes.

4          Q.   Why wasn't that Tonya Neal's fault?

5          A.   They both were at fault.

6          Q.   Was Tonya Neal written up, counseled,

7    warned or fired?

8          A.   No.

9          Q.   Then let's talk about --

10         A.   Not a written counsel.

11         Q.   Well, are you saying that she was -- Tonya

12   Neal was verbally counseled about her conflict?

13         A.   Yes.  Yes, she was.

14         Q.   By whom?

15         A.   Veta Holt.

16         Q.   Were you there?

17         A.   No, I wasn't.

18         Q.   What did Veta Holt tell you?

19         A.   She told me that she had counseled with

20   Tonya in how to work with Liz.

21         Q.   And what was Tonya's response?

22         A.   I don't know.

23         Q.   Reverend Brianna Parker, are you saying

24   that Elizabeth Payne was held responsible for a

25   conflict with her?

1   the church.  Part of that was walking to the front of

2   the church to say you're going to become a member as

3   opposed to Liz just wanted to fill out the paperwork

4   and become a member.

5        Q.   So was this a conversation between Reverend

6   Parker and Liz?

7        A.   Yes.

8        Q.   And your understanding was that Liz said, I

9   do want to be a member, but I don't want to walk in

10   front of the church?

11       A.   Right.

12       Q.   And Reverend Parker was upset because she

13   wanted Liz to walk in front of the church?

14       A.   I don't know that she was upset at all.  I

15   just remember Liz sending me the e-mails and that was

16   the issue, that they kept going back and forth and

17   back and forth about whether, you know, to go up

18   front and become a member or just fill out paperwork.

19       Q.   Is there anyone else who's ever become a

20   member that didn't go up to the front?

21       A.   I don't know.

22       Q.   Okay.  Well, again, I'm having a little

23   trouble finding out where the conflict is.

24       A.   Okay.

25       Q.   What's the problem -- did you determine

1    that there was something that Elizabeth Payne was

2    doing wrong in that situation?

3                   MS. JOHNSON:  Object to form.

4        A.    I don't know.  I don't think so.  The whole

5    issue was that they kept going back and forth about

6    it.

7        Q.    (By Ms. Hutchison)  What was Reverend

8    Parker's reason for insisting upon her going to the

9    front of the church?

10                  MS. JOHNSON:  Object to relevancy and

11   form.

12       A.    I don't know.

13       Q.    (By Ms. Hutchison)  Is there some Biblical

14   requirement that you're aware of that would require

15   somebody to go in front of the congregation as

16   opposed to joining in some other way?

17       A.    No.

18                  MS. JOHNSON:  Object to form.

19       Q.    (By Ms. Hutchison)  So you did not consider

20   that discussion between the two of them to be a

21   reason for termination, did you?

22       A.    What I considered was there was so many

23   different mediations and issues where Liz was

24   concerned.

25       Q.    Well, now, Reverend Parker had at least

1    Q.    (By Ms. Hutchison)   Well, did you think

2    Elizabeth was doing something wrong to provoke

3    Dee Moten?

4              MS. JOHNSON:   Object to form.

5         A.   I don't have an opinion on that.

6         Q.    (By Ms. Hutchison)   Are you aware of

7    anything or, you know, of any opinion that Elizabeth

8    Payne was doing something wrong to provoke Dee Moten?

9              MS. JOHNSON:   Object to form.

10        A.   I don't know.

11        Q.   (By Ms. Hutchison)   Now, is Dee Moten

12   somebody that was demoted at some point?

13             MS. JOHNSON:   Object to relevancy and

14   form.

15        A.   No.

16        Q.   (By Ms. Hutchison)   She wasn't demoted from

17   Reverend Hill's assistant to another position?

18        A.   It wasn't a --

19             MS. JOHNSON:   Object to relevancy

20   and --

21        A.   -- demotion.

22             MS. JOHNSON:   Object to relevancy and

23   form.

24        Q.   (By Ms. Hutchison)   It was not a demotion?

25        A.   No.

1      A.   No.

2      Q.   Do you hold it against them that they want

3  to have mediation sessions?

4      A.   No.

5      Q.   Isn't it actually a sign on the part of an

6  employee that they want to improve relations to ask

7  for a mediation session?

8      A.   Yes.

9      Q.   And so rather than holding it against them

10  and deciding that they are a troublemaker, the

11  request for mediation sessions would actually be a

12  plus on their side to show that they want to

13  harmonize relationships, correct?

14           MS. JOHNSON:  Object to relevancy and

15  form.

16      A.   That's -- I didn't use those terms.

17      Q.   (By Ms. Hutchison)  Well, I'm using those

18  terms.

19      A.   Okay.

20      Q.   Don't you think that an employee who asks

21  for mediation sessions is trying to improve relations

22  in a workplace?

23           MS. JOHNSON:  Object to relevancy and

24  form.

25      A.   Could be.

```
 1        Q.   So did you have any criticism of Tonya Neal
 2   coming to you for help?
 3                MS. JOHNSON:  Object to form.
 4        A.   No.
 5        Q.   (By Ms. Hutchison)  Did you have any
 6   criticism of Elizabeth going to Tonya Neal for help?
 7                MS. JOHNSON:  Object to form and
 8   relevancy.
 9        A.   No.
10        Q.   (By Ms. Hutchison)  And when you prepared
11   the resume, where did you get the information to put
12   in it?
13        A.   I did research on the Internet and worked
14   with Tonya.
15        Q.   Did you get any information directly from
16   Reverend Haynes?
17        A.   I think so.
18        Q.   Do you remember where you got the
19   information concerning where he obtained his degrees?
20        A.   No.
21        Q.   Do you remember where he obtained his
22   degrees?
23        A.   No.
24                MS. JOHNSON:  Object to relevancy and
25   form.
```

```
 1   form.

 2        A.    It had a picture of a woman in it, and she

 3   was kind of busty and, you know, not dressed well.

 4   But beyond that, that's -- that's all I had.

 5        Q.    (By Ms. Hutchison)  Wearing a low-cut shirt

 6   or dress or blouse or something?

 7        A.    Yeah.

 8              MS. JOHNSON:  Object to relevancy and

 9   form.

10        A.    Yeah.  Yeah.

11        Q.    (By Ms. Hutchison)  And did the card say

12   anything?

13              MS. JOHNSON:  Object to relevancy and

14   form.

15        A.    I don't remember what it said.

16        Q.    (By Ms. Hutchison)  But it was your

     impression    there was a woman that was sending

18   something sexually suggestive to Dr. Haynes?

19              MS. JOHNSON:  Object to relevancy and

20   form.

21        A.    Yes.

22        Q.    (By Ms. Hutchison)  And what did Elizabeth

23   say to you when she brought it to you?

24              MS. JOHNSON:  Object to relevancy and

25   form.
```

LAURIE PURDY REPORTING SERVICE, INC.
PHONE/FAX    817-461-1716

Appx 91

1    not Pastor Haynes and the person who sent the picture

2    had any kind of a relationship?

3         A.   No.

4              MS. JOHNSON:  Object to relevancy and

5    form.

6         A.   No, I didn't.

7         Q.   (By Ms. Hutchison)  Have you ever made any

8    determination as to whether or not Pastor Haynes and

9    this woman had a relationship?

10        A.   No.

11             MS. JOHNSON:  Object to relevancy and

12   form.

13        Q.   (By Ms. Hutchison)  Wouldn't    be

14   significant to you in human resources if

15   Pastor Haynes was having inappropriate relationships

16   with women that were not his wife?

17             MS. JOHNSON:  Object to relevancy and

18   form.

19        A.   Wouldn't   be what to me?

20        Q.   (By Ms. Hutchison)  Significant.

21        A.   Yes.

22        Q.   And because there were other people that

23   were being fired for doing that very thing, right?

24             MS. JOHNSON:  Object to relevancy and

25   form.

```
 1              MS. JOHNSON:  Object to relevancy and
 2   form.
 3       Q.   (By Ms. Hutchison)  Were you going to do
 4   anything about that?
 5       A.   Was I going to do anything about what?
 6       Q.   About him having an inappropriate
 7   relationship with another woman.
 8              MS. JOHNSON:  Object to relevancy and
 9   form.
10       A.   I didn't know he was having an
11   inappropriate relationship with another woman.
12       Q.   (By Ms. Hutchison)  But you didn't do
13   anything   find out    he was having an
14   inappropriate relationship with a woman, right?
15              MS. JOHNSON:  Object    relevancy and
16   form.
17       A.   No.
18       Q.   (By Ms. Hutchison)  No what?
19              No, I didn't.
20              MS. JOHNSON:  Object to relevancy and
21   form to that last question.
22       Q.   (By Ms. Hutchison)  Did Liz ever come to
23   you other than the occasion with the picture of the
24   suggestive woman on any other occasion about
25   Pastor Haynes and possible relationships with other
```

1   ask them to access any particular e-mails?

2       A.   I could have, but I didn't.

3       Q.   When was the first time you saw any of the

4   communications between Elizabeth Payne and Reverend

5   Wright?

6       A.   It was after Liz was gone, so maybe late

7   August or September time frame.

8       Q.   But it was never prior to the time that she

9   was terminated?

10      A.   No.

11      Q.   Did you ever talk to Lora Clack about

12  Elizabeth Payne?

13      A.   No.

14      Q.   Did Veta Holt ever tell you that Lora Clack

15  was concerned about Elizabeth's communications with

16  Reverend Wright?

17      A.   No.

18      Q.   So it's your position that you were not

19  aware in any way, shape or form about Elizabeth's

20  communications with Reverend Wright that went beyond

21  professional?

22      A.   That's correct.

23      Q.   Do you believe that there's an attitude at

24  the church that promotes black people over other

25  races?

```
 1    to the explanation for the fact that the church

 2    employs, other than the cleaning crew, a hundred

 3    percent African-Americans?

 4                    MS. JOHNSON:  Object to relevancy and

 5    form.

 6        A.   Ask that again.

 7        Q.   (By Ms. Hutchison)  Yeah.  What's your

 8    opinion as to why it is that the church employs all

 9    African-Americans other than the cleaning crew?

10                    MS. JOHNSON:  Object to relevancy and

11    form.

12        A.   I don't have an opinion on it.

13        Q.   (By Ms. Hutchison)  Do you believe that the

14    church promotes an attitude that black people need to

15    stick together to the exclusion of other races?

16                    MS. JOHNSON:  Object to relevancy and

17    form.

18        A.   I don't have an opinion on that, no.

19        Q.   (By Ms. Hutchison)  Have you ever

20    encountered an attitude on the part of

21    African-American women that they get offended by

22    African-American men having relationships outside

23    their race?

24                    MS. JOHNSON:  Object to relevancy and

25    form.
```

```
 1   me that Vernon Robinson, Kassandra Foard, Charlotte

 2   Rhone and Renee Shepherd are all African-American?

 3        A.    They look African-American.

 4                  MS. JOHNSON:  Object to relevancy and

 5   form.

 6        Q.    (By Ms. Hutchison)  One of the other things

 7   that you said that you reviewed for your deposition

 8   was the Christian Standards of Living?

 9        A.    Yes.

10        Q.    I can't read my own handwriting.

11        A.    Christian Standards of Living.

12        Q.    What are the Christian Standards of Living?

13        A.    It's a standard that we expect every

14   employee to live by as an employee of the church.

15        Q.    Now, you had not mentioned that being a

16   factor in Elizabeth Payne's termination.  Are you now

17   saying that was a factor in her termination, a

18   violation of the Christian Standards of Living?

19        A.    No, I did not say that.

20        Q.    And, in fact, that doesn't have anything to

21   do with her termination, does it?

22                  MS. JOHNSON:  Object to relevancy and

23   form.

24        A.    No.

25        Q.    (By Ms. Hutchison)  Did you have any
```

LAURIE PURDY REPORTING SERVICE, INC.
PHONE/FAX   817-461-1716

1   talking about?

2        A.   Yes, but I can't remember the details.

3        Q.   Was it one or more than one?

4        A.   When I spoke with him it was one.

5        Q.   Were you ever aware of any more than one

6   appointment that Pastor Haynes was complaining that

7   Elizabeth had put on his calendar that he did not

8   approve?

9        A.   No.

10       Q.   And you don't remember the details of the

11  one he complained of?

12       A.   No.

13       Q.   If it was like a speaking engagement --

14       A.   It was a speaking engagement.

15       Q.   And was he objecting to speaking at that

16  particular place or --

17       A.   It was scheduled during the time that he

18  typically celebrates either his wife's birthday or

19  daughter's birthday, and he just -- he never -- he's

20  never out of town during that time.

21       Q.   Did he tell you whether or not he had

22  explained this to Elizabeth and had her fix it?

23            MS. JOHNSON:   Object to hearsay.

24       A.   He said that he had never told her to put

25  it on his schedule.

```
 1        A.    Yeah.   Yeah.

 2        Q.    Did you give any examples of racial

 3   harassment?

 4               MS. JOHNSON:   Object to relevancy and

 5   form.

 6        A.    Not that I can recall.

 7        Q.    (By Ms. Hutchison)  Did you provide any

 8   training on how not to discriminate based on race?

 9               MS. JOHNSON:   Object to relevancy and

10   form.

11        A.    Not that I can recall.

12        Q.    (By Ms. Hutchison)  What did you tell them

13   to do if they felt that they were being discriminated

14   against based on race?

15               MS. JOHNSON:   Object to relevancy and

16   form.

17        A.    Contact me.

18        Q.    (By Ms. Hutchison)  Anything else?

19               MS. JOHNSON:   Object to relevancy and

20   form.

21        A.    No, that was it.   To let me know so that we

22   could investigate it.

23        Q.    (By Ms. Hutchison)  Did you tell them they

24   had to do that in any certain format?

25        A.    No.
```

1   even if she had to get -- or notify everybody of what

2   was needed, that was part of her job.  It was still

3   her responsibility to make sure that the project was

4   in a format that he wanted.

5        Q.   And did that also include proofing the

6   project?

7        A.   Yes.

8        Q.   And did you indicate also that part of the

9   reason why she was fired was because of personality

10  conflicts with staff?

11       A.   Yes.

12       Q.   Were there any other reasons why she was

13  fired and terminated?

14       A.   Just Pastor Haynes' comment about her not

15  coming to work or not being to work on Sundays when

16  he needed her; and Mondays.

17       Q.   She was not required to be a member -- to

18  join the church --

19       A.   No.

20       Q.   -- in order to be a staff person?

21       A.   No, she was not.

22       Q.   And no member -- no staff member is

23  required to join the church to be a staff member; is

24  that correct?  I mean, there's no requirement that

25  you join the church -- I'm assuming other than

1   Q.   And was it designed to conduct performance

2   reviews more than once a year?

3   A.   No.

4   Q.   And did Liz Payne have a performance

5   review?

6   A.   No.

7   Q.   And why was that?

8   A.   She wasn't there a year.

9   Q.   And she was only there how long, do you

10  recall?

11  A.   Eight months.

12  Q.   If she had been there a year, then she

13  would have had a performance review?

14  A.   Most likely.

15          MS. JOHNSON:  I reserve my right to

16  further cross later.

17                FURTHER EXAMINATION

18  BY MS. HUTCHISON:

19  Q.   Does the job description for administrative

20  assistant give specific days and times for working?

21  A.   I don't know.

22  Q.   What was Elizabeth Payne told about the

23  days and the times that she needed to be there?

24  A.   That Sundays would be a workday.

25  Q.   What else?

1      A.     Staff meetings were mandatory.

2      Q.     And who told her that?

3      A.     I did, Pastor Haynes did, Veta did and

4 Reverend Hill did.

5      Q.     You don't know of any she missed, though,

6 do you?

7      A.     I don't know.

8      Q.     Okay.  You don't have any reason to believe

9 that was the basis for her termination, do you?  You

10 didn't mention it when I was asking you about reasons

11 for her termination, did you?

12     A.     Based on what Pastor Haynes reported, yes.

13     Q.     Didn't I ask you in your deposition --

14     A.     Yes, you did.  You did.

15     Q.     And you didn't mention anything about her

16 attendance, did you?

17     A.     I didn't.

18     Q.     Now you're telling me now that

19 Pastor Haynes told you that her attendance was part

20 of the reason she was being fired?

21     A.     Yes.

22     Q.     Now, certainly being in charge of human

23 resources, before you fire somebody, you want to get

24 their side of the story, right?

25     A.     Not always.

```
1   that Liz was terminated for, and the attendance was
2   just one of the items on the list.
3        Q.   (By Ms. Hutchison)  And I'm asking you,
4   since it was a basis for termination, is it your
5   testimony that it's good human resources practices to
6   allow that to be a reason for termination without
7   asking her about it?
8        A.   I don't have an opinion on that.
9             MS. JOHNSON:  Object to form.
10       Q.   (By Ms. Hutchison)  Pardon me?
11       A.   I don't have an opinion on that.
12       Q.   But you're not aware of anyone bothering to
13  ask her about her side of the story on that, are you?
14            MS. JOHNSON:  Object to form.
15       A.   No.
16       Q.   (By Ms. Hutchison)  Or do you know whether
17  she came in on Mondays?
18            MS. JOHNSON:  Object to form.
19       A.   No.
20       Q.   (By Ms. Hutchison)  Is there anything we
21  can look at to determine if she missed any?
22       A.   I don't know.
23       Q.   I mean, is there some document that we can
24  look at that's going to tell us whether Liz actually
25  did miss any Mondays?
```

1          MS. JOHNSON:  Object to form.

2     A.    I don't know.

3     Q.    (By Ms. Hutchison)  If she was missing work

4  or if attendance was a problem, wouldn't you expect

5  somebody to document that somewhere?

6               MS. JOHNSON:  Object to form.

7     A.    Possibly.

8     Q.    (By Ms. Hutchison)  I mean, is it okay with

9  you for someone to come in and say, You know what,

10 so-and-so has had attendance issues, fire them, or

11 would you want to say, Do we have any documentation

12 of that; can you tell me which days they missed?

13              MS. JOHNSON:  Object to form.

14    A.    I don't have an opinion on that.

15    Q.    (By Ms. Hutchison)  You know, saying that

16 she was there for eight months so she didn't have a

17 performance review, her performance could have been

18 reviewed with her at any time, right?

19              MS. JOHNSON:  Object to form.

20    A.    Yes.

21    Q.    (By Ms. Hutchison)  I mean, there's nothing

22 preventing anyone from sitting down with her and

23 saying, this is what you're doing and this is what

24 you need to do?

25    A.    Everytime someone sat down with her to talk

1  with her about her performance, that was, in my

2  opinion, a review of how she was doing.

3      Q.   So instead of how you answered your lawyer,

4  the real answer is her performance was reviewed with

5  her on a number of times, correct?

6                  MS. JOHNSON:  Object to form.

7      A.   Yes, it was reviewed a number of times, but

8  it wasn't a formal review.

9      Q.   (By Ms. Hutchison)  Okay.  And every single

10  time that you reviewed her performance with her, she

11  fixed it, right?

12                 MS. JOHNSON:  Object to form.

13     A.   No -- well, yes.

14     Q.   (By Ms. Hutchison)  Okay.

15     A.   Yes.

16     Q.   And so you don't know of anything that

17  would have indicated that if someone had sat down and

18  talked to her about their issues, that she wouldn't

19  have fixed it --

20                 MS. JOHNSON:  Object to form.

21     Q.   (By Ms. Hutchison)  -- do you?

22     A.   I don't know that.

23     Q.   Okay.  Are you -- did you ask Pastor Haynes

24  or Veta Holt or anyone else, Have you sat down with

25  Liz and talked to her about these things, because

213

1    seriously, did she refuse to listen?

2        A.   I don't know.  I wasn't there.

3             MS. JOHNSON:  Object to form.

4        Q.   (By Ms. Hutchison)  Did she ever talk to

5    the media after she was told not to?

6        A.   I don't know.

7        Q.   Don't you think that information is

8    relevant as to whether or not she should be fired?

9             MS. JOHNSON:  Object to form.

10       A.   I don't know whether Liz said anything else

11   to the media.

12       Q.   (By Ms. Hutchison)  But I'm asking you,

13   isn't that information that's really relevant as to

14   whether or not she should be fired?

15            MS. JOHNSON:  Object to form.

16       A.   No.

17       Q.   (By Ms. Hutchison)  Because if you've got

18   an employee who doesn't know they're not supposed to

19   do something and then after you tell them not to do

20   it anymore, never does it again, they shouldn't

21   really be fired for that, should they?

22            MS. JOHNSON:  Object to form.

23       Q.   (By Ms. Hutchison)  Should they?

24            MS. JOHNSON:  Object to form.

25       A.   No comment.  I don't have an opinion on

1   that.

2       Q.    (By Ms. Hutchison)  Did Veta Holt tell you

3   she talked to her about anything else other than that

4   she shouldn't talk to the media?

5       A.    She talked with Liz about the Harvard

6   project.

7       Q.    And what did she tell Liz about the Harvard

8   project?

9       A.    I don't know.  I wasn't there.

10      Q.    And what was Liz's response?

11      A.    I don't know.  I wasn't there.

12      Q.    Was Veta Holt critical of Liz's response

13  any time she talked to her?

14      A.    Yes.

15      Q.    Where was she critical?

16      A.    What do you mean "where was she critical"?

17      Q.    What was she critical about?  What was Veta

18  Holt critical about?

19      A.    She was critical about the fact that

20  Pastor Haynes was very upset about all of the errors

21  in the Harvard project.

22      Q.    No, my question is, was she critical of

23  Elizabeth's response to her?

24      A.    Not that I can recall.

25      Q.    Do you know of any time that Elizabeth was

1  insubordinate    disrespectful   or refused   mend her

2  ways?

3      A.   Not that I can recall.

4      Q.   Was she -- as far as you know, was she

5  always willing to try to fix the problem?

6      A.   I don't -- yes, in the situations that I

7  dealt with her on.

8      Q.   And did anyone ever tell you, you know, I

9  tried to talk to Elizabeth; she's just not willing to

10 fix it?

11          MS. JOHNSON:  Object to relevancy and

12 form.

13     A.   Not that I can recall.

14     Q.   (By Ms. Hutchison)  Do you believe that she

15 misrepresented herself in any way to you?

16          MS. JOHNSON:  Object to relevancy and

17 form.

18     A.   Yes.

19     Q.   (By Ms. Hutchison)  How did she do that?

20     A.   Based on the interviews that we had with

21 Elizabeth, I felt that she was not as prepared for

22 the position as she claimed.

23     Q.   What did she claim that was --

24     A.   I feel that she did not represent herself

25 well once she got in the job.

1    liked or didn't like?

2        A.   I can't recall.

3        Q.   Do you recall anything in particular that

4    anybody who interviewed Elizabeth Payne liked or

5    didn't like?

6        A.   I can't recall.

7        Q.   Do you remember Pastor Haynes making a

8    statement at a staff meeting to explain to them that

9    he was going to hire somebody that wasn't an

10   African-American and he wanted to make sure it wasn't

11   a problem?

12       A.   No.

13       Q.   If he had said that, would you remember it?

14       A.   Yes.

15       Q.   Do you go to all of the staff meetings?

16       A.   No.

17       Q.   So it's possible he said that at a meeting

18   you were not present at?

19              MS. JOHNSON:  Object to form.

20       A.   Quite possible.

21       Q.   (By Ms. Hutchison)  Now, Pastor Haynes

22   didn't say anything about his resume when he was

23   talking about firing Liz, did he?

24       A.   Not to me.

25       Q.   Well, did he say something to someone else

```
 1   that you're aware of?
 2                   MS. JOHNSON:   Object to relevancy and
 3   form.
 4        A.    No.
 5        Q.    (By Ms. Hutchison)   Did anyone else ever
 6   claim to you that Elizabeth misrepresented herself?
 7                   MS. JOHNSON:   Object to relevancy and
 8   form.
 9        A.    Say that again.
10        Q.    (By Ms. Hutchison)   Did anyone else ever
11   tell you that they believed Elizabeth misrepresented
12   herself?
13                   MS. JOHNSON:   Object to relevancy and
14   form.
15        A.    Veta Holt.
16        Q.    (By Ms. Hutchison)   What did Veta Holt say?
17                   MS. JOHNSON:   Object to hearsay.
18        A.    I can't recall.
19                   MS. HUTCHISON:   I'll pass the witness.
20                   MS. JOHNSON:   We'll reserve further
21   cross-examination to a later date.
22                   MR. LEWIS:   We are off the record at
23   2:25.
24                   (Deposition proceedings concluded
25                    at 2:25 p.m.)
```