1   IN THE UNITED STATES DISTRICT COURT
    FOR THE NORTHERN DISTRICT OF TEXAS
2              DALLAS DIVISION

3   ELIZABETH PAYNE,        )
                            )
4        Plaintiff,         )
                            )
5   VS.                     )   CIVIL ACTION NO.  3-09CV0595-B
                            )
6   FRIENDSHIP WEST BAPTIST )
    CHURCH, INC.,           )
7                           )
         Defendant.         )
8

9   ************************************************

10       ORAL AND VIDEOTAPED DEPOSITION OF

11             FREDERICK HAYNES

12             JANUARY 22, 2010

13  ************************************************

14                        COPY

15

16   '   ORAL DEPOSITION OF FREDERICK HAYNES, produced as

17  a witness at the instance of the Plaintiff, and duly

18  sworn, was taken in the above-styled and numbered

19  cause on the 22nd day of January, 2010, at 9:55 a.m.

20  to 5:28 p.m., before Laurie Purdy, CSR, in and for

21  the State of Texas, reported by machine shorthand, at

22  the offices of Faith Johnson & Associates, L.L.P.,

23  5201 North O'Connor Boulevard, Suite 500, in the City

24  of Irving, County of Dallas, State of Texas, pursuant

25  to the Federal Rules of Civil Procedure.

LAURIE PURDY REPORTING SERVICE, INC.
PHONE/FAX   817-461-1716

1        A.    6846 Talbot Parkway in Dallas.

2        Q.    And how long have you lived in Dallas,

3    Texas?

4        A.    I guess since, what, 1992, '93.

5        Q.    And have you lived at that Talbot Parkway

6    address all of that time, or have you moved?

7        A.    Well, that's the address I've been residing

8    at since '92 or '93.  Prior to that, I lived in

9    Cedar Hill, which is, I guess, Dallas County, and

10   Duncanville before that Dallas County.  So I've been

11   here quite awhile.

12       Q.    All right, sir.  You are the senior pastor

13   at the Friendship-West Baptist Church, correct?

14       A.    Right.

15       Q.    And you have held that position for about

16   26 years?

17       A.    27 next month.

18       Q.    27 next month, in February?

19       A.    Yes.

20       Q.    Now, 27 years ago when you came to

21   Friendship-West Baptist Church, was it an existing

22   church, or did you start that congregation?

23       A.    It was an existing church.

24       Q.    Who was the prior pastor there?

25       A.    Reverend Robert L. Castle.

1    Q.   So you are the shepherd of the

2 Friendship-West Baptist Church?

3    A.   Yeah, if you look at it like that.

4    Q.   Okay.  And how many pastors does

5 Friendship-West have?

6    A.   On the pastoral staff, I guess eight or

7 nine.

8    Q.   But as the senior pastor, are you the

9 person who is the ultimate decision-maker for the

10 affairs of the church?

11   A.   Yes.

12   Q.   Now, does the church have a board of

13 elders --

14   A.   No.

15   Q.   -- or presbyters or bishops?

16   A.   We have deacons and trustees.

17   Q.   But above deacons, you don't have any

18 bishops or elders who are not pastors?

19   A.   No.

20   Q.   So the pastors, then, would they be

21 considered the bishops of the church?

22   A.   No.

23   Q.   Does the church have bishops?

24   A.   No.

25   Q.   Are the pastors, then, the executive

```
 1          A.    No.
 2          Q.    Have you ever served in a role as trustee
 3   for the church?
 4          A.    No.
 5          Q.    When you say the trustee set policy, are
 6   you referring to doctrinal policy for the doctrine of
 7   the church, or are you referring to administrative
 8   policies or both?
 9          A.    Administrative.
10          Q.    So as far as, for example, let's say an
11   employee handbook, the policies that are contained in
12   that employee handbook, are those policies adopted
13   and set by the trustees of the church?
14          A.    I wouldn't go that far.  They have in the
15   past, but that was when the church was smaller.  As
16   the church has grown, we've been able to, you know,
17   hire an HR consultant who is responsible for the HR
18   policies, the employee handbook, et cetera, that, you
19   know, we approve.
20          Q.    All right.  And when you say "we approve,"
21   who is it -- the HR consultant might draft some
22   policies, but who is it who has the ultimate approval
23   of whether or not those policies are going to be
24   adopted by the church?
25          A.    The trustees and myself.
```

```
 1   the ultimate authority over those things?
 2        A.    The senior pastor, me.
 3        Q.    That would be yourself?
 4        A.    Right.
 5        Q.    Okay.  What about decisions to either hire
 6   or fire an employee, who has the ultimate decision
 7   authority over that?
 8        A.    Ultimately, me.
 9        Q.    That would be you, sir.
10             Okay.  The Friendship-West Baptist
11   Church currently has about how many members?
12        A.    About 12,000.
13        Q.    Now, of that 12,000 members, do you
14   differentiate or contain -- keep in your mind any
15   separation between people who are active members who
16   attend services versus people who are on the rolls
17   that you might see at Easter or Christmas?
18                  MS. JOHNSON:  Object to relevance.
19        A.    I mean, there is a difference.
20        Q.    (By Mr. Lewis)  I understand.  Let me
21   phrase it this way.  On a -- how many different
22   services do you have on a Sunday?
23        A.    Two.
24        Q.    Approximately -- on a given Sunday,
25   approximately how many members are there in
```

```
 1  attendance?

 2              MS. JOHNSON:  Object to relevance.

 3      A.    Seven to 8,000.

 4      Q.    (By Mr. Lewis)  Of the seven to 8,000

 5  people that are generally in attendance on a given

 6  Sunday, what is the ethnic percentages that you would

 7  estimate for that membership?

 8              MS. JOHNSON:  Object to relevance.

 9      A.    I mean, honestly I have no idea.  If you've

10  seen our facility, we have a balcony that precludes

11  me from saying, okay, there are so many people who

12  are of one persuasion and another of another.

13      Q.    (By Mr. Lewis)  Okay.  Well, would you

14  agree with me that Friendship-West is a predominantly

15  African-American church?

16      A.    Yes.

17              MS. JOHNSON:  Object to relevance.

18      Q.    (By Mr. Lewis)  And would you say that it

19  is more than 90 percent African-American?

20              MS. JOHNSON:  Object to relevance.

21      A.    It could be.

22      Q.    (By Mr. Lewis)  Would you think that that

23  would go as high as more than 95 percent

24  African-American?

25              MS. JOHNSON:  Object to relevance.
```

```
 1    recognize the information that is contained on that
 2    document.
 3                 (Deposition Exhibit 1 was marked.)
 4        A.    Okay.
 5        Q.    Do you recognize it?
 6        A.    Yes.
 7        Q.    Is that a printout from the Friendship-West
 8    Baptist Church, the page that says "Our Pastor"?
 9                 MS. JOHNSON:  Page?
10        Q.    (By Mr. Lewis)  Web page.
11        A.    I would imagine.
12                 MS. JOHNSON:  Object to relevance.
13        A.    I would imagine, yeah.
14        Q.    (By Mr. Lewis)  Okay, sir.  Friendship-West
15    Baptist Church maintains a website?
16        A.    Correct.
17                 MS. JOHNSON:  Object to relevance.
18        Q.    (By Mr. Lewis)  And who's in charge of that
19    website?
20                 MS. JOHNSON:  Object to relevance.
21        A.    There are a few people.  Jack Akana, and
22    it's under media, so Tonya Neal.
23        Q.    (By Mr. Lewis)  Jack O'Connor?
24        A.    Akana.
25        Q.    Akana.  How do you spell that?
```

1  right?

2        A.    Executive pastor.

3        Q.    Now, as executive pastor, does he have a

4  particular area of focus?

5        A.    Well, the pastoral staff falls under his

6  umbrella.

7        Q.    As a matter of fact, if we look at this

8  page that is contained in Exhibit Number 2, that --

9  the organizational chart, it's Page 31 --

10       A.    Okay.

11       Q.    -- shows yourself as the senior pastor.

12  Underneath you is Elizabeth Payne as your executive

13  administrative assistant, and also underneath you as

14  an offshoot is Danielle Ayers, minister of social

15  justice; and then it forks, and under pastoral

16  affairs is Reverend Rickey Hill as executive pastor.

17  So he, then, is in charge of the other pastors in

18  their different areas; is that correct?

19       A.    Right.  Right.

20       Q.    The -- Tonya Neal, as the director of

21  media, would you consider an organizational chart

22  like this to be a media item?

23            MS. JOHNSON:   Object to vagueness.

24       A.    What do you mean "a media item"?

25       Q.    (By Mr. Lewis)   Well, let's talk about the

1    scope of what you consider to be within the umbrella

2    of media at Friendship-West.

3        A.    Okay.

4        Q.    What do you consider under Tonya Neal's

5    direction as director of media?

6                MS. JOHNSON:   Object to form and

7    relevance.

8        A.    I mean, anything having to do with our

9    communications, I mean, the website, bookstore.   I

10   mean, media operations.   It's --

11       Q.    (By Mr. Lewis)  So media would be things

12   that relate to communications with the public; would

13   that be a fair description?

14       A.    To a degree, yeah.

15       Q.    So to the extent there's an organizational

16   chart that is being presented as a graphic, would you

17   consider that to be under the scope of media?

18       A.    Okay.  But she's fed the information, of

19   course, yeah.

20       Q.    Yes.  Okay.  She's fed the information from

21   who?

22       A.    I mean, that varies.

23       Q.    Well, for something like an organizational

24   chart, where would Tonya Neal get the information?

25       A.    That could come from my office.  That could

```
 1   necessary.

 2        Q.    And what would determine whether or not

 3   it's necessary, in your mind?

 4        A.    I mean, I guess the size of the project,

 5   the size of the presentation, the information that

 6   communications may have that she doesn't have on

 7   hand, that may, you know, require that.  But, you

 8   know, again, I mainly look to her, my assistant, for,

 9   you know, putting that together.

10        Q.    When you look to her for putting it

11   together, do you look to her for the overseeing of it

12   being completed, or do you look to her and expect her

13   to type it like a secretary?

14        A.    Well, most of the time it's already typed,

15   so I can't say that.  But overseeing it and being

16   responsible for its presentation, oh, yeah.

17        Q.    Okay.  When you say "most of the time it's

18   already typed," is there someone that you have who

19   types it for you, or do you do the typing yourself?

20        A.    Yeah, for the most part, I do the typing

21   myself.

22        Q.    What if the presentation is to contain

23   graphics or charts, is that something you prepare

24   yourself or --

25        A.    No.
```

LAURIE PURDY REPORTING SERVICE, INC.
PHONE/FAX    817-461-1716

Appx 119

1   sections.  I was concerned about the whole -- the

2   whole product.

3        Q.   For right now my question is, Section One,

4   the Defining Moments section.  Did you have any

5   complaints about that particular section --

6              MS. JOHNSON:  Object to asked and

7   answered.

8        Q.   (By Mr. Lewis)  -- the appearance of that

9   section?

10       A.   I'd have to go through and read it again,

11  to be honest, because I don't recall.  What I do

12  recall, as I'm going through the presentation, errors

13  just start jumping up off the page, and, you know,

14  I'm at Harvard and embarrassed.

15       Q.   What types of errors jumping off the page

16  do you recall?

17       A.   Grammar, spelling.

18       Q.   Now, is it -- the grammar and spelling,

19  were those contained in the materials that you

20  yourself typed?

21       A.   No.

22       Q.   So if the grammar and spelling errors were

23  not in the content you typed, where were they?

24       A.   In other sections.

25       Q.   Okay.  What sections are you referring to?

```
 1   information after it was laid out and printed?
 2        A.   It should have been.
 3             MR. LEWIS:   I'm going to object,
 4   nonresponsive.
 5        Q.   (By Mr. Lewis)   My question is --
 6             MS. JOHNSON:   Object, it was
 7   responsive.
 8             MR. LEWIS:   No.
 9        Q.   (By Mr. Lewis)   My question is, do you know
10   of anyone who did proof it?
11        A.   My former assistant.
12        Q.   Okay.  And how do you know?  What is the
13   source of your belief that she proofed it?
14        A.   She was the last one to have the product
15   before it was mailed.
16        Q.   Did someone say to you that they observed
17   her proofing it?
18        A.   No.
19        Q.   Did she say to you that she proofed it
20   before it was mailed?
21        A.   I don't recall that.
22        Q.   So it's your assumption that she would have
23   been the one to proof it?
24        A.   She was supposed to proof it.
25        Q.   I understand -- I understand that's your
```

1  position.

2      A.    That's not an assumption.  She's supposed

3  to proof it.

4      Q.    I understand.

5          MR. LEWIS:  object, nonresponsive.

6          MS. JOHNSON:  We object that it was

7  responsive.

8      Q.    (By Mr. Lewis)  My question is not who was

9  supposed to proof it.

10      A.    Right.

11      Q.    My question is, do you have any knowledge

12  of who actually did proof it?

13      A.    I guess not.

14      Q.    Let's look at the next section, what I will

15  call the biographical pages which begin on Page 7 and

16  go through Page -- what would you consider to be the

17  end of the biography section?  Page --

18      A.    The middle of Page 8 is my biography.

19      Q.    Okay.  Well, let's talk about the biography

20  section through pages -- 7 through the middle of

21  Page 8.  Do you know who typed that information?

22      A.    You know, I need to think about that.

23      Q.    Is it possible that this biographical

24  information -- or this content is something that

25  existed from prior presentations that you just

```
 1    brought forward?
 2         A.    Huh-uh.
 3         Q.    You believe it was recreated or produced
 4    specifically for this Harvard presentation?
 5         A.    I believe so.
 6         Q.    Okay.  But you don't recall if you typed it
 7    or if someone else typed it?
 8         A.    I don't, not at this point, no.
 9         Q.    Do you know who did the layout of it in
10    terms of its appearance of how the text was going to
11    appear on the page?
12         A.    I mean, I gave it to my former assistant,
13    so
14         Q.    I understand.  But as far as who physically
15    on the computer did the layout --
16         A.    I don't know.
17         Q.    I do you know?
18         A.    No.
19         Q.    Do you know -- did you give any specific
20    instructions of how you wanted the design of the
21    layout to be for that information?
22              MS. JOHNSON:  Object to asked and
23    answered.
24         A.    No.
25         Q.    (By Mr. Lewis)  Okay.  And, again,
```

1    referring to this biographical information, do you

2    know who printed it out?

3         A.    No.

4         Q.    And do you -- do you have any personal

5    knowledge of who proofed it, actually proofed the

6    information?

7         A.    No.

8         Q.    The next section of the document I guess

9    beginning in the middle of Page 8 -- Page 8 would be

10   under the subtitle History of Friendship-West Baptist

11   Church.

12        A.    (Witness nods head.)

13        Q.    And how far -- would you say through what

14   pages would you consider to be part of that section?

15        A.    It's just that section on Page 8.

16        Q.    Okay.  Just on Page 8.  So I want to ask

17   the same questions about that.  Do you know who typed

18   that content?

19        A.    No, I don't know.

20        Q.    Do you know who did the layout of the

21   content on the page?

22        A.    No.

23        Q.    Do you know who -- did you have any input

24   or give any instruction as to how you wanted the

25   design of that layout to be?

1      A.    No.

2      Q.    So do you know who actually designed the

3  layout?

4      A.    (Witness shakes head.)

5      Q.    Do you know who printed the information?

6      A.    No.

7      Q.    And do you know who actually proofed the

8  information?

9      A.    No.

10      Q.    The next section, I guess beginning on

11  Page 9, what would be a title that you would

12  recognize as identifying this section of the

13  presentation?

14      A.    A Study of the Area Where We Serve.

15      Q.    Okay.  And approximately what pages would

16  you say that that goes through beginning on Page 9?

17      A.    Well, it's 9, 10 and 11.

18      Q.    And what about that little first paragraph

19  at the top of Page 12?

20      A.    That is a continuation of the history.

21      Q.    Okay.  So that goes back into the history

22  of Friendship-West?

23      A.    Uh-huh.

24      Q.    Well, then --

25      A.    And you do see that as an example of a real

1    gave us this and we took it verbatim or there was a

2    marriage of material.

3        Q.    Okay.   And so you, then, don't know if you

4    typed that information or if it was just --

5        A.    Oh, I didn't type it, no.

6        Q.    Okay.   Do you know who did type it?

7        A.    Huh-uh.

8        Q.    It could have been someone from the

9    McDonald study that typed it and y'all just lifted it

10    and put it into these presentations in the form in

11    which it existed in the McDonald study?

12        A.    It could have been.   I don't know.

13        Q.    Okay.   Did you give any direction as to how

14    that information was to be laid out in the materials

15    you were presenting?

16        A.    Yes.   Yes.

17        Q.    What type of direction did you give?

18        A.    I mean, I wanted, as you've seen, the

19    Defining Moments to open up and then the

20    autobiographical material, History of the Church, and

21    then we slide into The Community We Serve In.

22        Q.    So you gave direction as to the order in

23    which the information was to be presented?

24        A.    Right.

25        Q.    But I'm talking about as to the layout of

75

1  it of you want this chart that's on Page 9 to be this

2  big versus 2 inches high versus 3 inches high.  Did

3  you give any specific direction in that regard?

4     A.   No.

5     Q.   Those types of design layout decisions --

6     A.   Right.

7     Q.      did you make any of those?

8     A.   No.

9     Q.   Do you know who actually did make those

10  decisions?

11     A.   No.

12     Q.   Okay.  Do you know if anyone actually

13  proofed that information?

14     A.   No.

15     Q.   Okay.  The next section of the materials, I

16  guess could we call that the Transformation section

17  where it begins on Page 12 with the subtitle

18  Transformation Through Engagement and Empowerment?

19     A.   Okay.

20     Q.   The Transformation section, do you know who

21  typed that information?

22     A.   It looks like me, but I'm not sure.

23     Q.   Okay.  Do you know who laid it out?

24     A.   No.   gave it to my former assistant.

25     Q.   But as far as physically taking what you

1  typed and laid it out, do you know who actually did

2  that?

3      A.   No.

4      Q.   Do you know who designed the layout, came

5  up with the idea of we'll make it this font or this?

6      A.   Oh, no.

7      Q.   Okay.  Do you know who printed it?

8      A.   No.

9      Q.   And do you know who proofed it, if anyone?

10     A.   No.

11     Q.   The next section of the document, I believe

12  that would begin on Page 14.  Would you call this

13  the -- what would you call this section?

14     A.   Information about one of our nonprofits.

15     Q.   The Empowerment Corporation?

16     A.   Right.

17     Q.   And how many pages would you consider to be

18  part of this Empowerment section?

19     A.   14 and 15.

20     Q.   Okay.  Do you know who typed that

21  information?

22     A.   No.

23     Q.   Do you know who laid it out?

24     A.   No.

25     Q.   Do you know who designed it?

```
 1        A.    No.
 2        Q.    Do you know who printed it?
 3        A.    No.
 4        Q.    And do you know who proofed it?
 5        A.    No.
 6        Q.    The next section I guess would begin on
 7   Page 16 where it says The Bill of Rights for The
 8   Poor.  If we, for the purposes of our question,
 9   entitle this section The Bill of Rights for the Poor
10   section, how many pages would you include in it?
11        A.    That's it, one page.
12        Q.    Okay.  So for this section on Page 16, do
13   you know who typed it?
14        A.    I mean, I typed the original draft.
15        Q.    All right.  As far as the content that's
16   here
17        A.    That's me.
18        Q.    You typed it.  Do you know who laid it out?
19        A.    No.
20        Q.    Do you know who designed it?
21        A.    No.
22        Q.    Do you know who printed it?
23        A.    No.
24        Q.    And do you know who proofed it?
25        A.    No.
```

1    Q.   Okay.  A team consisting of who?

2    A.   Probably my former assistant, Tonya, Veta.

3    I mean -- I mean, even Rick, I would imagine.  And,

4    again, I'm speculating, to be honest, because I was

5    in Massachusetts.

6    Q.   The new document -- did the new document

7    just go through and make the error corrections to

8    this document, or was it a completely new document?

9    A.   Honestly, I never looked at it.

10   Q.   Why did you never look at it?

11   A.   Because I was disgusted and it should have

12   been done right the first time.

13   Q.   Well, but if you were disgusted and it

14   should have been right the first time, why didn't you

15   do something to make sure it was done right the

16   second time?

17   A.   Because I was gone.

18   Q.   You didn't ask them to send it to you in

19   Massachusetts to look at before it was --

20   A.   No, I was on my way back to Dallas.  I'm

21   sorry.

22   Q.   Before it was disseminated, you just

23   entrusted those people to do it right?

24   A.   (Witness nods head.)

25              MS. JOHNSON:  Make sure you speak

1    loud, too --

2                   THE WITNESS:  Okay.

3                   MS. JOHNSON:  -- and not just shake

4    your head because the court reporter won't be --

5                   THE WITNESS:  Right.  Okay.  I'm

6    sorry.

7                   MS. JOHNSON:  -- able to get that

8    down.

9                   Sorry about that.

10       Q.   (By Mr. Lewis)  Do you know if you have a

11   copy still of the new document that was disseminated?

12       A.   Yes.

13       Q.   And even though you didn't see it before it

14   was disseminated, have you since looked at it to see

15   what changes were made in the document?

16       A.   No.

17       Q.   Okay.  So you don't know if it's better

18   than the first document or not?

19       A.   Well, based on Veta Holt and Tonya Neal, it

20   was corrected.

21       Q.   How do you know that if you haven't seen

22   it?

23       A.   I just said based on Veta Holt and Tonya

24   Neal.

25       Q.   You're saying they told you it was

1   corrected?

2        A.    Right.

3        Q.    And you relied on them?

4        A.    Exactly.

5        Q.    Okay.  When you had the discussions with

6   them about creating the new document, did you ask

7   them about their involvement in the first Harvard

8   presentation materials?

9        A.    Yeah.  Yeah.

10        Q.    Okay.  And what do you recall about that?

11        A.    I don't.  I really don't.

12        Q.    And you don't recall one way or another if

13   any of them said, yes, I worked on that section?

14        A.    Oh, no, huh-uh.

15        Q.    Okay.  All right.  We were talking about

16   this Section Number 18 and 19.  What would you

17   categorize as the next section?  I guess that's --

18   that was Page 18.  So Page 19, what would we call

19   this section?

20        A.    Again, like, this is a part of -- when

21   you -- Pages 19 and 20 should really go with the

22   Faith Summit on Poverty information.  So there's,

23   again, a break.

24        Q.    Pages 19 and 20 should be part of the Faith

25   Summit on Poverty information?

1      Q.    And you told me that you proofed it and you
2  were happy with the content in it, correct?
3      A.    Content, yeah.
4      Q.    Okay.  If you'll look under Article Two on
5  the first line.  Page 16, if that will help you.
6      A.    Page 16?
7      Q.    Yes, sir.
8      A.    Right.
9      Q.    Article Two.
10     A.    Two, yeah.
11     Q.    "The poor have an opportunity -- or the
12  poor have a right to a public policy agenda that
13  invest in human beings.  Too this end" -- the word
14  "to" is misspelled, isn't it?
15     A.    Right.
16     Q.    Is that your bad?
17     A.    My bad.
18     Q.    All right.  So you were responsible for at
19  least one of the typographical errors contained in
20  the publication?
21     A.    In terms of what was given to my former
22  assistant, yes.
23     Q.    Okay.  Where else has this Bill of Rights
24  for the Poor been printed or published?
25              MS. JOHNSON:  Object to relevance.

```
 1    Rights for the Poor, when you took those materials
 2    which you had -- which you had used or prepared for a
 3    previous presentation, the Faith Summit, did you
 4    change or modify them before submitting them to be
 5    included in the publication for the Harvard
 6    presentation?
 7         A.   No.
 8         Q.   Earlier when I asked you about
 9    Friendship-West Baptist Church, I -- do you consider
10    Friendship-West Baptist Church to be a black church?
11                   MS. JOHNSON:  Asked and answered;
12    object.
13         A.   There are traditions of the church that are
14    in line with the black church tradition.
15         Q.   (By Mr. Lewis)  Okay.  In what way?
16         A.   There are certain customs that reflect a
17    tradition that, you know, came up, you know, through
18    slavery as endured -- endured racism and ministry
19    to -- you know, Christ referred to as the least of
20    these, the marginalized, and that has been a priority
21    emphasis, you know, for us which is a part of the
22    black church tradition.
23         Q.   Well, does Friendship-West have as a focus
24    of its ministry, ministry to the black community?
25                   MS. JOHNSON:  Object, asked -- already
```

1      MS. JOHNSON:  Object, asked and

2   answered.

3      A.   First of all, as I said earlier, we're all

4   over the D/FW Metroplex.  And secondly, our church

5   grows at a phenomenal rate; and as a consequence, I'm

6   not keeping up with, you know, where everybody lives

7   when we have, you know, 50 to 100 people join every

8   Sunday.

9      Q.   (By Mr. Lewis)  The 50 to 100 people that

10   join every Sunday, are they predominantly

11   African-American?

12      A.   Yes.

13      Q.   Okay.  And when you, as the minister, stand

14   up at the pulpit and look out over the congregation,

15   are the majority of the faces that you see, are they

16   of African-American descent?

17      A.   Probably.

18      MS. JOHNSON:  Object, asked and

19   answered.

20      Q.   (By Mr. Lewis)  So wouldn't you agree that

21   the community in which Friendship-West Baptist -- or

22   that the church itself of Friendship-West is

23   predominantly black?

24      MS. JOHNSON:  Object, already asked

25   and answered.

```
 1          A.    Probably.

 2          Q.    (By Mr. Lewis)   In fact, on your

 3   organizational chart, if you'll turn with me to

 4   Page -- I don't know what page number it is since

 5   they're not numbered.  The one that's titled Men's

 6   Community, so I'm going to guess it's about 38, 30,

 7   maybe 40.

 8          A.    Okay.

 9          Q.    That page that says Men's Community.

10          A.    Uh-huh.

11          Q.    What is Operation B.L.A.C.C.?

12          A.    Brothers Leading and Loving the

13   African-American Church and Community.

14          Q.    When you say the African-American church,

15   what are you referring to?

16          A.    The African-American church.

17          Q.    What is the African-American church as

18   opposed to the church?

19                MS. JOHNSON:   Object to being asked

20   and already answered.

21          A.    It's a part of the church that has a

22   certain cultural dynamic.

23          Q.    (By Mr. Lewis)   Would it consist of those

24   members of the church that are African-American?

25          A.    Yeah.
```

1     Q.    But the name of the operation has not been

2    changed to reflect that it applies to people other

3    than black men, has it?

4     A.    No.

5     Q.    And when you said the black church when you

6    talked about Operation B.L.A.C.C., what is the black

7    church?

8          MS. JOHNSON:  Object, already asked

9    and answered.

10    Q.    (By Mr. Lewis)  Is it just the church that

11   appeals to a certain cultural dynamic, or is there a

12   different doctorate associated with the black church

13   than other -- the church as a whole?

14    A.    I mean, there's a cultural dynamic, without

15   question, because, again, it comes from a tradition

16   that's been handed down.  But that tradition is not

17   limited to, quote, unquote, black people.

18    Q.    You have characterized yourself as a mentee

19   of Reverend Jeremiah Wright; is that correct?

20    A.    Correct.

21    Q.    And when you use that term "mentee," what

22   are you referring to?

23    A.    I'm a protege of him.  I've learned -- I've

24   been a student of his ministry, and I have a

25   relationship with him that is, you know, as if an

117

1    adopted father -- adopted son to adopted father.

2       Q.   Does Friendship-West Baptist Church, does

3    it consider that its ministry is similar to

4    Dr. Jeremiah Wright's ministry in the Trinity Church

5    in Chicago?

6             MS. JOHNSON:   Object to relevance.

7       A.   No, we're in a different context.

8       Q.   (By Mr. Lewis)   Okay.  In what way are you

9    a different context?

10      A.   Chicago and Dallas are totally different

11   dynamics, and the culture of Chicago is different

12   than the culture of Dallas.  The needs of Dallas are

13   different from the needs of Chicago, so my approach

14   to ministry is not to copy, you know, from someone

15   else, but to be true to what I'm called to do.

16      Q.   I didn't mean to ask that as if you're

17   copying his ministry.  What I mean is, would you

18   agree that the focus of the Trinity West Church in

19   Chicago is a black-focused church?  It's a church

20   focused on the needs of the black community?

21      A.    It's the -- it's a church focused on the

22   needs of the community where it resides, where it

23   serves.

24      Q.   And the community where it resides and

25   serves is a predominantly black community?

```
 1   it then be offensive to you?
 2                MS. JOHNSON:  Object to speculation,
 3   along with relevancy and form, and outside the scope
 4   of discovery.
 5        Q.   (By Mr. Lewis)  Let me ask it this way.
 6   B.L.A.C.C. -- that ministry Operation B.L.A.C.C.
 7   stands for Brothers Leading and Loving the
 8   African-American Church and Community.  If another
 9   church had a ministry that was called Operation,
10   whatever the letters are, which stands for Brothers
11   Leading and Loving the Anglo-American Church and
12   Community, would you feel like that was racist?
13                MS. JOHNSON:  Object to speculation.
14        A.   I mean, that's a funny question.  That's
15   like would I be against the National Association for
16   the Advancement of White People.  I mean, the history
17   of this country dictates an NAACP.  The history of
18   this country dictates the need of an Operation
19   B.L.A.C.C.                                          '
20        Q.   (By Mr. Lewis)  What do you mean by that?
21        A.   Racism, current and past, has put certain
22   burdens and even discriminatory blocks, as it were,
23   hindering the advancement of black males, in
24   particular.  And so we have a specific ministry
25   that's designed to address that.  Is it limited to
```

```
 1   that?  No.  But is there a focus?  Yes.

 2        Q.    Okay.  So is it okay, then, because of past

 3   discrimination against African-Americans for

 4   African-Americans to now discriminate against other

 5   races as a means of rectifying the past

 6   discrimination?

 7        A.    So discrimination, then, is being pro --

 8   if     I don't see discrimination as being affirming

 9   in a positive fashion with positive redresses in

10   ministries those who have been denied and

11   discriminated against.  That's simply affirming and

12   lifting up those who have been down.

13        Q.    But does it not exclude --

14        A.    No.

15        Q.    -- people -- other people or other races?

16        A.    No.

17             MS. JOHNSON:  Object to speculation.

18        A.    No.

19             MS. JOHNSON:  Outside the scope of

20   discovery.

21        A.    Not at all.  And that's why we had at our

22   last worship, for all male worship we had white men

23   and Hispanic men.  Evidently they don't feel

24   excluded.

25        Q.    (By Mr. Lewis)  Well, but to be -- but to
```

1    call something Operation B.L.A.C.C. and refer to the

2    African-American church and the African-American

3    community, that's not race neutral, is it?

4         A.    No, nor is the NAACP.

5              MS. JOHNSON:  Object --

6         A.    But white people helped form the NAACP.

7    White people are part of the NAACP.

8              MS. JOHNSON:  Object to that question

9    in terms of speculation, outside the scope of

10   discovery and also irrelevant and also to form.

11             MR. LEWIS:  Okay.  I object to the

12   answer as being nonresponsive.

13        Q.    (By Mr. Lewis)  My question --

14             MS. JOHNSON:  We object that the

15   answer was responsive.

16        Q.    (By Mr. Lewis)  My question is, having an

17   organization called Brothers Leading and Loving the

18   African-American Church and Community, do you feel

19   like that is race neutral?

20             MS. JOHNSON:  We object, already asked

21   and answered at least three or four, five times;

22   object.

23        A.    Yeah, I've answered that.

24        Q.    (By Mr. Lewis)  No, you told me about the

25   NAACP.  You didn't tell me whether or not you feel

```
 1                  Okay.   What is The Empowerment
 2  Experiment?
 3                  MS. JOHNSON:  Object to relevancy and
 4  form; outside the scope of discovery.
 5       A.    A couple in Chicago, the Andersons, began
 6  last year an educational effort about black
 7  businesses whereby they made a commitment to shop
 8  only at black operated and owned establishments for
 9  an entire year, and in so doing, again, they sought
10  to educate the black community, in particular, and
11  the nation, in general, about black businesses and
12  our need for supporting them.
13       Q.    (By Mr. Lewis)  Okay.  And what, if any,
14  was your affiliation with The Empowerment Experiment?
15                  MS. JOHNSON:  Object to relevancy and
16  form; outside the scope of discovery.
17       A.    When I met the Andersons, they asked --
18  they shared the vision with me.  And after they had
19  started, they asked me to serve in an advisory
20  capacity.
21       Q.    (By Mr. Lewis)  And did you consent to do
22  that?
23       A.    I did.
24       Q.    And in your advisory capacity, what were
25  your duties?
```

```
 1              MS. JOHNSON:  Object to relevancy and
 2   form; outside the scope of discovery.
 3        A.    They just asked -- I mean, again,
 4   advisory.  Just advice, guidance when requested.
 5        Q.    (By Mr. Lewis)  And on -- do you
 6   remember -- recall any specific instances in which
 7   you were requested to provide advice?
 8              MS. JOHNSON:  Object to relevancy and
 9   form; outside the scope of discovery.
10        A.    Yes.
11        Q.    (By Mr. Lewis)  Okay.  And what were those
12   instances?
13              MS. JOHNSON:  Object to relevancy and
14   form.
15        A.    Well, basically they shared the vision with
16   me for the project, and they also asked could, you
17   know, one of them or both of them come to Dallas in
18   order to have a weekend of sharing and educating the
19   community about The Empowerment Experiment.
20        Q.    (By Mr. Lewis)  And did you think that that
21   was a good idea?
22              MS. JOHNSON:  Object to speculation;
23   relevancy and form.
24        A.    Yes.
25        Q.    (By Mr. Lewis)  And did they come to Dallas
```

1    Q.   (By Mr. Lewis)  And let me show you what's

2    been marked as Exhibit Number 3.  I'm going to ask

3    you if you can identify what that is?

4    A.   I would imagine it's from their website.

5    Q.   Okay.  Have you ever seen their website?

6    A.   No, I haven't.

7    Q.   But did you authorize the Andersons to list

8    you as a person who was an advisor to The Empowerment

9    Experiment?

10        MS. JOHNSON:  Object to relevancy and

11   form.

12   A.   Yes.

13        (Deposition Exhibit 4 was marked.)

14   Q.   (By Mr. Lewis)  Let me show you what has

15   been marked as Exhibit Number 4.  And I'll represent

16   to you this is also from The Empowerment Experiment

17   website.  And that lists you as the executive

18   advisor, community empowerment and economic

19   justice --

20        MS. JOHNSON:  Object to form.

21   Q.   (By Mr. Lewis)  -- as your title, correct?

22        MS. JOHNSON:  Object to form.

23   A.   I see that, yes.

24   Q.   (By Mr. Lewis)  Okay.  And you authorized

25   them to include you and biographical information

1    about you on their website?

2       A.   Yes.

3            MS. JOHNSON:  Object to relevancy and

4    form.

5      Q.   (By Mr. Lewis)  And that is because you

6    believe in and endorse the efforts of The Empowerment

7    Experiment?

8            MS. JOHNSON:  Object to relevancy and

9    form.

10     A.   Yes.

11     Q.   (By Mr. Lewis)  And, in fact, you allowed

12   The Empowerment Experiment to be publicly endorsed at

13   Friendship-West Baptist Church?

14           MS. JOHNSON:  Object to relevancy and

15   form.

16     A.   Explain, yes.

17     Q.   (By Mr. Lewis)  Well, did you encourage

18   members of Friendship-West Baptist Church to support

19   the ideas behind The Empowerment Experiment?

20           MS. JOHNSON:  Object to relevancy and

21   form.

22     A.   I mean, in that I allowed her to speak and,

23   you know, encouraged the people to pray for what

24   they're doing, yes.

25           (Deposition Exhibit 5 was marked.)

1    micromanager, so I can't say -- no.

2        Q.    (By Mr. Lewis)   Well, would that fall under

3    the jurisdiction of Tonya Neal as the director of

4    communications?

5                    MS. JOHNSON:  Objection, form.

6        A.    Yeah.

7        Q.    (By Mr. Lewis)   Okay.  And so you would

8    expect that Tonya Neal would approve the content that

9    goes on the Friendship-West Baptist Church website?

10       A.    She's one of the persons --

11                   MS. JOHNSON:  Object to speculation.

12       A.    -- yeah.

13       Q.    (By Mr. Lewis)   Who else besides Tonya

14   Neal?

15                   MS. JOHNSON:  Object to speculation

16   and form.

17       A.    I mean, whoever she works with.

18       Q.    (By Mr. Lewis)   Well, if there's a

19   philosophy of someone is responsible for that

20   content -- ultimately responsible for what's on

21   there, who is it that's ultimately responsible for

22   the content on the website?

23                   MS. JOHNSON:  Object to form.

24       A.    Probably Tonya.

25       Q.    (By Mr. Lewis)   Now, on The Empowerment

LAURIE PURDY REPORTING SERVICE, INC.
PHONE/FAX    817-461-1716

1      Experiment where it says -- on Exhibit -- let's go

2      back.  What was it    Exhibit Number    I believe.

3      Now, on the left-hand side, like in the little margin

4      it says, What Was Our Experiment.  For the

5      empowerment experiment, the Anderson family publicly

6      committed to live off of black business for one year,

7      correct?

8              A.    Yes.

9                    MS. JOHNSON:  Object to form.

10             Q.    (By Mr. Lewis)  Is that, in your opinion, a

11     race neutral experiment?

12                   MS. JOHNSON:  Object to speculation

13     and form and relevancy.

14             A.    Is it race neutral?  No.

15             Q.    (By Mr. Lewis)  Okay.  Is it discriminatory

16     against nonblack businesses?

17                   MS  JOHNSON:  Object to speculation.

18             A.    No.

19                   MS. JOHNSON:  Also, object to form;

20     relevancy.

21             Q.    (By Mr. Lewis)  So promising only to buy

22     from black businesses is not discriminatory against

23     nonblack businesses --

24                   MS. JOHNSON:  Object --

25             Q.    (By Mr. Lewis)  -- in your opinion?

1          A.    No.   It's affirming black businesses.

2                    MS. JOHNSON:  Excuse me.   Hold on one

3    second.

4                    THE WITNESS:  I'm sorry.

5                    MS. JOHNSON:  Object to relevancy and

6    form and speculation.

7          Q.    (By Mr. Lewis)   Well, if I wanted to have a

8    policy where I would only buy from white businesses,

9    would that be discriminatory against black

10   businesses?

11                   MS. JOHNSON:   Object to speculation --

12         A.    That's the history of this nation.

13                   MS. JOHNSON:   -- and form.

14                   Hold on.   Make sure to let me get my

15   objection in before you start answering.

16                   Object to speculation and form and

17   relevancy.

18         Q.    (By Mr. Lewis)   And when you say it's the

19   history of this nation, you feel like that is a

20   discriminatory history?

21                   MS. JOHNSON:   Object to speculation --

22         A.    Yeah.

23                   MS. JOHNSON:   -- and form and

24   relevancy.

25         Q.    (By Mr. Lewis)   And if I had a policy of

LAURIE PURDY REPORTING SERVICE,  INC.
PHONE/FAX   817-461-1716

Appx 148

1    only -- if I owned a business and I had a policy of

2    only hiring white people to work in my white

3    business, would that be discriminatory against

4    blacks?

5                    MS. JOHNSON:   Object to speculation;

6    form and relevancy.

7         A.   Yes.

8         Q.   (By Mr. Lewis)   But would it be okay

9    because it is affirming whites?

10                   MS. JOHNSON:   Object to speculation;

11   form and relevancy.

12        A.   I mean, you're affirming people who have

13   been on top since the inception of the country, so

14   why is there affirmation needed?

15        Q.   (By Mr. Lewis)   Okay.   So whether or not

16   something is discriminatory in your mind depends upon

17   whether or not the group that's being affirmed is on

18   top or on bottom?

19                   MS. JOHNSON:   Object to speculation;

20   form and relevancy.

21        A.   It depends on if they've been impacted by

22   the legacy of racism in this country.

23        Q.   (By Mr. Lewis)   So since blacks have been

24   impacted by the legacy of discrimination, it's --

25   when blacks do something that is not race neutral and

1  focuses solely on blacks, are you saying that's not
2  discriminatory; that's affirming?
3          MS. JOHNSON:  Object to relevancy;
4  also, object to form; also, object to speculation and
5  outside the scope of discovery.
6      A.    Yeah.  Yeah.  Affirmative action, yeah.
7      Q.    (By Mr. Lewis)  Okay.  And so if the
8  Friendship-West Baptist Church wants to have a policy
9  of only hiring black employees, you do not feel
10  that's discriminatory?
11          MS. JOHNSON:  Object to relevancy;
12  also object to form; also object to speculation.
13      A.    Well, we don't, so that's not an issue.
14      Q.    (By Mr. Lewis)  Okay.  Well, my question --
15          MR. LEWIS:  I object, nonresponsive.
16      Q.    (By Mr. Lewis)  My question is --
17          MS. JOHNSON:  Object.  It is
18  responsive.
19      Q.    (By Mr. Lewis)  If Friendship-West wants to
20  have a policy or course of conduct of preferring
21  black employees over people of other races, do you
22  feel like that is discriminatory?
23          MS. JOHNSON:  Object to speculation;
24  form and relevancy.  I was trying to make sure you
25  were through with your question before I got it out.

1   Friendship-West Baptist Church, other than some

2   housekeeping -- a lady that we saw mentioned in

3   housekeeping --

4        A.   She's not the only one.

5        Q.   Okay.  When you say she's not the only one,

6   you mean the only one in housekeeping?

7        A.   Uh-huh.

8        Q.   Other than housekeeping staff, is there

9   anybody currently employed at Friendship-West Baptist

10  Church who you do not believe is at least a portion

11  of African-American descent?

12       A.   Phrased that way, I guess not.

13       Q.   Do you know how many people in total are

14  employed at Friendship-West Baptist Church at this

15  time?

16       A.   No.

17       Q.   Would that answer -- let me ask the same

18  question but for the time period in which Elizabeth

19  Payne worked at Friendship-West.  Other than

20  housekeeping staff, was there anybody employed by

21  Friendship-West Baptist Church at the time Elizabeth

22  Payne was employed there who you did not believe was

23  at least of partial African-American descent?

24       A.   No.  No.

25       Q.   And I want to make sure I understand.  Is

 1   it your testimony that having programs or policies at

 2   the church which seek to affirm blacks is not

 3   discriminatory even if it involves excluding other

 4   races like The Empowerment Experiment?

 5                  MS. JOHNSON:  Object to being asked

 6   and answered; irrelevant; also, object to form; also,

 7   object to speculation.

 8        A.   Again, based on the history of this

 9   country, no.

10        Q.   (By Mr. Lewis)  You were -- at one time you

11   applied for the presidency of the NAACP; is that

12   correct?

13                  MS. JOHNSON:  Object to relevancy and

14   form.

15        A.   Yes.  They asked me to apply.

16        Q.   (By Mr. Lewis)  And who was it that asked

17   you to apply for that position?

18                  MS. JOHNSON:  Object to relevancy and

19   form.

20        A.   They had a search committee.

21        Q.   (By Mr. Lewis)  And what had your

22   affiliation been with the NAACP prior to that time?

23                  MS. JOHNSON:  Object to relevancy and

24   form.

25        A.   I was a member.

1      Q.   Okay.  Did you offer her the job at that

2   time?

3      A.   If it wasn't then, it was shortly

4   thereafter.

5      Q.   At any time in this process, did you and

6   Liz Moffitt have any discussions about the fact that

7   Elizabeth Payne was not of African-American descent?

8      A.   No, I don't recall a conversation like

9   that, no.

10      Q.   Okay.  Did you have a conversation with

11   anyone else about your thoughts or their thoughts on

12   hiring someone for this position who was not of

13   African-American descent?

14      A.   Yeah.  Yeah.

15      Q.   And who was that?

16      A.   Probably one of my colleagues.

17      Q.   Who do you believe that was?

18      A.   I mean, it could have been a number of

19   people.  I mean, it could have been a number of

20   people.

21      Q.   What do you recall about that conversation?

22      A.   Well, I mean, the fact is, I was going to

23   hire her.  And, you know, in light of how close, you

24   know, she was going to be to me, you know, how could

25   I best make sure that the orientation process and the

1    assimilation process was as smooth as possible.

2        Q.    The orientation process and the

3    assimilation process?

4        A.    And really assimilation process.

5        Q.    Okay.  When you say "assimilation process,"

6    what do you mean by that?

7        A.    Well, this would have been the first time

8    that I had a non-African-American in my office that

9    close.

10        Q.    All right.  And who was it -- or in what

11    ways would she need to assimilate differently because

12    of the fact she was not of African-American descent?

13        A.    Pardon me?

14        Q.    In what ways was assimilation going to be

15    different or complicated because of the fact she was

16    not of African-American descent?

17        A.    I mean, it was just new.  That's all.

18        Q.    Okay.  Well, what was your concern about

19    the assimilation process in relationship to her not

20    being of African-American descent?

21        A.    Again, the fact that it would be new and it

22    would be my office.  And any time we do something

23    that's new, you know, at the church, there is an

24    education curve that we allow for to make sure that

25    the -- whatever is new is going to be as warmly

1  received as possible.

2      Q.    Okay.  So were you, then, concerned that

3  some other people on the staff might not warmly

4  receive the idea of a non-African-American having

5  this position as your assistant?

6                MS. JOHNSON:  Object to speculation.

7      A.    No, I wouldn't say that, no.

8      Q.    (By Mr. Lewis)  Well, you just said you

9  were -- that because this was new, you wanted to make

10  sure it was going to be warmly received.

11      A.    Right.

12      Q.    And --

13      A.    But I also said whenever I do something

14  new, there is an educational curve that, you know,

15  accompanies whatever I do that's new.

16      Q.    But what was new about Elizabeth was the

17  fact that she was not of African-American descent?

18      A.    Right.

19      Q.    And so you felt like that might possibly be

20  an issue that someone may not warmly receive in the

21  office?

22                MS. JOHNSON:  Object to speculation

23  and form.

24      A.    No.  I felt that in keeping with my policy

25  of giving an educational curve when I do something

```
 1   okay, we want to let you know, we're going to hire
 2   someone who's not white; there's going to be a
 3   learning curve; I want you all to cooperate with
 4   them; would you feel like that was discriminatory or
 5   race neutral?
 6                 MS. JOHNSON:  Object to speculation;
 7   form; irrelevancy.
 8       A.   No.  I'd welcome it.
 9       Q.   (By Mr. Lewis)  In response to that, did
10   anybody that you spoke to indicate any hesitation or
11   reservation about a non-African-American being hired?
12       A.   No.
13       Q.   Did you speak to your mentor,
14   Reverend Wright, about the fact that you were
15   considering hiring a non-African-American for this
16   position?
17                 MS. JOHNSON:  Object to form;
18   relevancy and speculation.
19       A.   Probably.
20       Q.   (By Mr. Lewis)  Okay.  What, if anything,
21   do you recall about that conversation?
22                 MS. JOHNSON:  Object to relevancy and
23   form.
24       A.   I mean, I got from him what I got from all
25   of the colleagues I consulted with and that is --
```

```
 1   well, let me just say this.  Consistently across the
 2   board, because I don't remember specific
 3   conversations, what I do remember is that everyone
 4   said can she do the job, and next, since this is the
 5   first time that you've ever done this, then you make
 6   sure that you inform the people up front so that she
 7   just doesn't show up one day at the office and people
 8   are taken aback.
 9       Q.   (By Mr. Lewis)  Why do you feel like people
10   would be taken aback by a non-African-American?
11       A.   I didn't say -- I didn't say that.  I said
12   that's what that was the consistent counsel I
13   received.
14              MS. JOHNSON:  Object to speculation
15   and form.
16       Q.   (By Mr. Lewis)  And is that the counsel you
17   received from Reverend Wright?
18              MS. JOHNSON:  Object to speculation
19   and form and relevancy.
20       A.   Again, I don't recall.
21       Q.   (By Mr. Lewis)  But in any event, you felt
22   like because this was something new and different,
23   that you were hiring someone who was not
24   African-American, you needed to bring the subject up
25   with the staff in the office as well as your mentor,
```

1   Reverend Wright?

2                    MS. JOHNSON:   Object to relevancy and

3   form.

4        A.    And my colleagues in ministry.

5        Q.    (By Mr. Lewis)   And your colleagues in

6   ministry; is that right?

7        A.    Uh-huh.

8        Q.    Okay.  Do you recall approximately when

9   Elizabeth Payne began as your assistant?

10       A.    January of, I guess, '08.

11       Q.    2008.  And her employment with you or with

12   Friendship-West Baptist Church ended in August of

13   2008?

14       A.    The end of July, yeah.

15       Q.    The end of July, first of August, correct?

16       A.    (Witness nods head.)

17                    MS. JOHNSON:   You've got to speak up.

18       Q.    (By Mr. Lewis)   Do you recall if it was the

19   end of July or the first of August?

20       A.    I mean, it was right in there, end of July,

21   first of August.

22       Q.    So she worked for Friendship-West Baptist

23   Church approximately seven months, correct?

24       A.    Yes.

25       Q.    When she first began working there in

1  church for my anniversary, and -- which is in April.

2  And we established that only certain people would

3  speak to the media during this time.  And she spoke

4  to the media, which was, again, unacceptable and

5  beyond her line -- beyond her lines and boundaries of

6  responsibility.

7       Q.   Okay.  Anything else?

8       A.   That's -- that's -- those are the big ones.

9       Q.   Okay.  Well, I don't want just the big

10 ones.  I want if there's any little ones that

11 contributed.

12      A.   I mean, I really don't recall.  I've moved

13 on, so --

14      Q.   Okay.  Well, first, let's talk about are

15 there any -- so I want to look at my notes.  I've got

16 that you have identified as her reasons for

17 termination, the Harvard document, problems with the

18 Harvard document, correct?

19      A.   Correct.

20      Q.   Misspellings with appointment folders?

21      A.   Correct.

22      Q.   Calendar entries containing misspellings?

23      A.   Correct.

24      Q.   Not checking with you on Sundays in between

25 services?

1          A.   Correct.

2          Q.   Not answering her cell phone between 8:00

3    and 5:00 --

4          A.   Correct.

5          Q.   -- on weekdays when you would call?

6          A.   Correct.

7          Q.   Not -- being absent from work on Mondays?

8          A.   Correct.

9          Q.   Not attending the P-A-L-S, PALS leadership

10   meetings?

11         A.   Correct.

12         Q.   Using your name to get personal things

13   done?

14         A.   Right.

15         Q.   And speaking to the media during

16   Reverend Wright's visit during April of 2008?

17         A.   It was around that time, yeah.

18         Q.   Is there anything else that was a reason

19   for her termination?

20         A.   I mean, those are the reasons.

21         Q.   Okay.  There's nothing else you can think

22   of?

23         A.   Not off the top of my head, no.

24         Q.   Okay.  Let's -- we've talked a little bit

25   about the Harvard document and the spelling errors.

```
 1        A.    Right.
 2        Q.    It was about several appointment folders?
 3        A.    Right.
 4        Q.    Okay.  Do you recall what the names were
 5   that were involved?
 6        A.    No.
 7        Q.    Do you recall approximately when this was
 8   that you spoke to Liz Moffitt about it?
 9        A.    I don't know.
10        Q.    Was it early in Elizabeth Payne's
11   employment with Friendship-West Baptist Church, or
12   was it towards the end?
13        A.    It was probably in the first three months.
14        Q.    Okay.  After you spoke to Liz Moffitt about
15   this one time in the first three months, did the
16   problem continue?
17        A.    Yes.
18        Q.    Did you -- did you let Liz Moffitt know
19   that the problem was continuing?
20        A.    No.
21        Q.    Did you tell Elizabeth Payne that the
22   problem was continuing?
23        A.    Yes.
24        Q.    Did you tell her this orally or in writing?
25        A.    Orally.
```

1      Q.    Did you document it in any way that there

2    was a performance problem with regard to these

3    appointment folders?

4      A.    No.

5      Q.    When you spoke to Liz about it, how much

6    later was it after the time in which you had

7    previously spoke to Liz Moffitt about it?

8      A.    I don't know.

9              MS. JOHNSON:   Object to vague.

10      Q.    (By Mr. Lewis)  You spoke to Liz Moffitt in

11    the first couple of months?

12      A.    Right.

13      Q.    How much in proximity in time after that

14    was it that you spoke to Liz Payne about it that it

15    was continued?

16      A.    Again, I don't recall.

17      Q.    Well, was it close to the end of her

18    employment, or was it --

19      A.    Maybe the middle.  I don't recall.

20      Q.    When you spoke to her about it, how did she

21    respond?

22      A.    I mean, she was always very apologetic and

23    willing to, you know, make changes.

24      Q.    Did it get any better after you spoke to

25    her about it?

1    A.    Not to me, no.

2    Q.    On how many instances did it continue to

3  occur after you spoke to her about it?

4    A.    Oh, I didn't count.   I don't know.

5    Q.    Well, are we talking one time, two times or

6  20 times?

7            MS. JOHNSON:   Object to asked and

8  answered.

9    A.    I didn't count.   I didn't count.   I was

10  frustrated, and I just went on about my business.

11    Q.    (By Mr. Lewis)   Well, every time it would

12  occur after that, would you speak to her about it?

13    A.    No.

14    Q.    When you did speak to her about it, though,

15  her attitude was good and she indicated that she

16  wanted to try to fix the problem?

17    A.    Yes.

18    Q.    Can you remember any specific names or

19  instances where there was a problem with the

20  misspelling on the appointment folder?

21    A.    No.

22    Q.    Do you have any specific recollections of

23  how that led to an embarrassing moment where you

24  called someone by the wrong name?

25    A.    That's exactly what happened.   I called

1  them and it was not -- that was not their name, just

2  put it that way.

3      Q.    How far off was it?  Did you call someone

4  Jones whose name was Smith, or are we talking about a

5  pronunciation of a name issue?

6      A.    I pronounced it wrong because it was

7  spelled wrong.

8      Q.    But how big of a -- how big of a

9  pronunciation difference are we talking?

10     A.    I mean, enough for them to correct me.

11     Q.    Okay.  And you don't have any recollection

12 of that instance of what their name really was versus

13 what you called them?

14     A.    No.

15     Q.    And you don't have any recollection of how

16 many occurrences or occasions that happened?

17     A.    No.

18     Q.    Putting things on your calendar.  Do you

19 have copies, any documents that show those calendars

20 where the entries are misspelled?

21     A.    It was on my BlackBerry calendar.

22     Q.    Is that something you can print out?

23     A.    No.

24     Q.    Okay.  Can you give me any specific

25 instances of something being misspelled on your

1   calendar?

2      A.   No.

3      Q.   Can you tell me how many instances on which

4   that occurred?

5      A.   Several.

6      Q.   Are we talking more than 10, less than 10?

7      A.   In that neighborhood, I guess.

8      Q.   Can you tell me when that occurred in the

9   course of her employment at Friendship-West Baptist

10   Church?

11      A.   The duration.

12      Q.   It continued up until the time of her

13   termination?

14      A.   Correct.

15      Q.   What kinds of misspellings are we referring

16   to?

17      A.   Streets, church names, even the names of

18   the pastors where I preach.

19      Q.   The name of the pastor of the church where

20   you were going to be preaching?

21      A.   Right.

22      ·Q.   And was that a situation where you went to

23   the church and you didn't know the pastor prior to

24   getting there?

25      A.   Oh, no, no.  So it -- no.

1   problem if you were depending on an address in an

2   unfamiliar place.  Did it ever -- did that ever

3   occur, to your recollection?

4        A.   Not that I recall.

5        Q.   Okay.  Do you consider yourself a

6   perfectionist about spelling?

7        A.   I mean, you know, my mother is an English

8   teacher, so probably.

9        Q.   All right.  These spelling mistakes, would

10  they be in regard to a street name that is an unusual

11  name?

12       A.   No.

13       Q.   Okay.  Or a foreign-sounding name?

14       A.   No.

15       Q.   So you're saying it would be things like

16  she would misspell Main Street?

17       A.   Well, I doubt if she ever did that.

18       Q.   Okay.  Can you give me an example?

19       A.   I really can't.

20       Q.   All right.  On the Sundays where she didn't

21  check with you in between services, you said when

22  that happened early in her employment, you mentioned

23  it to her?

24       A.   (Witness nods head.)

25       Q.   And when you mentioned it to her, did she

```
 1    exhibit a good attitude about it, that she would try
 2    to fix that?
 3         A.    Oh, yeah.
 4         Q.    And then did she after that fix it?
 5         A.    No.
 6         Q.    It continued?
 7         A.    Right.
 8         Q.    And then you never mentioned it to her
 9    again?
10         A.    (Witness shakes head.)
11         Q.    Is that a "no"?
12         A.    Right.  No, I did not.
13         Q.    Did you send her any e-mails about it?
14         A.    No.
15         Q.    Did you ever talk to Liz Moffitt about
16    counseling her about that?
17         A.    I don't think so.
18         Q.    Is there any document we can look at to
19    determine on how many occasions that occurred, that
20    she didn't check with you between services?
21         A.    Well, she did it twice during her tenure,
22    so
23         Q.    So she only did it twice?  Every other
24    Sunday, she did not do it?
25         A.    Right.  I mean, she wasn't there.
```

1    Q.   And you specifically told her that that was

2  a part of her job to check with you?

3    A.   That was a part of the orientation, yeah.

4    Q.   If you'll look at Exhibit Number 6 on the

5  candidate checklist, what does it say are the work

6  hours?

7    A.   8:00 to 5:00, Monday through Friday.

8    Q.   Okay.  So checking with you on a Sunday in

9  between service    services is not listed on the work

10  hours as they are set forth on Exhibit Number 6, is

11  it?

12    A.   Not on here, no.

13    Q.   Is it documented anywhere that she did not

14  check with you on Sundays in between services?

15    A.   Liz Moffitt would have that information.  I

16  did not document it.

17    Q.   Okay.  To your knowledge, if there is

18  information, Liz Moffitt would have it?

19    A.   Right.

20    Q.   Are you saying that you specifically know

21  that Liz Moffitt does have some information?

22    A.   No.  I'm just saying   don't have that

23  information.

24    Q.   Okay.  Is it documented anywhere that it

25  was part of her job to check with you on Sundays in

1 between services?

2     A.   Again, I'm not sure.  I'm not sure.  It was

3 a part of our initial discussion between she and I

4 our personal orientation.  Liz Moffitt made that

5 clear during her orientation and during the interview

6 process.

7     Q.   And you were present when Liz -- when

8 you're saying Liz Moffitt made that clear?

9     A.   Yes.

10     Q.   But it was not put on the candidate

11 checklist as for her employment?

12     A.   It was not on here (indicating).

13     Q.   Okay.  Is it in the job description

14 anywhere that is the second page of Exhibit Number 6

15 that they will need to check with you on Sundays in

16 between services?

17     A.   No.

18     Q.   Does the job description indicate anywhere

19 that it is a requirement of the position that the

20 person be a member of Friendship-West Baptist Church?

21     A.   No.

22     Q.   Was that a requirement?

23     A.   No.

24     Q.   Was it okay for her, then, to be a member

25 of a different church?

1  that they would be available to personally check with

2  you between services?

3      A.   No.

4      Q.   With regard to her not answering the phone

5  between 8:00 a.m. and 5:00 p.m. on weekdays, on how

6  many occasions was that a problem?

7      A.   Oh, I don't know.

8      Q.   Was that a problem that -- or when in time

9  did that problem occur in relationship to her hiring

10 in January and her termination at the end of July?

11     A.   I mean, it was    it was a problem probably

12 from February on.

13     Q.   From February, and you're saying it

14 continued into July?

15     A.   Yes.

16     Q.   Okay.  Is it documented anywhere that she

17 failed to answer your phone calls?

18     A.   No.

19     Q.   Did you ever send her an e-mail about that?

20     A.   No.

21     Q.   Did you ever send an e-mail to Liz Moffitt

22 or anyone else asking them to counsel or take action

23 about her not answering the phone?

24     A.   I believe I spoke with Liz Moffitt.

25     Q.   You believe that was orally?

1    A.    Yes.

2    Q.    Okay.  Are you aware of any written

3  documentation anywhere about your complaint that she

4  was not answering the phone between 8:00 and 5:00?

5    A.    No.

6    Q.    And did you ever give to Elizabeth a

7  written warning or job counseling about she needed to

8  answer the phone between 8:00 and 5:00?

9    A.    I mean, I told her verbally.

10              MR. LEWIS:  Objection, nonresponsive.

11   Q.    (By Mr. Lewis)  Did you ever give to her --

12              MS. JOHNSON:  Object, it was

13  responsive.

14   Q.    (By Mr. Lewis)  My question was, did you

15  ever give to her a written --

16   A.    No.

17   Q.    -- warning or job counseling about that?

18   A.    Not written, no.

19   Q.    Okay.  With regard to her not being present

20  on some Mondays, do you have any documentation of

21  which Mondays it was she was not present?

22   A.    No.

23   Q.    Does the church maintain any kind of

24  employee attendance system that documents when

25  people

LAURIE PURDY REPORTING SERVICE, INC.
PHONE/FAX    817-461-1716

1      A.   We have off and on

2      Q.   Okay.  During the time period that Liz was

3  employed at Friendship-West, was such a system in

4  place?

5      A.   I'm not sure.  I'd have to check.

6      Q.   So as we sit here, you're not aware of any

7  documentation that would reflect her    the time she

8  came and left from work?

9      A.   Not right now, no.  I don't recall

10      Q.   On how many occurrences do you have

11  personal knowledge that she was not there on a

12  Monday?

13      A.   A few times.  I'm not sure how many, but

14  there were a few times.

15      Q.   Okay.  Were those all occasions -- when you

16  say a few, do you mean two or three?

17      A.   No, it's more than that.

18      Q.   Okay.  Is it more than 10?

19      A.   I doubt that.

20      Q.   On those occasions, do you know whether or

21  not she was not there the whole day or just maybe at

22  the specific time that you were there?

23      A.   From my understanding, she eventually

24  arrived.

25      Q.   On those occasions?

```
 1        A.    Yeah.

 2        Q.    She was just not present when you were

 3   there?

 4        A.    At least, yeah.

 5        Q.    Do you know what time of the day it was

 6   that you were there when she was not there?

 7        A.    Morning.

 8        Q.    In the mornings?  So she was late on

 9   Mondays?

10        A.    Or didn't show, from what I heard.

11              MR. LEWIS:  Okay.  Objection,

12   nonresponsive.

13              MS. JOHNSON:  Object, is responsive.

14        Q.    (By Mr. Lewis)  My question was about your

15   personal knowledge, not from what you heard from

16   other people.  Your personal knowledge is that on

17   some Mondays she was late?

18        A.    (Witness nods head.)

19        Q.    Do you have some personal knowledge that on

20   some Mondays she did not show at all?

21        A.    I'm not sure.  I don't remember.

22        Q.    What is your understanding from other

23   people on how many occurrences she did not show at

24   all on a Monday?

25        A.    That that became a habit.
```

1    Q.   Is there any documentation of that

2    anywhere?

3    A.   I don't know.

4    Q.   Did you ever counsel Elizabeth about that?

5    A.   I doubt it.

6    Q.   Did you ever ask Liz Moffitt to give her a

7    written warning or counseling about that?

8    A.   No.

9              MS. JOHNSON:   Kern, before you go into

10   a -- whenever you get ready to go into another area,

11   let's, if you don't mind, take a break.

12             MR. LEWIS:   I've got three more little

13   things to ask him about and it would --

14             MS. JOHNSON:   Right.   I didn't want to

15   stop you, but --

16             MR. LEWIS:   -- be a good break place

17   after that.

18   Q.   (By Mr. Lewis)  With regard to her not

19   showing to PALS leadership meetings, when did these

20   meetings occur?

21   A.   The first Saturday of every month.

22   Q.   At what time on Saturdays?

23   A.   10:00 a.m.

24   Q.   Is it your testimony that she never

25   attended one of these meetings?

LAURIE PURDY REPORTING SERVICE, INC.
PHONE/FAX    817-461-1716

```
 1        A.    No, she made an appearance.

 2        Q.    On how many occasions did she not make the

 3   meeting?

 4        A.    Oh, I don't know how many.  I didn't count.

 5        Q.    Okay.  When did this occur that she did not

 6   appear?  Was it early in her employment, or was it

 7   late in her employment at Friendship-West?

 8        A.    Probably late.

 9        Q.    You're saying May, June, July?

10        A.    May, June, probably -- April, May, June.

11        Q.    Did you counsel her about that?

12        A.    No.

13        Q.    Why not?

14        A.    Because I had a lot of other stuff I was

15   doing.

16        Q.    Did you ask Liz Moffitt in human resources

17   to counsel her about that?

18        A.    I doubt it.

19        Q.    Did you ask Veta Holt to counsel her about

20   that?

21        A.    No.

22        Q.    To your knowledge, was she ever issued a

23   written warning about that?

24        A.    No.

25        Q.    Was she ever asked in writing to take any
```

```
 1   corrective action about that?

 2        A.    (Witness shakes head.)

 3        Q.    Is that a "no"?

 4        A.    No.

 5        Q.    Does her job description indicate that

 6   that -- that attending these Saturday morning

 7   meetings are a requirement of the job position?

 8        A.    No.

 9        Q.    When -- and you don't recall ever speaking

10   to her about not attending these meetings?

11        A.    Not right now, no.

12        Q.    And so you don't know as to whether or not

13   there was a reason, an excuse or a medical problem or

14   some other kind of problem that prevented her from

15   attending the meeting as opposed to just not -- just

16   not wanting to be there?

17        A.    If I recall, one time she may have given me

18   an excuse.

19        Q.    That she volunteered on her own of why she

20   wasn't at the meeting?

21        A.    Right.  Right.

22        Q.    When you counseled her about -- if you ever

23   spoke to her about anything that was a performance

24   problem in her work, did she ever indicate to you

25   anything other than a good attitude about trying to
```

```
1   that?

2        A.   That she had -- was speaking to Stephanie

3   and said that if Stephanie did whatever for her that,

4   you know, she would get good publicity from me.

5        Q.   And did you -- other than hearing about it

6   from Veta, did you ask Elizabeth about that?

7        A.   No.

8        Q.   Did you give her an opportunity to explain

9   whether or not that had actually happened?

10       A.   No.

11       Q.   Did you give her a written warning or

12  counseling about that?

13       A.   No.

14       Q.   And you're not aware of it happening on any

15  other occasion?

16       A.   It would be hearsay, so, no.

17       Q.   And with regard to Reverend Wright's visit

18  in April, you mentioned that she had spoken to the

19  media?

20       A.   Uh-huh.

21       Q.   And what was it that she said to the media?

22       A.   Oh, I don't know.

23       Q.   Okay.  Well, if -- how was it she was

24  informed not to speak to the media?  Do you know how

25  that occurred?
```

1    A.    I'm not sure how she was informed, no.

2    Q.    Well, how did you learn about this

3    situation where she had supposedly spoken to the

4    media?

5    A.    I was told by Veta.

6    Q.    Did you see what she said to the media

7    reported in the news anywhere?

8    A.    I don't recall.

9    Q.    So you don't even know if it made it into

10   print or on the air what she said?

11   A.    I don't recall.

12   Q.    What do you recall Veta telling you?

13   A.    That we had put in place, in light of the

14   media storm and frenzy, a policy that only certain

15   people would speak to the media and that she had

16   violated that.

17   Q.    Did she tell you how she had violated it?

18   A.    That she spoke to the media.

19   Q.    But she didn't tell you what it was she

20   said to the media?

21   A.    No.

22   Q.    If she said Reverend -- Reverend Wright is

23   a wonderful man, you have a problem with that, her

24   saying --

25   A.    Yes.

1      A.   She shared that, yeah.

2      Q.   When you first heard about this

3 relationship with Reverend Wright, was it after the

4 date she had already been terminated?

5      A.   Yes.

6      Q.   Okay.  And you heard about it from her

7 husband?

8      A.   Correct.

9      Q.   And when you heard that, did you take any

10 steps to verify whether or not it was true?

11      A.   No.

12      Q.   Did you ever discuss it with Reverend

13 Wright?

14      A.   I told him that this was being said, yeah.

15      Q.   Did he deny that there was a relationship

16 between him and Elizabeth?

17             MS. JOHNSON:  Object to form and

18 relevancy.

19      A.   He denied that there was an affair, yeah.

20      Q.   (By Mr. Lewis)  When you say "affair," are

21 you referring to a physical --

22      A.   Physical relationship.

23      Q.   -- physical sexual relationship?

24      A.   Right.

25      Q.   Did he deny that they had engaged in

```
 1                   THE WITNESS:  Sorry.
 2        A.   -- and hoping that it was not the case.
 3        Q.   (By Mr. Lewis)  And in the course of hoping
 4   it was not the case, did you ask him whether or not
 5   it was the case?
 6                   MS. JOHNSON:  Object to relevancy --
          A.   No.
 8                   MS. JOHNSON:  -- and form.
 9        Q.   (By Mr. Lewis)  You are aware that -- have
10   you read -- well, have you read any of the e-mails
11   that have been produced in this litigation as having
     been exchanged between Elizabeth and Reverend Wright?
13        A.   Nope.
14        Q.   Why have you not read those?
15                   MS. JOHNSON:  Object to speculation.
16        Q.   (By Mr. Lewis)  Is that a conscious
     decision on your part that you don't want to read
18   them?
19        A.   Correct.
20                   MS. JOHNSON:  Object to speculation;
21   relevancy and form.
22        Q.   (By Mr. Lewis)  Why is that?
23                   MS. JOHNSON:  Object to speculation;
24   relevancy and form.
25        A.   I'm just not interested.
```

```
 1        Q.    (By Mr. Lewis)   Reverend Wright is married
 2   to a lady named Ramalah, correct?
 3        A.    No, Ramah.
 4              MS. JOHNSON:   Object to relevancy.
 5        A.    Ramah.
 6        Q.    (By Mr. Lewis)   Ramah.   Okay.   And she was
 7   married at all times during which Elizabeth Payne
 8   worked for you; Reverend Wright was married to Ramah
 9   Wright?
10              MS. JOHNSON:   Object to relevancy and
11   form.
12        Q.    (By Mr. Lewis)   Is that correct?
13        A.    Yes.
14        Q.    You still maintain a good relationship with
15   Reverend Wright?
16        A.    Yes.
17        Q.    And you still invite him to speak at your
18   church?
19        A.    Yes.
20              MS. JOHNSON:   Object to relevancy and
21   form.
22        Q.    (By Mr. Lewis)   You allow him to
23   participate as a leader in your congregation?
24              MS. JOHNSON:   Object to relevancy and
25   form.
```

```
 1        A.    No.

 2        Q.    (By Mr. Lewis)   Well, I know he's not a

 3   member, but he's going to be allowed to preach from

 4   the pulpit in your congregation?

 5        A.    He's a guest preacher, yes.

 6        Q.    Okay.   You haven't banned him from any

 7   participation at the church?

 8        A.    No.

 9             MS. JOHNSON:   Object to relevancy and

10   form.

11        Q.    (By Mr. Lewis)   And you haven't decided

12   that you are compelled to hold these e-mails that are

13   alleged to exist out there that you haven't looked

14   at, but you don't feel compelled to hold those

15   against him in any way?

16        A.    No.

17             MS. JOHNSON:   Object to relevancy and

18   form.

19        Q.    (By Mr. Lewis)   Okay.   And even though

20   you're aware of the allegations, you want to move on

21   and not hold those against him?

22             MS. JOHNSON:   Object to relevancy and

23   form.

24        A.    Yeah.

25        Q.    (By Mr. Lewis)   There was -- let me show
```

1    Q.    (By Mr. Lewis)    You mentioned earlier a

2  man.

3    A.    Jack Akana.

4    Q.    Jack Akana.

5    A.    He was employed there then.    That was

6  probably who --

7    Q.    He was there then?

8    A.    If he was, yeah, that was probably his

9  responsibility.

10    Q.    Okay.    I'll tell you what, on the

11  organizational chart, we can find -- Jack Akana would

12  be under Communications, wouldn't he?

13    A.    Correct.

14    Q.    Yeah, there's no date listed for his -- I

15  thought maybe we might find a date of his hire

16  there.

17            Do you know when Tonya Neal became the

18  director of communications?

19    A.    I don't recall.

20    Q.    Do you know, has she held that position for

21  a number of years, or has it been more recent?

22    A.    A few years.

23    Q.    On Exhibit Number 9, the version of the

24  website as it appeared sometime '05, '06 time frame,

25  in the second full paragraph, this paragraph here --

1    A.    Uh-huh.

2    Q.    -- that states that you received your

3  doctorate from Oxford University, correct?

4    A.    Uh-huh.

5    Q.    And that's not accurate.  You did not

6  receive your doctorate from Oxford.  Your doctorate

7  was from the Graduate Theological Seminary.

8    A.    Graduate Theological Foundation.

9    Q.    Yes, sir.  But you do not hold a doctorate

10  conferred upon you by Oxford University.

11    A.    No.

12    Q.    And then in Exhibit -- so Exhibit Number 9,

13  to the extent it says you received your doctorate in

14  ministry from the illustrious Oxford University in

15  Oxford, that's not correct, is it?

16        MS. JOHNSON:  Object to relevancy.

17    A.    It's correct in that that's where I studied

18  to earn my doctorate degree through the Graduate

19  Theological Foundation.

20    Q.    (By Mr. Lewis)  You studied there for a

21  couple of intensive study programs, but you also

22  studied through South Bend, Indiana, and another

23  institution other than Oxford?

24    A.    No, this was the Graduate Theological

25  Foundation.

1    Q.    Which had privileges for you to attend

2    courses at Oxford University, correct?

3    A.    To study at Oxford.

4    Q.    Yes, sir.  But you did not receive --

5    A.    That was taught by Oxford tutors.

6    Q.    But you did not receive a degree from

7    Oxford --

8                MS. JOHNSON:  Object to relevancy --

9    Q.    (By Mr. Lewis)  -- did you?

10               MS. JOHNSON:     and form.

11   A.    My degree was from the Graduate Theological

12   Foundation for having studied at Oxford University at

13   Christ Church.

14   Q.    (By Mr. Lewis)  Right.  But my question,

15   sir, is, your degree is not conferred upon you by

16   Oxford University?

17               MS. JOHNSON:  Object to asked and

18   answered; form --

19   A.    And I've already answered it.

20               MS. JOHNSON:  -- and relevancy.

21   Q.    (By Mr. Lewis)  And Exhibit Number 8, which

22   is the website as it appeared in '06 and '07, that

23   also says that you have a degree from Oxford

24   University, correct?

25   A.    Yes.

1      Q.    And then Exhibit Number 1, your current

2   degree -- the current website does not claim that you

3   received a degree from Oxford University, does it?

4      A.    Right.

5      Q.    So that's been changed?

6      A.    Right.

7      Q.    Was anybody reprimanded or disciplined for

8   posting information that you received a doctorate

9   from Oxford University on the earlier versions of the

10  website?

11                    MS. JOHNSON:  Object --

12     A.    They were corrected and counseled.

13                    THE WITNESS:  I'm sorry.

14                    MS. JOHNSON:  Object to relevancy and

15  form.

16                    THE WITNESS:  I'm sorry.

17     Q.    (By Mr. Lewis)  They were corrected and

18  counseled?

19     A.    Yes.

20     Q.    Who was?

21     A.    Tonya Neal.

22     Q.    Okay.  Was that done in writing?

23     A.    No.  It was just corrected and -- it was

24  corrected.

25     Q.    Do you recall when that occurred that she

```
 1        Q.     Do you know a lady named Liz Harrod?
 2                    MS. JOHNSON:   Object to relevancy and
 3   form.
 4        A.     No.   I know Lisa.
 5        Q.     (By Mr. Lewis)  A Lisa Harrod?
 6        A.     (Witness nods head.)
 7        Q.     Okay.   How do you know Lisa Harrod?
 8                    MS. JOHNSON:   Object to relevancy and
 9   form.
10        A.     I've preached in churches where she
11   attended or -- and/or was a member.
12        Q.     (By Mr. Lewis)  Has she ever been a member
13   at Friendship-West Baptist Church?
14                    MS. JOHNSON:   Object to relevancy and
15   form.
16        A.     Nope.
17        Q.     (By Mr. Lewis)  Where does she live
18   currently, do you know?
19                    MS. JOHNSON:   Object to relevancy and
20   form.
21        A.     No.   She was moving last time I spoke with
22   her.
23        Q.     (By Mr. Lewis)  Okay.   When is the last
24   time you spoke with her?
25                    MS. JOHNSON:   Object to relevancy and
```

```
 1   form.
 2        A.    Probably in the fall, I think.
 3              MS. JOHNSON:  Object to relevancy and
 4   form.
 5        Q.    (By Mr. Lewis)  In fall of 2009?
 6              MS. JOHNSON:  Object to relevancy and
 7   form.
 8        A.    Yeah.
 9        Q.    (By Mr. Lewis)  Where was she living at
10   that time?
11              MS. JOHNSON:  Object to relevancy and
12   form.
          A.    In Miami.
14        Q.    (By Mr. Lewis)  It has been mentioned in
15   this lawsuit that at one point Elizabeth Payne
16   received a photograph in the mail from Ms. Harrod
17   that was addressed to you, and in this photograph she
18   was scantily clad, if not topless.  Are you aware of
19   any photographs from Ms. Harrod of that nature?
20        A.    No.  I --
21              MS. JOHNSON:  Object to relevancy and
22   form.
23              THE WITNESS:  I'm sorry.
24        A.    No, I never received it.
25        Q.    (By Mr. Lewis)  Did you hear about her
```

```
 1        Q.    (By Mr. Lewis)   Ever.

 2        A.    No.

 3        Q.    Okay.   How would you describe your

 4   relationship with Ms. Harrod?

            MS. JOHNSON:   Object to relevancy and

 6   form.

          A.    Mentor to mentee.

 8            (Deposition Exhibits 10 through

 9            were marked.)

10        Q.    (By Mr. Lewis)   Let me show you    what

     does she do that you're a mentor to her about?

12            MS. JOHNSON:   Object to relevancy and

13   form.

14        A.    What does she do by way of her employment?

     I mean --

16        Q.    (By Mr. Lewis)   What is it you're mentoring

     in?

18            MS. JOHNSON:   Object to relevancy and

19   form.

20        A.    's spiritual mentoring.   It's --

21        Q.    (By Mr. Lewis)   So your relationship to her

22   is as a pastor or as a spiritual advisor?

23            MS. JOHNSON:   Object to relevancy and

24   form.

25        A.    Yeah, for the most part.
```

LAURIE PURDY REPORTING SERVICE, INC.
PHONE/FAX    817-461-1716

1          MS. JOHNSON:  Object to relevancy and

2     form.

3      A.   Yes.

4      Q.   (By Mr. Lewis)  Okay.  And let me show you

5     what has been marked as Exhibit Number 12.  Is that

6     the same Lisa Harrod that you are a mentor to?

7          MS. JOHNSON:  Object to relevancy and

8     form.

9      A.   Yes.

10     Q.   (By Mr. Lewis)  And let me show you what's

11     been marked as Exhibit Number 13.  Are you a friend

12     of Ms. Harrod's on Facebook?

13     A.   Yes.

14          MS. JOHNSON:  Object to relevancy and

15     form.

16          (Deposition Exhibits 14 and 15

17          were marked.)

18     Q.   (By Mr. Lewis)  And let me show you what

19     has been marked as Exhibit Number 14.  Do you

20     recognize that lady as Lisa Harrod?

21          MS. JOHNSON:  Object to relevancy and

22     form.

23     A.   Okay.  Yeah.

24     Q.   (By Mr. Lewis)  And let me show you what's

25     been marked as Exhibit Number 15.  Is that a blowup

1  that church?

2     A.    New Birth.

3           MS. JOHNSON:   Object to relevancy and

4  form.

5     Q.    (By Mr. Lewis)   And did you see her there

6  at the church, or did you see her outside of the

7  church?

8           MS. JOHNSON:   Object to relevancy and

9  form.

10    A.    At the church.

11    Q.    (By Mr. Lewis)   Okay.   And then did you see

12  her anywhere else outside the church after seeing her

13  then?

14           MS. JOHNSON:   Object to relevancy and

15  form.

16    A.    We had lunch.

17    Q.    (By Mr. Lewis)   Okay.   Was anyone else in

18  attendance at this lunch?

19           MS. JOHNSON:   Object to relevancy and

20  form.

21    A.    There were other people in the restaurant.

22    Q.    (By Mr. Lewis)   No, I mean, with -- at your

23  table with you and Ms. Harrod.

24    A.    No.

25           MS. JOHNSON:   Object to relevancy and