1       IN THE UNITED STATES DISTRICT COURT
2         FOR THE NORTHERN DISTRICT OF TEXAS
                  DALLAS DIVISION

3   ELIZABETH PAYNE,          )
                              )
4        Plaintiff,           )
                              )
5   VS.                       )   CIVIL ACTION NO. 3-09CV0595-B
                              )
6   FRIENDSHIP WEST BAPTIST)
    CHURCH, INC.,             )
7                             )
         Defendant.           )
8

9   ********************************************************

10       ORAL AND VIDEOTAPED DEPOSITION OF

11                  VETA HOLT

12               JANUARY 4, 2010

13  ********************************************************

14                                    COPY

15

16       ORAL DEPOSITION OF VETA HOLT, produced as a

17  witness at the instance of the Plaintiff, and duly

18  sworn, was taken in the above-styled and numbered

19  cause on the 4th day of January, 2010, at 1:00 p.m.

20  to 3:19 p.m., before Laurie Purdy, CSR, in and for

21  the State of Texas, reported by machine shorthand, at

22  the offices of Faith Johnson & Associates, L.L.P.,

23  5201 North O'Connor Boulevard, Suite 500, in the City

24  of Irving, County of Dallas, State of Texas, pursuant

25  to the Federal Rules of Civil Procedure.

```
 1          Q.    You might ask -- Carol is --
 2          A.    Up a little higher?  Oh, I'm okay?
 3                    MS. JOHNSON:  Carol, are you able to
 4     hear?
 5                    MS. LEXING:  I barely can.
 6                    THE WITNESS:  Okay.  I'll try to talk
 7     louder.  I may have to -- I don't naturally talk
 8     loud, so --
 9                    MS. LEXING:  I can hardly hear Susan
10     either for whatever reason.
11                    MS. HUTCHISON:  Okay.  I'll speak up,
12     too.
13                    MS. LEXING:  Okay.  Thank you.
14                    MS. HUTCHISON:  Okay.  We'll talk
15     louder.
16          Q.    (By Ms. Hutchison)  Are you currently
17     employed with Friendship-West Baptist Church?
18          A.    Yes.
19          Q.    And what is your official title?
20          A.    My official title is chief administrations
21     officer.  Sometimes I'll use chief operations officer
22     because it's the same thing, and people get confused
23     when I say chief administrations officer because no
24     one knows what that is.
25          Q.    Okay.  Yeah, chief operations officer is a
```

```
 1         Q.    So is Dr. Haynes the one who fired
 2    Elizabeth Payne?
 3         A.    Authorized the firing.  I actually --
 4    Liz Moffitt and myself met with her.
 5         Q.    But it was Dr. Haynes who made the decision
 6    and then asked you to execute it?
 7         A.    Right.
 8         Q.    And when Dr. Haynes told you that he had
 9    decided to fire Elizabeth Payne, did he relay that
10    information to you verbally or in writing?
11         A.    In person.
12         Q.    What did he tell you as to his reasons?
13                   MS. JOHNSON:  Object to hearsay.
14                   THE WITNESS:  Go ahead.
15                   MS. JOHNSON:  You may want to explain
16    to her that when I make an objection, she can still
17    answer.  I'm just making an objection.
18                   THE WITNESS:  Oh, okay.  All right.
19         Q.    (By Ms. Hutchison)  She makes an objection,
20    but then you --
21         A.    Then I still answer?
22         Q.    -- still answer, and then --
23         A.    Okay.  What was the question again?
24         Q.    What did Dr. Haynes tell you was his
25    reasons for firing or wanting to fire Elizabeth
```

1    Q.   Have you ever been involved in drafting or

2  creating any policies and procedures for either

3  hiring or firing employees at the church?

4    A.   No.

5    Q.   Do you know what the church's policy is

6  concerning discipline of employees?

7    A.   No.

8    Q.   Do you know whether or not the handbook

9  contains any policies related to discipline or

10  termination of employees?

11    A.   There are expectations in the employee

12  handbook, and if certain expectations aren't met, it

13  could include discipline up to and including

14  termination.

15    Q.   Does the handbook provide for any

16  discipline prior to termination?

17    A.   I don't know.

18    Q.   Have there ever been any discussions

19  amongst the hierarchy of the church as to whether or

20  not race plays a factor in hiring employees?

21        MS. JOHNSON:   Object to hearsay and

22  relevance.

23    A.   There has not been a discussion.

24    Q.   (By Ms. Hutchison)   You acknowledge that

25  all of the employees that are currently employed

```
 1    there, other than the cleaning people, are at least
 2    partially African-American?
 3         A.   Yes.
 4         Q.   And that there are no Caucasians, correct?
 5         A.   Correct.
 6         Q.   Is that ever a subject of discussion at the
 7    church?
 8         A.   No.
 9         Q.   And so the hierarchy at the church has
10    never discussed the fact that out of all of the
11    employees that are employed at the church, there
12    aren't any Caucasians?
13         A.   No.   The church is in Oak Cliff.
14         Q.   And what relevance does that have?
15         A.   Internet or any type of -- when you are
16    looking for a position and you maybe want to pull up
17    the web page, dah, dah, dah, dah, dah, we interview
18    people.  Before -- but until the last maybe two or
19    three years, the staff was around 30 people.  Most of
20    them, I think, came from the congregation, even
21    though that was before my time.  It was a smaller --
22    much smaller operation with a lot of the people being
23    part time.
24         Q.   Okay.  But the number of employees now is
25    about what?
```

1    A.   About 20 part time, 40 full time.

2    Q.   Does that include the pastors?

3    A.   Yes.

4    Q.   So altogether probably around 60?

5    A.   Yes.

6    Q.   And they're not all from the Oak Cliff

7    area, are they?

8    A.   Not all today.

9    Q.   Is it your position that there are no

10   nonAfrican-Americans that are qualified to hold any

11   of the positions?

12   A.   No.

13   Q.   Have there been any nonAfrican-Americans

14   that have applied for any of the positions?

15   A.   I don't know.

16   Q.   Do you know whether or not

17   Reverend Haynes -- is it -- do I call him Reverend

18   Haynes, Dr. Haynes?

19   A.   Either will be fine.

20   Q.   Okay.  Because I'm --

21   A.   Or pastor.  It's interchangeable for us.

22   Q.   I'm switching back and forth, and I'm not

23   sure which one is the right term.

24   A.   I know different people -- some call him

25   Reverend, some call him Doctor, some call him Pastor.

```
 1   small.  It was just trying to keep people from going
 2   out of business.  So I understand what you're
 3   saying.  So, no, it -- I mean, it may be all right
 4   for a certain period of time.  We were just trying to
 5   keep people in business for a year.  There was a time
 6   limit on it as well during a recession.  And so the
 7   premises was maybe not to shop anywhere else, but to
 8   make a consorted effort to support black business.
 9        Q.    (By Ms. Hutchison)  And do you believe that
10   supporting a business because of the race of the
11   owners of the business is discrimination in any form?
12        A.    No.
13             MS. JOHNSON:  Object to relevancy and
14   form.
15        A.    No.
16        Q.    (By Ms. Hutchison)  So telling people, for
17   example, on a radio show, We want you guys to go to
18   these specific businesses even though you don't know
19   them, we want you to go out of your way to go there
20   and support them because they're owned by white
21   people, that would not be discrimination?
22             MS. JOHNSON:  Object to relevancy and
23   form.
24        A.    No.  No.
25        Q.    (By Ms. Hutchison)  Which year was it that
```

1        Q.    (By Ms. Hutchison)   And do you remember

2   when that was?

3                  MS. JOHNSON:   Object to relevancy and

4   form.

5        A.    No.   2009.   I would say in the past six

6   months.

7        Q.    (By Ms. Hutchison)   Do you remember when it

8   was that she appeared on the radio show?

9                  MS. JOHNSON:   Object to relevancy and

10   form.

11        A.    No.   It was the same weekend.

12        Q.    (By Ms. Hutchison)   Who all participates in

13   the staff meetings?

14        A.    All full-time employees, because most of

15   the part-time employees are not there.

16        Q.    So all 40 or so full-time employees --

17        A.    Uh-huh.

18        Q.    -- are in the staff meetings?

19        A.    Yes.

20        Q.    Is it a requirement for your employees to

21   attend church services?

22        A.    No.   We have employees that are not members

23   of Friendship-West.

24        Q.    That is not a basis for terminating anyone?

25        A.    No.

1    Q.   Do the staff meetings occur on a regular

2    basis?

3    A.   Every first Friday of the month.

4    Q.   And the executive assistants are part of

5    that?

6    A.   Yes.

7    Q.   Are you aware of Elizabeth Payne missing

8    any particular meeting or event that she was supposed

9    to be at?

10   A.   She -- we have every first Saturday of the

11   month a meeting that we call PALS, preachers and

12   leaders.  The staff is required to be at the meeting

13   on the Saturday after the first Friday.  And so

14   basically it is the same -- almost the same meeting

15   again but with the leaders of the church.  She is

16   required to be there.

17   Q.   P-A-L-S?

18   A.   Uh-huh.

19   Q.   So you have the staff meeting on the Friday

20   and then the PALS meeting on the following Saturday?

21   A.   Yes.

22   Q.   And did Ms. Payne miss any of those?

23   A.   Yes, but I don't know if it was authorized

24   or not.

25   Q.   So that wasn't one of the reasons for

1       Q.   Did you ask him whether --

2       A.   No.

3       Q.   Did you ask him whether he had taken any

4  steps to correct any deficiencies before termination?

5       A.   No.

6            MS. JOHNSON:  Object to relevancy;

7  form and hearsay.

8       Q.   (By Ms. Hutchison)  Are you aware of any

9  steps taken by anyone to correct any deficiencies

10 before termination?

11           MS. JOHNSON:  Object to relevancy and

12 form and hearsay.

13      A.   I talked to Liz Payne on three different

14 occasions about some things I was concerned about,

15 but it did not have anything to do with her

16 termination.

17      Q.   (By Ms. Hutchison)  Okay.  So are you aware

18 of any steps taken by anyone to talk to her to

19 correct any behavior that was a basis for

20 termination?

21      A.   I'm not aware.

22      Q.   What are the things that you talked to her

23 about?

24      A.   She approached my facilities manager,

25 Cornell Towns, and I don't recall the conversation,

LAURIE PURDY REPORTING SERVICE, INC.
PHONE/FAX   817-461-1716

```
 1        Q.   They talked to her after she was fired?

 2        A.   Uh-huh.

 3        Q.   Right?

 4        A.   Right.

 5        Q.   But, I mean --

 6        A.   No.

 7        Q.   -- did anybody after she was fired say, oh,

 8   I was talking to her while she still worked there?

 9        A.   No.

10        Q.   What was the quote in the Fort Worth

11   Star-Telegram?

12        A.   "He's a great man."

13        Q.   That's it?

14        A.   Yeah, that's it.  And she hadn't even met

15   him.  It was about Dr. Wright.

16        Q.   Well, certainly you can form an opinion --

17   I never met Martin Luther King and I think he was a

18   great man.

19        A.   I know, but I don't want you talking to the

20   media, period, anybody.  And that wasn't for her.

21   That was for staff.  The only people that communicate

22   with the media would be Dr. Haynes and Reverend Hill.

23        Q.   I understand.  But you're not saying that

24   her quote in the Star-Telegram was harmful in any

25   way, are you?
```

1      A.    No.

2      Q.    Did she have -- but before you talked --

3  before the quote came out in the Star-Telegram, did

4  Elizabeth Payne have any way to know that she wasn't

5  supposed to say he was a great man to the media?

6              MS. JOHNSON:   Object to relevancy and

7  form.

8      A.    I don't know.  I do know a staff-wide

9  e-mail went out.  I don't know what the date was that

10 he gave instructions for the staff not to talk to the

11 media.

12     Q.    (By Ms. Hutchison)  If the e-mail went out

13 after the quote in the Star-Telegram, then Elizabeth

14 Payne didn't have any way to know she wasn't supposed

15 to say he was a great man to the reporter, did she?

16     A.    Correct.

17     Q.    Did she get written up for any of these

18 things?

19     A.    No.

20     Q.    Could you have written her up had you

21 determined that it was the appropriate response to

22 what she did?

23     A.    Typically we'd give a verbal warning first,

24 and that's what I did.

25     Q.    Okay.  But you could have written her up or

1 specifically tell them?

2  A. You would have to ask them.  That's my

3 take.  That's what they told me or that was

4 communicated to me.

5  Q. Okay.  And my question to you is, what did

6 they specifically tell you that she specifically told

7 them?

8     MS. JOHNSON:  Object to hearsay.

9  A. All reporter -- all calls coming into the

10 switchboard from reporters, be it newspaper, radio --

11 and that's my take on it -- all reporters' calls

12 should be transferred to her.

13  Q. (By Ms. Hutchison)  And the receptionist

14 said okay and didn't do anything else about it?

15  A. They did something about it by contacting

16 Tonya.

17  Q. Okay.  And was this documented anywhere?

18  A. I don't know.

19  Q. Are you aware of it being documented?

20  A. I didn't document it, but I don't know that

21 it was not documented at all.

22  Q. Have you seen any documentation of it?

23  A. No.

24  Q. Was this -- but this wasn't anything that

25 Dr. Haynes mentioned as a reason for termination, was

```
 1        Q.   -- adultery?  And the part -- and so you
 2   can have sex with somebody you're not married to as
 3   long as you're not married to somebody else?
 4             MS. JOHNSON:   Object to relevancy and
 5   form.
 6        A.   I wouldn't say that, but these people were
 7   hired after this baby was born, so I don't even know
 8   what thought was put into it.
 9        Q.   (By Ms. Hutchison)  Was Elizabeth Payne's
10   relationship with Reverend Wright a factor in her
11   termination?
12        A.   No.
13        Q.   When did you find out that she had had any
14   kind of communications with Reverend Wright that were
15   not okay?
16        A.   One of our employees came to see me, and
17   she listed -- she had some concerns about Liz Payne.
18   Pastor was traveling.  Her boss, Rick, was
19   traveling.  And she listed maybe four or five things
20   that she -- complaints she had about Liz Payne, and
21   that was one of them.  The other ones being that she
22   felt like she was doing a lot of Liz's work.  Liz
23   would say that she was behind and would ask her to
24   help her catch up.  And she said she finally found
25   out that she was -- or realized she was taking some
```

1    anyone else on behalf of him?

2                    MS. JOHNSON:  Object to form and

3    relevancy.

4        A.   No.

5        Q.   (By Ms. Hutchison)  When you met with

6    Elizabeth to tell her that she was fired, did you

7    tell her why?

8        A.   No.

9        Q.   Why not?

10                   MS. JOHNSON:  Object to relevancy.

11       A.   I terminated her the way I was taught at

12   Brinker International, and which was basically a one

13   sentence in saying you're -- we're terminating your

14   relationship -- or your employment with

15   Friendship-West as of today, and Liz Moffitt is going

16   to give you the instructions from this point on.  And

17   so Liz talked to her about making sure she left her

18   phone and her keys, her this, her that, and that we

19   would box up her personal items and FedEx it to her.

20   And so she, in turn, asked me if she could get her

21   son's phone number out of her phone, and I told her

22   no, because she had shared with me that she had a

23   court order not to be in contact with her son.

24       Q.   (By Ms. Hutchison)  Did you ever see the

25   court order?

1    Q.    Or that Liz -- that Elizabeth had any

2  personality conflicts with anyone?

3    A.    I knew that there were going to be

4  meetings, but I don't know the details behind it.

5    Q.    What do you mean there were going to be

6  meetings?

7    A.    Well, I knew that there had been meetings.

8  Let me put it like that.

9    Q.    Okay.  What did you know about the

10  meetings?

11    A.    Well, that early on that Liz had maybe -- I

12  mean, rubbed some people the wrong way, and it was

13  just a matter of talking it through.  I don't really

14  know the situations.  I don't know what happened.  I

15  just know that Liz had met with Liz Payne, and I

16  can't even tell you the other employees.

17    Q.    So as far as you know, that wasn't related

18  to her termination?

19    A.    As far as I know.

20    Q.    And as far as you know, the information

21  given to you by Lora Clack was not related to her

22  termination?

23          MS. JOHNSON:  Object to relevancy and

24  form.

25    A.    Yes.  As far as I know, that is correct.

98

1   any e-mails between Dr. Wright and Elizabeth Payne?

2        A.   When Jay Gormley brought them to the

3   church.

4        Q.   Do you know when that was?

5        A.   It was after Liz was terminated, maybe a

6   month or so.

7        Q.   Okay.  And you-all interviewed someone to

8   replace Elizabeth Payne, did you or did you not?

9        A.   Correct.

10        Q.   And who was that person?

11        A.   Darlene Alexander.

12        Q.   And what is her racial makeup?

13        A.   Her father is Mexican.  Her mother is

14   black.

15        Q.   And did you-all interview only

16   African-Americans for the position when you-all

17   replaced Liz Payne with Darlene?

18        A.   I wasn't involved in all of the

19   interviewing.  I don't know if I left town, but I

20   remember only being involved in a couple.  I know

21   there were many more people that Liz Moffitt

22   interviewed.

23        Q.   When you-all do interview and do post, do

24   you-all post and say job for African-American only?

25        A.   No.

1   what did they teach you about what you needed to do

2   to fire somebody?

3            MS. JOHNSON:  Object to relevancy and

4   form.

5       A.   A verbal warning.  Every case was looked at

6   individually.

7       Q.   (By Ms. Hutchison)  Okay.  Did they teach

8   you to document the reasons for termination?

9            MS. JOHNSON:  Object to relevancy and

10  form.

11      A.   Yes.

12      Q.   (By Ms. Hutchison)  Are you aware of any

13  documentation of the reasons for Elizabeth Payne's

14  termination?

15           MS. JOHNSON:  Object to relevancy and

16  form.

17      A.   I'm sure that Liz Payne -- Liz Moffitt

18  documented -- made the document.

19      Q.   (By Ms. Hutchison)  Have you seen it?

20      A.   No.

21      Q.   And are you aware of or have you seen any

22  documentation of any reasons for termination?

23      A.   No.

24           MS. JOHNSON:  Object to relevancy and

25  form.

```
 1        Q.    (By Ms. Hutchison)  When you went in to
 2   fire Elizabeth Payne, did you instruct anybody to
 3   document the reasons for termination?
 4                MS. JOHNSON:  Object to relevancy and
 5   form.
 6        A.    No.
 7        Q.    (By Ms. Hutchison)  At that time, did you
 8   ask anybody whether or not there was any documented
 9   justification for firing her?
10                MS. JOHNSON:  Object to relevancy and
11   form; hearsay.
12        A.    No.
13                MS. HUTCHISON:  Pass the witness.
14                MS. JOHNSON:  No further questions at
15   this time.  We'll reserve any further questioning to
16   a later date.
17                MR. FOREMAN:  Going off the record at
18   3:19 p.m.
19                (Deposition proceedings concluded
20                 at 3:19 p.m.)
21
22
23
24
25
```

1      IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
2                   DALLAS DIVISION

3   ELIZABETH PAYNE,            )
                                )
4        Plaintiff,             )
                                )
5   VS.                         )  CIVIL ACTION NO. 3-09CV0595-B
                                )
6   FRIENDSHIP WEST BAPTIST)
    CHURCH, INC.,               )
7                               )
         Defendant.             )
8

9   ********************************************************

10       ORAL AND VIDEOTAPED DEPOSITION OF

11                   TONYA NEAL

12               JANUARY 4, 2010

13  ********************************************************

14                   COPY

15

16       ORAL DEPOSITION OF TONYA NEAL, produced as a

17  witness at the instance of the Plaintiff, and duly

18  sworn, was taken in the above-styled and numbered

19  cause on the 4th day of January, 2010, at 9:35 a.m.

20  to 12:07 p.m., before Laurie Purdy, CSR, in and for

21  the State of Texas, reported by machine shorthand, at

22  the offices of Faith Johnson & Associates, L.L.P.,

23  5201 North O'Connor Boulevard, Suite 500, in the City

24  of Irving, County of Dallas, State of Texas, pursuant

25  to the Federal Rules of Civil Procedure.

```
 1        A.   Yes, he does.

 2        Q.   And who is his assistant?

 3        A.   Darlene Alexander.

 4        Q.   Did he replace Elizabeth Payne?

 5        A.   Yes.

 6        Q.   And is she African-American?

 7        A.   She's biracial.

 8        Q.   And what are the races that she is?

 9        A.   I don't -- I know she's half black.  I

10   don't know the other.

11        Q.   What is it that makes you believe she's

12   biracial?

13        A.   Because I was told she was.

14        Q.   Who told you that?

15        A.   I don't remember.  I don't remember.

16        Q.   What happened to the other coordinators

17   that you worked with on the healthy marriage

18   initiative?

19        A.   They're -- well, one of them is no longer

20   there.

21             MS. JOHNSON:  Object to relevancy.

22        A.   And that's Andrea.

23        Q.   (By Ms. Hutchison)  Okay.  What about the

24   other three?

25        A.   They're still a part of the grant.
```

33

```
 1   oversee the media sales area.  I oversee the copy
 2   center.  I oversee the bookstore.  I also -- I deal
 3   with the media, of course, and I'm over the church
 4   magazine.  Gosh.  The website, of course, I told
 5   you.  The graphics department, the print department.
 6   That's the gist of it.
 7        Q.   So if there's something that's going to be
 8   printed to be distributed, that comes out of the
 9   print department?
10        A.   It comes -- yes.
11        Q.   Now --
12        A.   Unless it's outsourced, but, yes.
13        Q.   Okay.  The pastors, the ministers
14   frequently speak at other places, right?
15        A.   Uh-huh.
16        Q.   And when they do that, is there frequently
17   printed material that goes along with that?
18        A.   If -- normally what the printed material
19   and the pastors -- if you're saying when they do
20   something from the outside, their assistants -- they
21   have privy to like confidential information and
22   things.  I mainly work with the ministries, per se.
23   So if the singles are going to have an event, you
24   know, they do all their stuff on -- you know, in that
25   way through our graphics department and stuff like
```

```
 1        A.    I don't have an opinion as to how she got

 2  along.

 3        Q.    But as far as you're concerned, she got

 4  along with you fine?

 5        A.    Fine, yes.

 6        Q.    Are you aware of anything that she did or

 7  didn't do that you would criticize?

 8        A.    I would say just -- the only thing that I

 9  would criticize is there were two projects that we

10  worked, and the handling of one of the projects that

11  made it a little stressful on the side of the

12  printing.

13        Q.    Okay.  What are the two projects that you

14  worked with her on?

15        A.    One of the projects was a Harvard project,

16  and then the other project was Pastor Haynes' resume.

17        Q.    When did you work with her on the Harvard

18  project?

19        A.    I don't remember the date of the Harvard

20  project.

21        Q.    Do you remember the year?

22        A.    It was -- well, the year that she was

23  there.

24        Q.    I guess it would have to be '08, wouldn't

25  it, 2008?
```

1       A.   The year she was there, because she

2   wasn't -- yeah.

3       Q.   Do you remember if it was at the beginning

4   or the middle or the end?

5       A.   The Harvard project?  No, I don't remember.

6       Q.   What was the Harvard project?

7       A.   Liz had contacted me to let me know that

8   she had a project to do for Pastor Haynes and that

9   she had to send it to wherever he was to be

10  distributed.  I believe it was Harvard.  And she told

11  me of a portion that I needed to do, and then there

12  were other pieces that some of the other pastors and

13  the ministers had responsibility of doing.  And

14  that's -- that was the project.

15      Q.   So she was trying to coordinate information

16  from various sources to put it all together to print

17  and send to Pastor Haynes?

18      A.   Yes.

19      Q.   And why was she contacting you about that?

20      A.   Because there was a piece within that

21  project that I needed to submit as well to her.

22      Q.   And do you remember what piece that was?

23      A.   I remember it being just overall    overall

24  content about the church.

25      Q.   Sort of a this is who we are kind of thing?

1    put together into one document?

2          A.    Yes.

3          Q.    Was there any piece that anybody else was

4    submitting or writing that you're aware of?

5          A.    Our HR person had the organizational chart.

6          Q.    Liz Moffitt?

7          A.    Yes.

8          Q.    Okay.  So she had the org chart and she was

9    submitting that piece?

10         A.    Yes.

11         Q.    Anybody else that you can remember?

12         A.    That's about all I can remember as far as

13   that goes.

14         Q.    Do you know whether or not Elizabeth Payne

15   herself wrote any part of the packet?

16         A.    That I'm not sure about.

17         Q.    So as far as you know all of the material

18   that was written was submitted by other people, and

19   Elizabeth's job was to coordinate it into a document?

20         A.    Yes.

21         Q.    And was there a problem in that regard?

22         A.    As far as --

23         Q.    Well, I mean, what's your criticism of how

24   she handled it?

25         A.    Oh, it was just in getting all the pieces.

1   Because what we had to do on my side is to put it in

2   some kind of booklet form for her.  So initially, I

3   believe, she said that she needed a cover for it,

4   which the graphics department did do the cover for

5   her.  And she just needed it to be one   one

6   document that was to be printed and sent to

7   Pastor Haynes.

8       Q.   Okay.  So she was going to gather all the

9   information and give it back to the communications

10  department who was going to actually do the printing

11  of the document?

12      A.   Right.

13      Q.   And was it just that it took her too long

14  to do it, or what's the -- where was the problem

15  area?

16      A.   Well, it was -- it was getting all of the

17  information in time enough to be able to put it --

18  you know, put it into that booklet format to print

19  and mail out.

20      Q.   So there was a deadline that you were up

21  against?

22      A.   Right.

23      Q.   And you needed a certain amount of lead

24  time to be able to get it printed --

25      A.   Correct.

1    that deals with morals relating to sexual relations

2    outside of wedlock, then that would apply to

3    Mr. Akana and Ms. Bottom, wouldn't it?

4         A.   If it's written, yes.   If it's written

5    somewhere, yes.

6         Q.   But you're not aware of anyone raising the

7    issue of whether or not either one of them violated

8    any morals provision of the church?

9         A.   No.

10        Q.   Did you ever hear anyone make any comments

11   about Ms. Payne's race or national origin?

12        A.   No.

13        Q.   Was there ever any discussion that you're

14   aware of about the fact that the church employs all

15   African-Americans?

16        A.   No.

17        Q.   Are you aware of anything that the church

18   does to try to recruit or hire nonAfrican-Americans?

19        A.   No.

20        Q.   Does it ever -- is it ever a concern or a

21   curiosity to you that the church employees are all

22   African-Americans?

23             MS. JOHNSON:   Object to relevancy.

24        A.   No.

25        Q.   (By Ms. Hutchison)   Why not?

1   or creating any of the information?

2        A.   I'm not sure, no.

3        Q.   In what manner did she provide it to you?

4        A.   She e-mailed it.  Now, what format, I can't

5   remember what format.

6        Q.   That's what I was going to ask you, whether

7   it was like a .pdf or Word documents or --

8        A.   I can't remember what format it was.

9        Q.   Did she send it to you all in one document

10  or as different pieces from different people?

11       A.   I can't remember.

12       Q.   Was it mailed to you or someone in your

13  department?

14       A.   It was e-mailed to me.

15       Q.   Okay.  And then you -- did you just print

16  off what she e-mailed to you?

17       A.   No.  We put it into a booklet format.

18       Q.   And who did that?

19       A.   Jack Akana.

20       Q.   And how did he know what kind of booklet

21  format to use?

22       A.   What do you mean how did he know?

23       Q.   How did he know what to do with the

24  information?

25       A.   I told him that she wanted it in booklet

100

```
 1   form.
 2        Q.    And booklet form is a term of art or is
 3   there some     he can choose from different kinds of
 4   booklet forms or --
 5        A.    Well, he's a graphic artist, and he does
 6   layout and design.  We use a -- he will use software
 7   called InDesign.  And page by page, whatever she
 8   submitted is how we put it in order.
 9        Q.    So the software is called InDesign?
10        A.    Uh-huh.
11        Q.    Is that correct?
12        A.    Yes.
13        Q.    And so he takes that software and then
14   takes the information, and he creates the design of
15   the booklet using the software?
16        A.    Right.
17        Q.    And he does that based upon his
18   determination as to what would be the best design for
19   it?
20        A.    Well, it's a booklet.  He just puts it in a
21   booklet format.  So there's a template.  You just put
22   it -- drop it into the template.
23        Q.    Okay.  And how did he know which piece of
24   information would go in which part of the template?
25        A.    It was based on what Liz sent.
```